UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x

DONALD DEAN JOHNSON,  :  Civil Action No. 11-cv-06341-PAC
                      :
            Plaintiff,  :  CLASS ACTION
                      :
     vs.  :  CONSOLIDATED AMENDED
                      :  COMPLAINT FOR VIOLATIONS OF
SEQUANS COMMUNICATIONS S.A., et al.,  :  FEDERAL SECURITIES LAWS
                      :
           Defendants.  :  DEMAND FOR JURY TRIAL

---------------------------------------------------------- x

Lead Plaintiffs Joseph C. Raines, Venugopal Nalakonda, Dave Auyeung, Scott M. Callan, and Gwendolyn January ("Lead Plaintiffs"), by their undersigned attorneys, on behalf of themselves and the class they seek to represent, for their Consolidated Amended Complaint for Violations of the Federal Securities Laws (the "Complaint"), allege the following upon knowledge as to their own acts, and upon the investigation conducted by Lead Plaintiffs' counsel as detailed below.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased the American Depositary Shares ("ADSs") of Sequans Communications S.A. ("Sequans" or the "Company") pursuant and/or traceable to the Company's initial public offering on or about April 14, 2011 (the "IPO" or "Offering"), as well as purchasers of the Company's ADSs between April 14, 2011 and July 27, 2011, inclusive (the "Class Period"), seeking to pursue remedies under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o], Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v], Section 27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §§1331 and 1337.

4.      Venue is properly laid in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District, and the IPO was marketed in this District.

5.      In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the New York Stock Exchange ("NYSE").

## BASIS OF ALLEGATIONS

6.      The allegations herein are based upon the investigation conducted by and under the supervision of Lead Plaintiffs' counsel, which included reviewing and analyzing information relating to the relevant time period obtained from numerous public and proprietary sources including, *inter alia*, SEC filings, other regulatory filings and reports, publicly available annual reports, press releases, published interviews, news articles and other media reports (whether disseminated in print or by electronic media), and reports of securities analysts and investor advisory services, in order to obtain the information necessary to plead Lead Plaintiffs' claims with particularity where necessary.  In the course of their investigation of the underlying claims, certain former Company employees and other individuals who possessed direct knowledge of the wrongdoing alleged herein were interviewed.  Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## PARTIES

**Plaintiffs**

7.      Plaintiff Joseph C. Raines purchased Sequans ADSs, as set forth in the certification previously filed with the Court and incorporated herein by reference, pursuant and/or traceable to the Company's IPO, and was damaged thereby.

8.      Plaintiff Venugopal Nalakonda purchased Sequans ADSs, as set forth in the certification previously filed with the Court and incorporated herein by reference, pursuant and/or traceable to the Company's IPO, and was damaged thereby.

9.      Plaintiff Dave Auyeung purchased Sequans ADSs, as set forth in the certification previously filed with the Court and incorporated herein by reference, pursuant and/or traceable to the Company's IPO, and was damaged thereby.

10.      Plaintiff Scott M. Callan purchased Sequans ADSs, as set forth in the certification previously filed with the Court and incorporated herein by reference, pursuant and/or traceable to the Company's IPO, and was damaged thereby.

11.      Plaintiff Gwendolyn January purchased Sequans ADSs, as set forth in the certification previously filed with the Court and incorporated herein by reference, pursuant and/or traceable to the Company's IPO, and was damaged thereby.

**Defendants**

12.      Defendant Sequans is a designer, developer, and supplier of 4G semiconductor solutions for wireless broadband.  The Company was founded in 2003 and is based in Paris, France, with additional offices throughout the world, including the United States.

(a)      Defendant Dr. Georges Karam ("Karam") served as Chief Executive Officer and Chairman of the Board of Directors of the Company at relevant times herein.  Karam personally sold 117,574 shares in the IPO for $1,175,740.

- 3 -

(b)      Defendant Deborah Choate ("Choate") served as Chief Financial Officer of the Company at relevant times herein.

(c)      Defendant Michael Elias ("Elias") served as a director of the Company at relevant times herein.  He was appointed to the board as the candidate proposed by the private equity firm Kennet Partners, of which he is a managing director.  Kennet Partners was a major shareholder of the Company at the time of the IPO, and the firm sold 121,822 shares in the Offering for $1,218,220.

(d)      Defendant James Patterson ("Patterson") served as a director of the Company at relevant times herein.

(e)      Defendant David Ong ("Ong") served as a director of the Company at relevant times herein.  He was appointed to the board as the candidate proposed by venture capital firm Add Partners, of which he is an Investment Director.  Add Partners was a major shareholder of the Company at the time of the IPO, and the firm sold 165,419 shares in the Offering for $1,654,190.

(f)      Defendant Hubert de Pesquidoux ("Pesquidoux") served as a director of the Company at relevant times herein.

(g)      Defendant Dominique Pitteloud ("Pitteloud") served as a director of the Company at relevant times herein.

(h)      Defendant Alok Sharma ("Sharma") served as a director of the Company at relevant times herein.

(i)      Defendant Zvi Slonimsky ("Slonimsky") served as a director of the Company at relevant times herein.  Slonimsky personally sold 8,202 shares in the IPO for $82,020.

(j)     Defendant T. Craig Miller ("Miller") served as the Company's U.S. Representative at relevant times herein.

(k)     Defendants Karam, Choate, Elias, Patterson, Ong, Pesquidoux, Pitteloud, Sharma, Slonimsky, and Miller are collectively referred to herein as the "Individual Defendants." Each of the Individual Defendants signed the Registration Statement (defined below) issued in connection with the IPO.

13.     Defendants UBS Limited ("UBS") and Jefferies & Company, Inc. ("Jefferies") (the "Underwriter Defendants") served as the lead underwriters for the IPO and helped to draft and disseminate the Prospectus, and participated in road shows, for the IPO. UBS maintains its principal United States executive offices in this District and Jefferies' executive offices are in this District. UBS and Jefferies failed to perform adequate due diligence in connection with their roles as underwriters for the IPO and were negligent in failing to ensure that the Registration Statement and Prospectus were prepared properly and accurately. The Underwriter Defendants, along with the other underwriters to the Offering, were paid almost $5.4 million in connection with the IPO.

## CLASS ACTION ALLEGATIONS

14.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons other than Defendants who purchased the ADSs of Sequans pursuant and/or traceable to the Company's IPO on or about April 15, 2011, as well as purchasers of the Company's ADSs between April 15, 2011 and July 27, 2011, inclusive and who were damaged thereby (the "Class"). Excluded from the Class are Defendants herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and

the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

15.     The members of the Class are so numerous that joinder of all members is impracticable.  Sequans sold more than 7.7 million ADSs in the IPO.  The precise number of Class members is unknown to Lead Plaintiffs at this time but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of Sequans or its transfer agent or the underwriters to the IPO.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

16.     Lead Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Lead Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

17.     Lead Plaintiffs' claims are typical of the claims of the other members of the Class because Lead Plaintiffs' and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Lead Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

18.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Lead Plaintiffs know of

no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

19. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether the Prospectus and Registration Statement issued by Defendants to the investing public in connection with the IPO negligently omitted and/or misrepresented material facts about Sequans and its business; and

(c) The extent of injuries sustained by members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

20. Sequans is a French company incorporated as a *société anonyme* (S.A.) under the laws of the French Republic on October 7, 2003. The Company describes itself as a designer, developer, and supplier of 4G semiconductor solutions for wireless broadband applications. The Company's solutions incorporate baseband processor and radio frequency transceiver integrated circuits along with its proprietary signal processing techniques, algorithms, and software stacks. The Company's manufacturing, testing, and assembly take place in Taiwan and Singapore.

21. The Company's sales cycle typically takes 12 months or more to complete. The Company's solutions are generally incorporated into customers' products at the design stage. Before customers select and purchase the Company's solutions, the Company, through its sales

agents and field-applications engineers, provide the end customers with technical assistance in the use of the solutions in their products.

### The IPO

22.     On or about March 22, 2011, Sequans filed with the Securities and Exchange Commission ("SEC") a Form F-1 Registration Statement and four amendments thereto (the "Registration Statement") for the IPO. On or about April 14, 2011, the Prospectus with respect to the IPO (the "Prospectus"), which forms part of the Registration Statement, became effective, and 7.7 million shares of Sequans ADSs were sold to the public at $10 per ADS, thereby raising $77 million.

### Wireless Standards Background

23.     The term 4G stands for fourth generation and refers to the newest generation of wireless standards that provide for higher data rates and more reliable service. Networks that use 4G standards and equipment allow users to stream mobile multimedia, such as TV broadcasts and online games, with speeds up to 10 times faster than the previous third-generation standards (*i.e.*, 3G).

24.     The two main wireless protocols that are referred to as 4G are WiMAX ("WiMAX") (standing for Worldwide Interoperability for Microwave) and LTE ("4G LTE") (standing for Long Term Evolution). WiMAX is used by Sprint, the third largest wireless telecommunications network in the United States, in phones and other wireless devices that run on its network. 4G LTE is used by the two largest telecommunications networks in the United States, AT&T Mobility ("AT&T") and Verizon Wireless ("Verizon"). Real-world, independent speed tests show that 4G LTE is as much as nine times faster than WiMAX.

25.     4G LTE can be further categorized based on duplex schemes into FDD-LTE, which utilizes the FDD duplex scheme, and TDD-LTE, which utilizes the TDD duplex scheme.

A duplex scheme allows cellular communications systems to transmit and receive data simultaneously.  There are two main duplex schemes: (i) frequency division duplex ("FDD") uses two channels, one for transmit and the other for receiver; and (ii) time division duplex ("TDD") uses one frequency, but allocates different time slots for transmission and reception. As of the date of the IPO, there were 16 4G LTE networks operational in the world, each of them utilized the FDD-LTE standard, and no commercial TDD-LTE networks had yet been launched.

### Sequans Was Dependent Upon Sprint and WiMAX at the Time of the IPO

26.     As of the date of the IPO, Sequans-designed 4G chips were used in only two smartphones, both made by HTC and both used only on Sprint's 4G WiMAX network: the HTC EVO 4G, launched by Sprint in the United States in June 2010, and the HTC EVO Shift, launched by Sprint in January 2011.  The chips sold to HTC for use in the HTC EVO 4G accounted for 66% of Sequans' revenue in 2010.

27.     Sprint, with its 4G WiMAX network, was the first wireless carrier to offer 4G smartphones in the U.S. and enjoyed a virtual monopoly until Verizon launched its 4G LTE network and released the HTC Thunderbolt nine months later on March 17, 2011.   The Thunderbolt looks very much like the EVO 4G with many of the same features.  The main difference was the 4G standard that each respective network utilized.  The HTC phones sold through Sprint ran on Sprint's 4G WiMAX network, and the HTC Thunderbolt, which used a 4G chip by Qualcomm, ran on Verizon's much faster 4G LTE network.

28.     On March 21, 2011, after releasing the Thunderbolt, Verizon announced the upcoming availability of five more 4G LTE devices, including devices manufactured by LG, Motorola, and Samsung.

29.     In addition to being forced to cope with competing wireless carriers with faster networks than Sprint's WiMAX network, the EVO 4G and EVO Shift smartphones were starting

- 9 -

to face competition from within Sprint. By the time of the IPO, Sprint offered another 4G WiMAX phone made by Samsung, and two more 4G devices, from Google and Motorola, were expected soon. None of these new devices used Sequans chips.

### Growth in the U.S. WiMAX Market Hits a Wall

30.     Sprint does not own its own 4G network and it was dependent on Clearwire Corp. and its subsidiary Clearwire Communications, LLC (together "Clearwire") to build, launch, and operate a viable WiMAX network. Since most of Sequans' revenue was derived from phones that run exclusively on Sprint's network, Sequans relied on Clearwire as well.

31.     Clearwire launched its WiMAX network in 2008, giving it a two-year jump start on competitors. Due to various missteps, however, Clearwire had squandered its huge lead in 4G WiMAX, and by the beginning of 2011, Clearwire lacked the funds to continue expanding into new markets.

32.     By mid-2010, there was a strong shift away from WiMAX and towards 4G LTE. For example, the Russian telecommunications company Yota, which had been using the WiMAX standard, announced in May 2010 that it would completely switch to 4G LTE. Prior to its announcement, Yota had been planning to launch WiMAX in 15 more Russian cities. Instead, Yota chose to abandon the technology and effectively rebuild its entire network. The move was a blow to the beleaguered WiMAX industry.

33.     By March 2011, because of Clearwire's financial strain, WiMAX expansion in the U.S. was brought to a near halt – well short of complete coverage, and on March 10, 2011, one month before the IPO, Clearwire's CEO resigned.

34.     By the beginning of 2011, 4G LTE was on the rise and WiMAX had fallen out of favor and was viewed as an outdated technology. According to a January 1, 2011 article by Information Gatekeepers Inc. ("IGI"), a well-respected source for wireless-industry information:

- 10 -

"When it comes to mobile network infrastructure discussions, LTE is the name on everyone's lips." Another article by IGI during January 2011 summarized an industry report by Research and Markets titled, *LTE: Global Outlook and Forecasts 2010-2014*, and stated in part:

> This report summarizes activity to date in the global LTE market, assesses the key drivers behind the move towards 4G LTE rather than WiMAX. LTE has now become the most widespread platform of choice for operators looking to migrate to the next generation of mobile broadband services. The weight of the backing and investment thrown behind LTE worldwide is such that, even with only a handful of commercial service launches to its name, LTE already has greater commercial credibility than its principal rival, WiMAX.

35.    Indeed, even Sequans' main customer HTC was moving away from WiMAX. As stated in a January 2011 article in *The Taiwan Economic News*, "After launching two 4G phones, namely EVO 4G and Mytouch 4G, in 2010, [HTC] now is increasingly devoted to development of new smartphones operating on the LTE network, and has expanded its cooperation with related telecom operators in the U.S." Another article around that time, in Associated Press Online, stated that "WiMAX looks set to be a niche technology, while the rest of the industry adopts LTE."

36.    In early 2011, before the IPO, research firm HIS iSuppli reported that 4G LTE by 2014 will have more than nine times as many subscribers as WiMAX: "Worldwide LTE subscribers will increase quickly in the next two years, surpassing those of WiMAX in 2012. In 2014, LTE subscribers will reach 303.1 million, compared to 33.4 million for WiMAX."



4G Worldwide Subscriber Forecast (Millions of Subscribers)

37.     Even Sprint recognized that WiMAX was on the way out.  The chief of networks for Sprint – the sole operator using the EVO 4G with the Sequans chip – told a roundtable discussion at the Mobile World Congress during February 2011 that Sprint was determining whether it should roll out 4G LTE as its competitors were.

38.     At the time of the IPO, 4G LTE was expanding by leaps and bounds, but WiMAX was stagnant.  By March 2011, because of Clearwire's financial strain, WiMAX expansion in the U.S. was brought to a near halt and well short of complete coverage and  Clearwire had no plans for any new WiMAX markets in 2011.  Indeed, even ongoing WiMAX projects were abruptly stopped.  According to a former employee of Bechtel Construction, who worked on Clearwire's WiMAX buildout in Denver, Colorado, the Denver project was stopped in October 2010 with only half of the work completed.  And, by the time of the IPO, even Clearwire said it might turn to 4G LTE if it could obtain funding.

39.     At the same time that Clearwire's deployment of WiMAX was at a standstill, Verizon and AT&T were rapidly expanding their respective 4G LTE networks. Verizon launched its 4G LTE market in December 2010, covering 38 markets. In January 2011, Verizon announced plans to expand into 49 markets. Then, on March 22, 2011, Verizon announced another 59 markets that would see 4G LTE before the end of 2011.

40.     This move to 4G LTE was a global trend. In February 2011, four of Russia's largest telecom operators agreed to facilitate a rollout of a national 4G LTE network. Each firm agreed to buy traffic from Yota and lease its 4G LTE facilities. In March 2011, Saudi Arabia announced that it would use 4G LTE – not WiMAX – as its first 4G network.

41.     Although WiMAX was used in India, WiMAX would not have much of a future there because operators in India were also dropping WiMAX for 4G LTE. As reported on May 2, 2011 on Newstex Web Blogs:

> After WiMAX operators in Europe have all but closed down, now it appears that India's WiMAX operators are keen on avoiding their fate by moving to LTE: Indian operator Mahanagar Telephone Nigam Ltd. (MTNL) has decided to indefinitely postpone its plan to roll out WiMAX networks in Delhi and Mumbai, the two metro markets where it offers its services . . . Its not surprising that MTNL has decided to postpone its WiMAX plans for now. With most of the other BWA license holders deciding to roll out networks using Long Term Evolution Time Division Duplex (LTE TDD) rather than WiMAX, the latter technology faces an uncertain future in India.

42.     Not only was 4G LTE growing faster than WiMAX, 4G LTE was also technologically superior. This superiority was most apparent when comparing two almost identical devices, the HTC EVO 4G running on Sprint's WiMAX network and the HTC Thunderbolt running on Verizon's 4G LTE network. In an online article, posted two weeks before the IPO, titled *Verizon LTE 'Blows Away' Sprint's WiMAX in 1,000 Speed Tests*, it was determined that the 4G LTE network's download speeds were up to nine times faster than

WiMAX's. The article also concluded that 4G LTE was more reliable and offered better

coverage:

> In the tests, Verizon's LTE network averaged speeds of 9Mbps down and 5Mbps
> up while Sprint's WiMAX network averaged about 1Mbps both down and up.
> Verizon's LTE speeds peaked at 19Mbps down and 10Mbps up during the tests.
> Piecyk also found that Verizon Wireless' LTE network was more reliable than
> Sprint's WiMAX offering, and it offers better coverage. (Mbps stands for
> *millions of bits per second* or *megabits per second* and is a measure of bandwidth
> on a telecommunications medium.)

[Emphasis added.]

| Hotspot device | Network Technology | Test device | Average Down (Mbps) | Average Up (Mbps) | Latency (ms) | # of tests |
|---|---|---|---|---|---|---|
| ThunderBolt | LTE | Apple iPad 2 | 7.37 | 4.30 | 202 | 129 |
| ThunderBolt | LTE | Toshiba Laptop | 9.28 | 4.64 | 79 | 125 |
| *Average In-Building* | | | *8.31* | *4.47* | *141* | *254* |
| | | | | | | |
| EVO | WiMAX | Apple iPad 2 | 0.65 | 0.43 | 334 | 125 |
| EVO | WiMAX | Toshiba Laptop | 1.73 | 0.36 | 161 | 128 |
| *Average In-Building* | | | *1.19* | *0.39* | *246* | *253* |
| | | | | | | |
| ThunderBolt | LTE | Apple iPad 2 | 8.35 | 7.11 | 210 | 125 |
| ThunderBolt | LTE | Toshiba Laptop | 11.35 | 5.10 | 80 | 130 |
| *Average Near Window* | | | *9.88* | *6.08* | *144* | *255* |
| | | | | | | |
| EVO | WiMAX | Apple iPad 2 | 0.91 | 0.88 | 619 | 131 |
| EVO | WiMAX | Toshiba Laptop | 1.41 | 0.95 | 134 | 128 |
| *Average Near Window* | | | *1.16* | *0.91* | *379* | *259* |
| | | | | | | |
| ThunderBolt | LTE | Apple iPad 2 | 7.85 | 5.68 | 206 | 254 |
| ThunderBolt | LTE | Toshiba Laptop | 10.34 | 4.88 | 79 | 255 |
| *Average Both Locations* | | | *9.10* | *5.28* | *143* | *509* |
| | | | | | | |
| EVO | WiMAX | Apple iPad 2 | 0.78 | 0.66 | 480 | 256 |
| EVO | WiMAX | Toshiba Laptop | 1.57 | 0.65 | 147 | 256 |
| *Average Both Locations* | | | *1.17* | *0.66* | *314* | *512* |

## Sequans' WiMAX Business Was in Steep Decline

43. It was clear to Defendants at the time of the IPO that WiMAX was on the way

out. According to a former employee of Sequans, who worked at the Company's office in Japan,

which oversaw five Japanese WiMAX projects and two Korean WiMAX projects, by late 2010,

it was apparent that Sequans would not have any opportunities to expand its WiMAX network in Japan or Korea because of the growing demand for the LTE standard. For this reason, Sequans closed its Japanese office in late 2010.

44.     Sequans knew that it was highly likely that most WiMAX operators would switch to 4G LTE. On May 1, 2011, Sequans and Senza Fili Consulting, a wireless industry advisory firm, announced the availability of a new white paper on the benefits to mobile operators of using dual-mode WiMAX/4G LTE devices while transitioning from WiMAX to 4G LTE. According to the white paper, titled *A Smooth Transition from WiMAX to 4G LTE with Dual-Mode Devices*: "[w]ith the exception of some vertical niche markets, most WiMAX operators will migrate to LTE." The paper further states, "many longer-established WiMAX operators have decided to transition to [4G LTE] because of wide support for the technology . . . and the advantages of converging to a single technology." In the press release announcing the availability of the white paper, Defendant Miller said, "It is important for operators to understand well the lowest cost options in conducting their network transitions from WiMAX to LTE."

### Sequans' 4G LTE Strategy

45.     At the time of the IPO, none of Sequans' 4G LTE chips were being used commercially, but according to the Company, its 4G LTE solutions were in trials with wireless carriers in the United States and China. Defendants described Sequans as well positioned to benefit from the exciting growth in the 4G LTE market.

46.     The Company also had plans to develop dual-band chips that would work on both WiMAX and 4G LTE networks. The development of these chips was part of Sequans' 4Sight initiative, which the Company indicated would allow it to benefit from the anticipated move from WiMAX to 4G LTE. The purpose of a dual-band chip was to ensure a smooth transition

for wireless carriers that wanted to switch from WiMAX to 4G LTE by offering them one "4G" chip to use in all of their 4G phones during the transition.

47.     Despite the Company's trials and plans, Sequans had earned no revenue from 4G LTE solutions by the time of the IPO.  As of January 2011, there were 16 operational 4G LTE networks worldwide.  All of theses networks, however, utilized the FDD-LTE standard; whereas Sequans' 4G LTE chip was only compatible with, and being tested on, the competing TDD-LTE standard.  Therefore, Sequans' 4G LTE chip was not compatible with any of the 4G LTE commercial networks that were operational at the time of the IPO or during the Class Period.

48.     The chart below depicts each of the 16 4G FDD-LTE networks that were operational during the Class Period:

| Region | Country | Operator | Spectrum band | Launch date |
|--------|---------|----------|---------------|-------------|
| North America | USA | Verizon | 700MHz | December 2010 |
| Western Europe | Finland | Elisa | 1800MHz | December 2010 |
| Western Europe | Denmark | TeliaSonera | 2.6GHz | December 2010 |
| Asia Pacific | Japan | NTT DOCOMO | 1500MHz | December 2010 |
| Asia Pacific | Hong Kong | CSL | 1800MHz / 2.6GHz | November 2010 |
| Western Europe | Sweden | Net4Mobility | 2.6GHz | November 2010 |
| Western Europe | Germany | Vodafone | 800MHz | November 2010 |
| Western Europe | Austria | Telekom Austria | 2.6GHz | October 2010 |
| Western Europe | Austria | T-Mobile | 2.6GHz | October 2010 |
| North America | USA | MetroPCS | 1.7 / 2.1GHz | September 2010 |
| CEE | Poland | CenterNet / Aero2 | 1800MHz | September 2010 |
| CIS | Uzbekistan | Ucell | 2.6GHz | August 2010 |
| CIS | Uzbekistan | MTS | 2.5 / 2.7GHz | July 2010 |
| Western Europe | Finland | TeliaSonera | 1800MHz / 2.6GHz | June 2010 |
| Western Europe | Norway | TeliaSonera | 2.6GHz | December 2009 |
| Western Europe | Sweden | TeliaSonera | 2.6GHz | December 2009 |

49.     In fact, the first commercial TDD-LTE network was not even launched until September 2011.  As stated in a September 14, 2011 article on Mobile World Live titled *Mobily Switches on World's First Commercial TD-LTE Network*:

> Etihad Etisalat (Mobily) claims to have become the first operator in the Middle East and North African region to launch LTE services.  **Most significantly, it is the first operator worldwide to launch commercial LTE services based on the emerging TDD version of the technology.**
>
> The first phase of coverage includes the Saudi Arabian cities of Najran, Jazan, Al Kharj, Ras tanoura, Algurayat and Aldudamy, with launches planned in the next two weeks in Hail, Al Baha, Al Mujamaaa and Wadi Al Dawasir.  Next month will see a third batch of cities pushed live: Riyadh, Jeddah and Damamm.  Targeted areas for TD-LTE coverage will exceed 32 cities and towns, representing 85 percent of the populated areas in Saudi Arabia, noted the operator in a statement.
>
> **The launch is significant as the TDD version of LTE is yet to fulfill its potential.**  The technology is expected to gain traction in India, and the Saudi Arabian launch could give Indian operators a helpful case study.  To date all global launches of LTE have used the FDD version of the technology.

[Emphasis added.]

50.     Sequans disclosed that China Mobile was testing and demonstrated Sequans' 4G LTE chips.  China, however, was not going to launch a 4G network until 2014.

### The Registration Statement and Prospectus Contained Inaccurate Statements of Material Fact and Omitted Material Information Required to Be Disclosed Therein

51.     The Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

52.     The Registration Statement positively described the Company's "competitive strengths" in the 4G market as a result of its strong position in the WiMAX market and it being an early leader in the 4G LTE market: "We believe we have a strong position in the WiMAX

market and are an early leader in the LTE market." The Registration Statement also described key elements of the Company's strategy and stated, in pertinent part, as follows:

> **Our Strategy**
>
> Our goal is to be the leading provider of next-generation wireless semiconductors by providing best-in-class solutions that enable mass-market adoption of 4G technologies worldwide. Key elements of our strategy include:
>
> **\* Maintaining and extending our market position in WiMAX.** We intend to maintain our market position in WiMAX by growing our revenues through continued penetration into 4G WiMAX devices that are deployed by large wireless carriers and the expansion of our sales in CPE broadband wireless applications for emerging markets;
>
> **\* Leveraging WiMAX expertise to become a leader in LTE.** We are leveraging our strong market position and technical expertise in WiMAX to deploy best-in-class LTE solutions, as WiMAX and LTE share many common technologies;

[Emphasis added.]

53.    The statements referenced above in ¶52 were each inaccurate statements of material fact when made because of the following adverse facts which existed at the time:

(a)    The WiMAX industry was stagnate and in steep decline due to the strong demand for 4G LTE over WiMAX. Increased competition from faster 4G LTE offerings, and other Sprint WiMAX devices, resulted in softening demand for Sequans WiMAX chips from HTC and other customers;

(b)    The Company's sales to HTC and other customers were slowing due to the shift away from WiMAX to 4G LTE;

(c)    The Company's 4G LTE offerings were not compatible with any of the 4G LTE networks commercially available at that time and the Company would not be in position to generate any meaningful revenues from sales of 4G LTE products until late 2012; and

(d)     As a result of the foregoing, Defendants' positive statements about the Company were lacking in a reasonable basis of fact and were materially false and misleading when made.

54.     The statements referenced above in ¶52 that the Company "is an early leader in the LTE market," and is "leveraging our strong market position and technical expertise in WiMAX to deploy best-in-class LTE solutions" were inaccurate statements of material fact when made because the Company was not an "early leader" in 4G LTE and was not "deploy[ing]" 4G LTE solutions to any commercially viable customer.   Indeed, the Company's 4G LTE products were not compatible with a single 4G Network that was commercially operational at the time because Sequans developed chips for the TDD and not the FDD standard.

55.     In describing the Company's "high performance solutions," the Registration Statement stated, in pertinent part, the following: "Our solutions offer high performance for use in a wide array of 4G-enabled devices. The key performance characteristics of our solutions include . . . high throughput with peak downlink data transfer rates of 38 Mbps in our WiMAX solutions and support for peak downlink data transfer rates of 150 Mbps in our LTE solutions."

56.     The statements referenced above in ¶55 were each inaccurate statements of material fact when made because Sequans-powered smartphones ran only on Sprint's WiMAX network which averaged download speeds of about 1 Mbps in real-world testing, and none of Sequans' 4G LTE solutions were being utilized on any operational 4G LTE network.

57.     The Registration Statement stated that the Company's product revenue was growing rapidly due to favorable trends in the 4G wireless market:

> Our product revenue is growing rapidly, driven primarily by increased sales volume of our products due to various trends in the 4G wireless broadband market.  These trends include deployment and broader adoption of the commonly accepted 4G protocols, WiMAX and LTE, and a dramatic increase in the number

and type of devices subscribers use to access the wireless broadband network. We expect our product revenue to continue to grow in absolute terms, although at a significantly lesser rate than what we experienced in 2010 compared to 2009.

58.     The statements referenced above in ¶57 were inaccurate statements of material fact for the reasons set forth in ¶53 above.  Additionally, the statements that "product revenue is growing rapidly," "increased sales volume . . . due to various trends in the 4G wireless broadband market" and "broader adoption of . . . WiMAX and LTE" were inaccurate statements of material fact because trends in the 4G wireless market away from WiMAX towards 4G LTE were negatively impacting the Company's revenues, demand for the Company's products was softening, and Sequans' 4G LTE chip was not compatible with any of the 4G LTE networks commercially operational at the time.

59.     The Registration Statement described the 4G LTE standard and 4G LTE networks, and stated, in pertinent part, the following:

> LTE is segmented into TDD and FDD technologies.  Each version is specific to the type of spectrum allocation wireless carriers are granted by a country's or region's government.  In the near term, we believe deployments of FDD LTE networks will be driven largely by legacy 3G wireless carriers who possess FDD spectrum licenses.  In 2010, wireless carriers including Verizon Wireless in the U.S., TeliaSonera in Sweden and Norway and Mobyland in Poland deployed FDD LTE networks.  Deployments of TDD LTE networks are expected to be driven by wireless carriers such as China Mobile in China, Reliance Industries in India, Rostelecom in Russia, Softbank in Japan and Clearwire in the U.S.  According to ABI Research, shipments of LTE chipsets are expected to grow from 39.0 million in 2011 to 185.4 million in 2014, representing a CAGR of 68%.

60.     The Registration Statement described Sequans' development and deployment of 4G LTE products and stated, in pertinent part, the following:

> Our products have been deployed by many wireless carriers worldwide, including 7 of the 10 largest WiMAX carriers globally by number of subscribers according to BWA Research UK. Given that WiMAX and LTE share a common technology platform, we have also leveraged our leadership in WiMAX to successfully develop LTE semiconductor solutions that are being deployed globally as existing 2G and 3G networks are upgraded to 4G.  Our LTE solutions are currently in trials with wireless carriers in the United States and China, where China Mobile

has successfully demonstrated its LTE capabilities using our solution at the World Expo in Shanghai and at the Asian Games in Guangzhou, which were both held in 2010.

61.     The statements referenced above in ¶¶59-60 were each inaccurate statements of material fact when made because the Company's 4G LTE offerings were not compatible with any of the 4G LTE networks commercially available at that time and the Company was not in position to generate any meaningful revenues from sales of 4G LTE products until late 2012. Additionally, the statement that the Company "leveraged our leadership in WiMAX to successfully develop LTE semiconductor solutions that are being deployed globally" was an inaccurate statement of material fact when made because the Company was not "deploy[ing]" 4G LTE solutions to any commercially viable customer.   Indeed, the Company's 4G LTE products were not compatible with a single 4G network that was commercially operational at the time because Sequans developed chips for TDD-LTE and not FDD-LTE.

62.     The statement referenced above in ¶60 that "[o]ur LTE solutions are currently in trials with wireless carriers in the United States and China, where China Mobile has successfully demonstrated its LTE capabilities using our solution at the World Expo in Shanghai and at the Asian Games in Guangzhou, which were both held in 2010" was misleading when made because at the time of the IPO, the Chinese Ministry of Industry had stated that China would not roll out a 4G network until 2014.

63.     The Registration Statement described the Company's marketing strategy, in pertinent part, as follows:

> By working to understand carrier services strategies, device roadmaps and technical requirements, we believe we are better positioned to drive our roadmap to meet these needs, to influence their choice of technology suppliers, and to identify manufacturers in the wireless industry who are best prepared to serve the needs of the wireless carrier.  For example, by engaging early with China Mobile, we were able to understand their  requirements and achieve aggressive timelines for delivering our TDD LTE solution for their demonstration network.

- 21 -

64.     The statements referenced above in ¶63 were each inaccurate statements of material fact when made because the Company's 4G LTE offerings were not compatible with any of the 4G LTE networks commercially available at that time and the Company was not in position to generate any meaningful revenues from sales of 4G LTE products until late 2012. Additionally, the Chinese Ministry of Industry had stated that China would not roll out a 4G network until 2014.

**The Registration Statement Omitted Known Trends or Uncertainties
Reasonably Likely to Have a Material Effect on the Company's Financial Results**

65.     Pursuant to Item 4(a) of Form 424B4, the Registration Statement was required to furnish the information required by Part I of Form 20-F.  Under Item 5(D) of Part I of Form 20-F an issuer is required to, among other things, "discuss, for at least the current fiscal year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition."

66.     The adverse trends and uncertainties associated with the softening demand for WiMAX, the strong demand for 4G LTE, and the halt of WiMAX's expansion into new markets in the United States, were reasonably likely to have a material impact on Sequans' continuing operations and revenues, and therefore, were required to be disclosed in the Registration Statement, but were not.   Additionally, the Registration Statement failed to disclose that Clearwire was having financial difficulties, lacked funding, and had halted expansion of its WiMAX network, leaving the network well short of complete coverage and that Clearwire had no plans to expand the WiMAX network into new markets during 2011.   The Registration Statement was required to disclose these trends and uncertainties but failed to do so.

67.     Furthermore, the Registration Statement failed to disclose that HTC, Sequans' largest customer, was increasing orders for, and focusing more on, 4G LTE products.  Finally, the Registration Statement failed to disclose that the 4G LTE chip developed by Sequans was not compatible with any 4G LTE networks commercially operational at that time, and that Sequans was dependent upon wireless carriers to deploy operational TDD-LTD networks.

**The Registration Statement Omitted a Discussion of the Significant Factors that Made the Offering Speculative or Risky**

68.     Under Item 3(D) of Part I of Form 20-F, the Registration Statement was required to "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk. . . ."  Additionally, pursuant to Item 3 of Form F-1, the Registration Statement was required to furnish the information required by Item 503 of Regulation S-K.  Under Item 503(c) of Regulation S-K, an issuer is required to, among other things, provide a "discussion of the most significant factors that make the offering risky or speculative," including the following:

69.     The Registration Statement failed to disclose the issues facing WiMAX at that time that made the IPO speculative and risky, including issues with its growth, demand, and its incomplete coverage:

(a)     The Registration Statement failed to disclose that Clearwire was having financial difficulties, lacked funding, and had halted expansion of its WiMAX network, leaving the network well short of complete coverage and failed to disclose that Clearwire had no plans to expand the WiMAX network into new markets during 2011;

(b)     The Registration Statement failed to disclose the extent of the risk associated with Clearwire's failure to expand the WiMAX network to new markets.  With new competition in the 4G smartphone market from 4G LTE, Sequans faced a risk of declining sales.

The halting of WiMAX's expansion at this pivotal time, made an investment in Sequans speculative or risky; and

> (c)     The Registration Statement failed to disclose the softening demand for WiMAX and strong demand for 4G LTE and the dramatic impact that this would have on orders for Sequans products from HTC and other customers in the near term.

70.     The Registration Statement failed to disclose that every operational 4G LTE network in the world utilized the FDD-LTE standard, and that China Mobile's TDD-LTE network would not be rolled out until 2014.  Additionally, the Registration Statement failed to disclose that Sequans was dependent upon wireless carriers to deploy operational TDD-LTE networks that didn't yet exist.  These factors made the offering risky because at the time of the IPO, Sequans' only available 4G LTE chip utilized the TDD-LTE standard.

**Any Purported Risk Warnings Were
Inadequate or Materially False and Misleading**

71.     Even though the Company's Prospectus, earnings press releases, conference calls and other Class Period statements may have been accompanied by purported risk warnings or warnings that certain statements may be forward-looking, they did not adequately warn investors about the materially false and misleading statements alleged herein.  These risk warnings: (i) were false or misleading as a matter of current or historical fact; and/or (ii) were not meaningful because, among other things, they were vague, boilerplate and did not adequately warn of the true risks of investing in Sequans.

72.     The Registration Statement contained a purported risk disclosure stating that *if* the WiMAX market declined, the Company's operations would be harmed:

> We currently derive substantially all of our revenue from the sale of our semiconductor solutions for the WiMAX market and expect to do so through at least 2011.  **If the WiMAX market declines, our results of operations would be harmed**. In addition to the impact of factors unique to the WiMAX market and

- 24 -

the impact of global economic factors, the WiMAX market may decline significantly in anticipation of LTE deployments. If customers believe LTE deployments will provide the same or superior coverage as WiMAX networks in the near future, customers may prefer to adopt LTE services and products instead of WiMAX, which in turn is likely to cause the WiMAX market to grow at a slower pace than expected or to decline. If the WiMAX market declines prior to the commercial viability and acceptance of our LTE solutions, our business, operating results and financial condition will be harmed.

[Emphasis added.]

73.    The Registration Statement contained another purported risk disclosure discussing how the Company depends on others to deploy and upgrade 4G wireless communications equipment to grow its business, and that Sequans could be harmed if wireless carriers delayed or were unsuccessful at deploying such equipment:

We depend on the commercial deployment of and upgrades to 4G wireless communications equipment, products and services to grow our business, and our business may be harmed **if wireless carriers delay or are unsuccessful in the commercial deployment of or upgrades to 4G technology** or if they deploy technologies that are not supported by our solutions.

[Emphasis added.]

74.    Although the Registration Statement contained purported "Risk Factors" about the potential for demand to decline and the Company's inability to sell products in the 4G LTE market, it did not explain or describe that – at the time of the IPO – the Company had already experienced softening demand for its products, the market had shifted away from WiMAX and was focusing instead on 4G LTE, and the Company would not be in position to generate meaningful revenues from 4G LTE for a significant amount of time. The Registration Statement was required to disclose these risks but failed to do so.

75.    Although the Registration Statement contained purported "Risk Factors" about the potential for the Company's business to be harmed if wireless carriers were unsuccessful in deploying networks, it did not explain or describe that – at the time of the IPO – the Company's

main end customer, Sprint, had stopped expanding its WiMAX network due to Clearwire's financial difficulties. This was a material fact and not merely a possible risk. The Registration Statement was required to disclose this but failed to do so.

76.     Furthermore, **the Registration Statement failed** to disclose that the 4G LTE networks that existed at that time were not compatible with the Company's 4G LTE chip and that brand new networks had to be launched before Sequans could generate sales from its chips.

### Sequans Announces Second-Quarter Results

77.     On July 28, 2011, before the stock market opened, Sequans announced financial results for the second quarter of 2011, and reported net profit of $0.1 million, or $0.00 per diluted ADS, compared to a net profit of $1.9 million, or $0.07 per ADS, in the first quarter of 2011 and a net profit of $0.6 million, or $0.02 per ADS, in the second quarter of 2010.

78.     Defendant Karam commented on the results, stating, in pertinent part, as follows:

> After rapid volume growth in the first two quarters of 2011, we recently have seen more cautious order patterns, which we believe are driven by some uncertainty related to several new WiMAX smartphone models being introduced into the U.S. market. This is occurring during a particularly dynamic phase in the evolution of 4G as various carriers plan their migration to LTE. With both a smartphone-optimized LTE chip and a dual-mode WiMAX/LTE chip in our roadmap for the second half, we are well-positioned to participate in any strategy operators choose, but LTE is not expected to contribute materially to our revenue until the second half of 2012.

79.     The press release discussed the Company's Outlook for the third quarter of 2011 and stated, in pertinent part, as follows:

> For the third quarter of 2011, Sequans expects revenue to be in the range of $25 to $28 million, with gross margin increasing to close to 50%. Based on this revenue range and gross margin, non-IFRS net profit per diluted share/ADS is expected to be between $0.00 and $0.05 for the third quarter of 2011, with approximately 36.7 million weighted average number of diluted shares/ADSs. Non-IFRS net profit per share/ADS, excludes any gain or loss from the option component of bank convertible notes, which will be outstanding until October 2011. The amount of any such gain or loss will depend on the price of Sequans's ADSs at

the end of the quarter. Non-IFRS EPS guidance also excludes the impact of stock based compensation.

Given the lack of visibility, Sequans currently expects revenue in the second half of 2011 is likely to be lower than $50 million.

80.     The Company held a conference call with analysts the same day (before the stock market opened) and provided additional details about the Company's financial performance and negative outlook. It was during the call that Defendant Karam disclosed what he and the other Defendants knew or should have known all along – that the WiMAX market in the U.S. would decline and that there was a significant shift from WiMAX to 4G LTE:

> However, against this backdrop of success in the WiMAX market, allowing us to have the rapid growth in the first two quarters of the year, we saw **recently a drop in the demand for the WiMAX US market, limiting our H2 growth as LTE revenue won't materialize before 2012. We believe this is driven essentially by some supply chain adjustment and the introduction of our ideal smart phone models that might limit our market share on the WiMAX smart phones in the US.** We do not see this happening with other WiMAX operators around the world, but we have to recognize that the WiMAX US market remains the largest one.
>
> This change comes during a particular dynamic phase in the evolution of the 4G market from WiMAX to LTE.  But no matter what, I believe strategically we are well positioned.  We are on schedule with our road map and our new chips position us to participate in any 4G strategy that carriers choose to implement. Whether its LTE smart phones and TDD or FDD spectrum, migration from WiMAX to LTE or deploying LTE alongside WiMAX.
>
> We are very focused on LTE as you can imagine and we are gaining good traction there.  We are in various stages of discussions with around a dozen different potential device customers for LTE as well as many carriers around the globe.
>
> Many operators planning to deploy 4G are considering LTE based networks because they are expecting a larger, more robust device ecosystem to develop for LTE due to early support from large carriers such as Verizon and China Mobile. Due to the technical similarities between WiMAX and LTE we are in a strong position to leverage our years of know how to become one of the leading chip makers for LTE.

[Emphasis added.]

- 27 -

81.    Due to slowing of demand for WiMAX in the U.S., during the call, Karam lowered guidance for the third quarter of 2011, indicating that revenues could decline: "[s]o in summary, after a rapid growth over the past year, developments so far in Q3 seems to indicate that we may level off temporarily in the second half and could even see some decline at revenues versus our blistering pace of growth in the first six months." This guidance was 25% lower than what was expected by analysts.

82.    Following the Company's announcements on July 28, 2011, the price of Sequans ADSs dropped from $15.43 per ADS to $8.55 per ADS, a one day decline of approximately 45%, on extremely heavy volume. Over the next seven days, the Company's ADSs continued to trade lower on heavy volume, closing at $5.70 per ADS on August 8 – a 63% drop from the July 27 closing price.

83.    On July 29, 2011, Jefferies issued an equity research report in which it downgraded Sequans from Buy to Hold. The report explained, "[w]ith questionable 2012 WiMAX volumes and LTE 12+ months off, we are downgrading SQNS from a Buy to Hold despite a 40% [share price] drop. The [guidance] for [the third quarter and second half] in general talks of tough market dynamics (crowded US smartphone market, decreasing Sprint user base)."

84.    On our about December 13, 2011, the Company announced that HTC had cut orders by 60%. In commenting on the change, Karam stated:

> As a result of this unexpected development, which the customer has informed us is due to the worldwide economic situation **and reduced WiMAX demand**, we now assume that we will make no shipments of product to, and recognize no revenues from, this customer in the first quarter of 2012.

> While **this development in our WiMAX business is disappointing**, we are encouraged by our design wins as well as the general level of interest in our LTE solutions. We continue to believe that our LTE business will begin to ramp in the second half of 2012. **Unfortunately, the small quantities of LTE chips we**

**expect to ship in the first half of 2012 will not be sufficient to offset the greater than expected decline in our WiMAX business**.

[Emphasis added.]

## COUNT I

### Violations of Section 11 of the Securities Act
### Against All Defendants

85.     Lead Plaintiffs repeat and reallege each and every allegation contained above.

86.     This Count is brought pursuant to Section 11 of the Securities Act [15 U.S.C. §77k] on behalf of the Class, against all Defendants.

87.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

88.     Sequans is the registrant for the IPO.   The Defendants named herein were responsible for the contents and dissemination of the Registration Statement and the Prospectus.

89.     As the issuer of the ADSs, Sequans is strictly liable to Lead Plaintiffs and the Class for the misstatements and omissions.

90.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true and without omissions of any material facts and were not misleading.

91.     By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

92.     Lead Plaintiffs acquired Sequans ADSs pursuant to the Registration Statement.

93.     Lead Plaintiffs and the Class have sustained damages.   The value of Sequans ADSs has declined substantially subsequent to and due to Defendants' violations.

- 29 -

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

94.     Lead Plaintiffs repeat and reallege each and every allegation contained above.

95.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all Defendants.

96.     Defendants were sellers and offerors and/or solicitors of purchasers of the ADSs offered pursuant to the Prospectus.

97.     The Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.  Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectus and participating in road shows to market the IPO to investors.

98.     Defendants owed to the purchasers of Sequans ADSs, including Lead Plaintiffs and other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the IPO materials, including the Prospectus contained therein, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the IPO materials as set forth above.

99.     Lead Plaintiffs and other members of the Class purchased or otherwise acquired Sequans ADSs pursuant to and/or traceable to the defective Prospectus.  Lead Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

100.     Lead Plaintiffs, individually and representatively, hereby offer to tender to Defendants those securities which Lead Plaintiffs and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.  Class members who have sold their Sequans ADSs are entitled to rescissory damages.

101.     By reason of the conduct alleged herein, these Defendants violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act.  Accordingly, Lead Plaintiffs and members of the Class who hold Sequans ADSs purchased in the IPO have the right to rescind and recover the consideration paid for their Sequans ADSs and hereby elect to rescind and tender their Sequans ADSs to the Defendants sued herein.  Lead Plaintiffs and Class members who have sold their Sequans ADSs are entitled to rescissory damages.

## COUNT III

### Violation of Section 15 of the Securities Act
### Against the Individual Defendants

102.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

103.     This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.

104.     Each of the Individual Defendants acted as controlling persons of Sequans within the meaning of Section 15 of the Securities Act by virtue of his position as a director and/or senior officer of Sequans.  By reason of their senior management positions and/or directorships at the Company, as alleged above, these Individual Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Sequans to

engage in the conduct complained of herein.   By reason of such conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

105.   Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statement and having otherwise participated in the process which allowed the Offering to be successfully completed.

## ADDITIONAL ALLEGATIONS IN SUPPORT
## OF CLAIMS UNDER THE EXCHANGE ACT

106.   For purposes of the allegations under the Exchange Act set forth herein, "Defendants" refers to Sequans, Karam and Choate.

107.   The statements referenced in ¶¶52, 55, 57, 59, 60, 63, 72 and 73 from the Registration Statement are incorporated herein by reference.   These statements were materially false and misleading and omitted material information for the reasons set forth above.

108.   On April 28, 2011, Sequans issued a press release announcing its financial results for the first quarter of 2011, for the period ending March 31, 2011.   This press release was filed with the SEC on April 28, 2011 on Form 6-K and was signed by Defendant Choate.   For the quarter, the Company reported revenue of $25.4 million, an increase of 11% compared to the fourth quarter of 2010 and 149% compared to the first quarter of 2010.   The Company also reported net profit of $1.9 million, or $0.07 per diluted share/ADS, compared to a net loss of $2.8 million, or $0.10 per diluted share/ADS, in the fourth quarter of 2010 and a net loss of $1.4 million, or $0.06 per diluted share/ADS, in the first quarter of 2010.   Defendant Karam commented on the results, stating, in pertinent part, as follows:

> Our first quarter results reflect *continued strong demand for* 4G devices to support bandwidth-intensive mobile data applications. In particular, we are benefitting from our position as the 4G chip supplier to HTC's EVO 4G and EVO Shift smart phones.  Our growth is also being fueled by our customers serving

emerging markets with devices that enable basic broadband connectivity to the home or enterprise. We are pursuing additional design wins that would further diversify our customer base, and we are involved in LTE trials in key markets such as China and India. Meanwhile, we are able to generate substantial operating leverage by carefully managing the growth in operating expenses and capitalizing on our depth of experience in 4G by shifting resources as the technologies evolve.

[Emphasis added.]

109. The statements referenced in ¶108 were materially false and misleading when made because they failed to disclose and misrepresented the following material adverse facts, which were known to Defendants or recklessly disregarded by them:

(a) The WiMAX industry was stagnate and in steep decline due to the strong demand for 4G LTE over WiMAX. Increased competition from faster 4G LTE offerings, and other Sprint WiMAX devices, resulted in softening demand for Sequans WiMAX chips from HTC and other customers;

(b) The Company's sales to HTC and other customers were in decline due to the shift away from WiMAX to 4G LTE;

(c) The Company's 4G LTE offerings were not compatible with any of the 4G LTE networks commercially available at that time and the Company was not in position to generate any meaningful revenues from sales of 4G LTE products until late 2012; and

(d) As a result of the foregoing, Defendants' positive statements about the Company were lacking in a reasonable basis of fact and were materially false and misleading when made.

110. The Company held a conference call with analysts the same day (before the stock market opened) and provided additional details about the Company's financial performance. In response to an analyst's question about the settling of the wholesale-pricing dispute between Sprint and Clearwire, Karam stated, "Obviously it was good news for us, but honestly for me it

was not a surprise, but I am pleased to see it is official. I'll say that the relationship between Sprint and Clearwire stabilizing which on one side gives us more stability in the WiMAX business with Sprint which is good news for the company in our existing business."

111.    The statements referenced above in ¶110 were each materially false and misleading when made because they failed to disclose and misrepresented that the WiMAX market was not "stable" but was in steep decline and Clearwire's lack of funding halted Clearwire's deployment of WiMAX into new markets.

112.    Following the Company's announcements on April 28, 2011, the price of Sequans ADSs increased from $8.50 per share to close at $9.68 per share that day, on extremely heavy volume. The Company's shares continued to rise thereafter and traded above $19.00 per ADS by the end of May 2011.

113.    On May 24, 2011, Defendant Karam was interviewed by the French website Easy Bourse (available on the Company's U.S. website). When asked about the Company's market share, Karam stated, "On the WiMAX, our market share is around 40% of the world. It amounts to 70% of WiMAX smartphone market. The 4G LTE will eventually be much larger. If we reach the 15% market share in the world, it will already be enormous."

114.    The statements referenced in ¶113 were materially false and misleading when made because they failed to disclose that the Company's WiMAX business was in steep decline, HTC was focusing heavily on 4G LTE, and Sequans did not offer any 4G LTE products for 4G LTE networks that were commercially operational at the time.

### Additional Scienter Allegations

115.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company (or in their own name) were materially false and misleading; knew or

recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Sequans, their control over, and/or receipt and/or modification of Sequans' allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

116.   Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including Defendants Karam and Choate.

117.   As alleged herein, during the Class Period, Defendants were aware of the true financial condition of Sequans, the weakening demand for the Company's WiMAX products, and that the Company's revenues had been, and would be, negatively impacted. Furthermore, Defendants knew, or recklessly disregarded, that the Company's financial performance was dependent upon Sprint and Clearwire and that Clearwire's WiMAX network in the U.S. had stopped expanding into new markets. Furthermore, Defendants knew, or recklessly disregarded, that its 4G LTE products were not compatible with any 4G LTE networks that were commercially operational. And, because the Company works closely with its customers during the design stage and throughout a 12-month sales cycle, and assists its customers with technical assistance, Defendants knew or recklessly disregarded that demand for Sequans' WiMAX

solutions would be slow during 2011 and that the Company would not generate meaningful sales from 4G LTE until late 2012.

118.   Additionally, the fraud alleged herein relates to the core business of Sequans so knowledge of the fraud may be imputed to Defendants.   Given Defendants' knowledge of the declining financial condition of Sequans, the positive statements detailed above, made contemporaneously with that knowledge, were false and/or misleading.

119.   Substantially all of Sequans' revenue revolved around a soon-to-be obsolete technology, and the Company was more than a year away from generating any revenue from 4G LTE, the *de facto* 4G standard, and these revenues were dependent upon other companies first launching commercially operational 4G TDD-LTE networks and then buying Sequans' products.   At the time of the IPO, Sequans was only testing chips that worked on the TDD-LTE standard – a standard that was not being used by any operational network in the world – and it was known by Defendants that the Chinese TDD-LTE network would not be operational until 2014.

120.   Furthermore, Defendants possessed substantial motives for misrepresenting Sequans' financial status, operations, and prospects throughout the Class Period.   Defendants knew that WiMAX was in a state of accelerating decline and that its WiMAX business was only going to get worse.   The WiMAX business was in decline and the Company would not generate meaningful near- or medium-term revenues from 4G LTE.   Defendants needed to raise cash in the IPO in order to fund operations and the research and development of 4G LTE products.   At the time of the IPO, the Company had approximately $9.8 million in cash and after the IPO the Company held almost $62 million in cash.   Had the Company not completed the IPO when it had, it would have been very likely, if not virtually certain, that the Company would not have

been able to raise the capital necessary to fund its operations through an IPO.  Defendants were presented with a short and fast closing window to take the Company public before sales of its WiMAX products declined to the point where a public offering of shares would not have been feasible.  The Defendants, and other Company insiders, benefitted personally in various ways from the fraud alleged herein.  They sold more than $4.1 million worth of stock in the IPO, obtained $6,525,000 worth of options and warrants that would vest only if the Company went public, and were able to convert their substantial illiquid holdings in a private company into liquid shares of a public company that trades on the NYSE.

121.  Defendants, other Company insiders, and affiliated entities sold 451,358 shares in the IPO for $4,513,580.

122.  The IPO enabled Defendants and other Company insiders to obtain $6,525,000 worth of options and warrants that would vest only if the Company completed the IPO.  On March 8, 2011, the board of directors granted 1,058,000 founders warrants and 127,000 stock options.  Of the founders warrants granted, 960,000 were granted to the executive officers, including 500,000 to Karam; 112,500 to Choate; and 40,000 to Miller.  Substantially all of these warrants (approximately 95%) *would only vest in the event of an IPO*.  Thus, Defendants Karam, Choate, and Miller could only profit from these warrants if there was an IPO.

123.  The IPO also enabled Defendants and other Company insiders to create liquidity for 11,082,027  shares in the Company worth approximately $110,820,270.

124.  The below chart depicts the financial gain yielded by Defendants, Company insiders, and affiliated entities, as a result of the fraud alleged herein:

| | ADSs Sold in IPO | Gross Proceeds | Warrants Options that Can Vest Due to IPO | Value as of IPO | ADSs Owned After IPO | Value of ADSs as of IPO |
|---|---|---|---|---|---|---|
| Georges Karam | 117,574 | $1,175,740 | 500,000 | $5,000,000 | 3,107,426 | $31,074,260 |
| Deborah Choate | | | 112,500 | $1,125,000 | 127,708 | $1,277,080 |
| Zvi Slonimsky | 8,202 | $82,020 | | $0 | 216,798 | $2,167,980 |
| T. Craig Miller | | | 40,000 | $400,000 | 38,333 | $383,330 |
| Michael Elias (Kennet Partners) | 121,822 | $1,218,220 | | | 3,219,766 | $32,197,660 |
| David Ong (Add Partners) | 165,419 | $1,654,190 | | | 4,371,996 | $43,719,960 |
| TOTAL | 413,017 | $4,130,170 | 652,500 | $6,525,000 | 11,082,027 | $110,820,270 |

### Applicability of Presumption of Reliance: Fraud on the Market Doctrine

125.     At all relevant times, the market for Sequans ADSs was an efficient market for the following reasons, among others:

(a)     Sequans ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Sequans filed periodic public reports with the SEC and the NYSE;

(c)     Sequans regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Sequans was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

126.    As a result of the foregoing, the market for Sequans ADSs promptly digested current information regarding Sequans from all publicly available sources and reflected such information in Sequans' share price.  Under these circumstances, all purchasers of Sequans ADSs during the Class Period suffered similar injury through their purchase of Sequans ADSs at artificially inflated prices and a presumption of reliance applies.

### Loss Causation

127.    The material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and other members of the Class.

128.    As described herein, during the Class Period, Defendants engaged in the fraudulent scheme, and made or caused to be made a series of materially false or misleading statements about Sequans and its financial performance.

129.    The scheme, including the material misstatements and omissions, had the cause and effect of creating in the market an unrealistically positive assessment of Sequans' business and financial performance, thus causing Sequans ADSs to be overvalued and artificially inflated during the Class Period.  Defendants' scheme, including the materially false and misleading statements during the Class Period, resulted in Lead Plaintiffs purchasing the Company's ADSs at artificially inflated prices.

130.    On July 28, 2011, the Company announced disappointing results for Sequans' second quarter of 2011 and reduced its earnings estimates due in part to "a particularly dynamic phase in the evolution of 4G as various carriers plan their migration to LTE." During a news

conference on the same day, Karam disclosed that the Company saw a "drop in demand for the WiMAX US market."

131.   In response to the Company's announcements on July 28, 2011, the price of Sequans ADSs dropped from $15.43 per ADS to $8.55 per ADS, a one-day decline of approximately 45%, on extremely heavy volume.  Over the next seven days, the Company's ADSs continued to trade lower on heavy volume, closing at $5.70 per ADS on August 8 – a 63% drop from the July 27 closing price.

132.   The decline in the price of Sequans ADSs after the disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price decline in Sequans ADSs negates any inference that the losses suffered by Lead Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Sequans' ADSs and the subsequent significant decline in the value of Sequans ADSs when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

133.   As a result of these revelations, and the corresponding drop in the price of Sequans ADSs, Lead Plaintiffs and Class members suffered real economic loss.

**No Safe Harbor**

134.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no

- 40 -

meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Sequans who knew that those statements were false when made.

## COUNT IV

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against Defendants Sequans, Karam, and Choate

135.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

136.    This Count is alleged against Defendants Sequans, Karam, and Choate (the "Count IV Defendants").

137.    During the Class Period, the Count IV Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

138.    The Count IV Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

139.   The Count IV Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

140.   Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sequans ADSs. Lead Plaintiffs and the Class would not have purchased Sequans ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

141.   As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Sequans ADSs during the Class Period. Following the Company's announcements on July 28, 2011, the price of Sequans ADSs collapsed from $15.43 per ADS on July 27, 2011 to close at $8.55 per ADS on July 28, 2011 – a one day decline of $6.88 per share, or 45% – on heavy volume. Thereafter, as more adverse facts were revealed to the market, the price of Sequans ADSs continued to decline and presently trade in a range of $5.50-$6.00 per share.

142.   By virtue of the foregoing, the Count IV Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT V

### Violation of Section 20(a) of the Exchange Act
### Against Defendants Karam and Choate

143.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

144.     Defendants Karam and Choate (the "Count V Defendants") acted as controlling persons of Sequans within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Sequans, and their ownership of Sequans ADSs, the Count V Defendants had the power and authority to cause Sequans to engage in the wrongful conduct complained of herein.   By reason of such conduct, the Count V Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.     Awarding Lead Plaintiffs and other members of the Class damages together with interest thereon;

C.     With respect to Count II, ordering that the IPO be rescinded;

D.     Awarding Lead Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.     Awarding Lead Plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.