UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
              :
DONALD DEAN JOHNSON,        :
              :
              :
                     Plaintiff,   :
              :
              :   No. 11 Civ. 6341 (PAC)
     -against-              :
              :
              :
              :
SEQUANS COMMUNICATIONS S.A. et al.,   :
              :
                     Defendants.   :
              :
              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
OF DEFENDANTS UBS LIMITED AND JEFFRIES & COMPANY, INC.

COVINGTON & BURLING LLP
Mark P. Gimbel
David W. Haller
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: (212) 841-1000

TABLE OF CONTENTS

Page

Preliminary Statement ................................................................................................................... 1

Factual Background and Allegations ............................................................................................. 3

Argument ........................................................................................................................................ 3

I. THE COMPLAINT FAILS TO ALLEGE ANY ACTIONABLE MISREPRESENTATION OR OMISSION ............................................................................. 3

    A. The Offering Documents Did Not Mislead Investors as to the Transition from WIMAX to LTE .................................................................................. 4

    B. The Offering Documents Did Not Mislead Investors as to Sequans' Position in the LTE Market ............................................................................. 6

    C. The Challenged Statements Are Not Actionable ........................................... 7

II. THE COMPLAINT ON ITS FACE ESTABLISHES THE DEFENSE OF NEGATIVE CAUSATION ................................................................................................. 9

III. PLAINTIFFS LACK STANDING TO ASSERT A CLAIM UNDER SECTION 12 ..................................................................................................................... 10

Conclusion .................................................................................................................................... 12

# TABLE OF AUTHORITIES

Page

CASES

*Feiner v. SS & C Tech., Inc.*,
   47 F. Supp. 2d 250 (D.Conn. 1999) ...................................................................... 11, 12

*Gustafson v. Alloyd Co. Inc.*,
   513 U.S. 561 (1995) ...................................................................................................... 10

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
   665 F. Supp. 2d 404 (S.D.N.Y. 2009) ............................................................... passim

*In re Cosi Sec. Litig.*,
   379 F. Supp. 2d 580 (S.D.N.Y. 2005) ................................................................ 10, 11

*In re Giant, Inc. Sec. Litig.*
   643 F. Supp. 2d 562 (S.D.N.Y. 2009) ........................................................................ 11

*In re Livent, Inc. Noteholders Sec. Litig.*,
   151 F. Supp. 2d 371 (S.D.N.Y. 2001) ..................................................................... 4, 5

*In re Worldcom, Inc. Sec. Litig.*,
   No. 02 Civ. 3288 (DLC), 2004 WL 1435356 (S.D.N.Y. June 28, 2004) ......... 11, 12

*Local 295/Local 851 IBT Emp'r. Grp. Pension Trust and Welfare Fund v. Fifth Third Bancorp*,
   731 F.Supp.2d 689 (S.D. Ohio 2010) ........................................................................ 11

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
   98 F. 3d 2 (2d Cir. 1996) ............................................................................................... 6

*Panther Partners, Inc. v. Ikanos Comm., Inc.*,
   538 F. Supp. 2d 662 (S.D.N.Y. 2008) (Crotty, J.) ................................................. 5, 6

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ......................................................................................... 9

STATUTES

15 U.S.C. § 77l(a)(2) ............................................................................................................ 10

Sections 11 and 12(a)(2) of the Securities Act of 1933 ..................................................... 3

Defendants UBS Limited ("UBS") and Jeffries & Company, Inc. ("Jeffries") respectfully submit this Memorandum of Law in support of their motion to dismiss Plaintiffs' Consolidated Amended Complaint ("Complaint" or "Compl.").[1] UBS and Jeffries (collectively, the "Underwriter Defendants") also join in and incorporate by reference the arguments set forth in the memorandum of law in support of the Company Defendants'[2] motion to dismiss ("Company Memorandum" or "Co. Mem.").

## PRELIMINARY STATEMENT

Plaintiffs are shareholders who allegedly purchased shares in Sequans Communications S.A. ("Sequans" or the "Company"), a developer of semiconductor solutions for smartphones and other products, after its initial public offering on April 15, 2011 (the "IPO"). Plaintiffs assert a variety of claims against the Company and the Underwriter Defendants based principally on allegations that the Prospectus and Registration Statement (collectively, the "Offering Documents") failed to disclose that a transition from WiMAX to LTE technology was "negatively affecting the Company's revenues." Compl. ¶ 58. The allegations fail to state a claim, because the Offering Documents were not in any respect misleading and specifically warned of the very transition about which Plaintiffs claim to have been misled. *See* Point I.

Contrary to Plaintiffs' allegation that Sequans' revenues were suffering from the LTE transition as of the offering date, the very materials cited in the Complaint show that the Company announced record revenues for the first two quarters of 2011 — a period of growth

---

[1] For the Court's convenience, a copy of the Consolidated Amended Complaint is attached as Exhibit G to the Declaration of Mark P. Gimbel dated May 14, 2012 ("Gimbel Decl."). Consolidated Am. Compl. for Violations of Fed. Sec. Laws, Feb. 1, 2012, ECF No. 33.

[2] The Company Defendants are Sequans Communications S.A., Georges Karam, Deborah Choate, Michael Elias, James Patterson, David Ong, Hubert De Pesquidoux, Dominique Pitteloud, Alok Sharma, Zvi Slonimsky, and T. Craig Miller.

that continued for months after the April 15, 2011 IPO. On July 28, 2011 — more than 3 months after the IPO — the Company did announce that it was observing "more cautious order patterns" from WiMAX customers that would affect its results *for the second half of the year* (Complaint ¶78), but Sequans could not have been expected to predict and disclose this development months earlier, at the time of its IPO. The securities laws do not require clairvoyance.

Moreover, the Offering Documents warned over and over again of the very risk about which Plaintiffs claim to have been misled. Disclosure after disclosure specifically cautioned that the Company was dependent on the WiMAX market for its revenue; that it was not in a position to earn revenues from LTE products in the near future; and that its financial results would be harmed if a transition from WiMAX to LTE took place "prior to the commercial viability and acceptance of our LTE solutions." Gimbel Decl. Ex. A, Prospectus, at 10-12 (hereinafter, "Prospectus"); *see also id.* Ex. B, Form F-1 Registration Statement (hereinafter, "Reg. Stmt."), at 9-11. Investors also were warned that customers could change, cancel or delay orders with little or no notice, and that a variety of other events, including fundamental shifts in technology in target markets, could adversely impact revenues. Prospectus at 12, 14; Reg. Stmt. at 11, 13. In light of this and other extensive cautionary language in the Offering Documents, Plaintiffs cannot plausibly claim to have been misled about the possibility that Sequans' financial results could suffer as a result of changes in order patterns and/or a transition from WiMAX to other technologies such as LTE.

The Complaint fails to state a claim for numerous independent reasons as well. For example, negative causation is apparent on the face of the Complaint insofar as Plaintiffs' own allegations reveal that their losses resulted not from misrepresentations in the Offering Documents, but from a decline in orders that took place months after the IPO. *See* Point II.

Plaintiffs also lack standing to assert claims under Section 12(a)(2) of the Securities Act, because they purchased shares in the aftermarket — not in the IPO. *See* Point III. For these and other reasons set forth below and in the Company Memorandum, the Complaint should be dismissed.

### FACTUAL BACKGROUND AND ALLEGATIONS

The Underwriter Defendants respectfully refer the Court to the Statement of Facts in the Company Memorandum for the relevant factual background and allegations.

### ARGUMENT

Plaintiffs' Complaint asserts claims against the Underwriter Defendants under Sections 11 and 12(a)(2) of the Securities Act of 1933, based on allegations that misleading statements and omissions were made in Offering Documents for Sequans' IPO. The Complaint fails to state a claim under either provision for at least three reasons. First, Plaintiffs fail to plead any actionable misrepresentation or omission in the Offering Documents, particularly in light of the myriad disclosures of pertinent facts and risks. Second, the allegations of the Complaint on their face negate any claim that Plaintiff suffered losses as a result of any such misrepresentation or omission. Third, as aftermarket purchasers, Plaintiffs lack standing to bring a claim under Section 12(a)(2).

### I. THE COMPLAINT FAILS TO ALLEGE ANY ACTIONABLE MISREPRESENTATION OR OMISSION.

To state a claim under Section 11 or Section 12(a)(2), a complaint must, among other elements, "identify a misstatement or omission in the registration statement or prospectus" and "demonstrate that the misrepresentation was material." *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 413 (S.D.N.Y. 2009). Here, Plaintiffs attempt to satisfy this requirement by alleging that the Offering Documents misled investors in a variety of ways — principally, by failing to disclose that the WiMAX market was declining in ways that imminently

3

would affect Sequans' financial results and by mischaracterizing the Company's position in the LTE market and its ability to earn revenue from LTE products. Plaintiffs' allegations fail to state a claim, because there are no well-pleaded allegations in the Complaint demonstrating that the Offering Documents misled investors in any respect. Moreover, the alleged misstatements Plaintiffs rely on consist of forward-looking statements, puffery, and other categories of representations that are not actionable as a matter of law.

### A. *The Offering Documents Did Not Mislead Investors as to the Transition from WiMAX to LTE.*

Plaintiffs' claim that the Offering Documents failed to disclose the "steep decline" in the WiMAX market relative to LTE (e.g., Complaint ¶¶ 53) fails at the threshold, because documents incorporated in the Complaint by reference contradict the assertion that such a decline had occurred as of the IPO. As explained in detail in the Company Memorandum, materials cited and relied upon by Plaintiffs' in the Complaint show that WiMAX remained the dominant technology as of the offering date. *See* Compl. ¶¶ 34 (citing white paper conceding that LTE still had "only a handful of commercial service launches to its name"); *id.* ¶ 36 (white paper predicting that WiMAX would continue to have more subscribers than LTE through the end of 2011); *see also* Gimbel Decl. Ex. C at 13 (noting that, as of November 19, 2010 publication date, "less than 10 LTE networks had been commercially launched, versus the 100-plus WiMAX networks on active duty"); *see also* Co. Mem. at 3-4. Because documents integral to the Complaint contradict Plaintiffs' claim that the WiMAX market had suffered a "steep decline" as of the IPO, the Court should not credit the allegation that such a decline had occurred and was not adequately disclosed. *See, e.g., In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are

4

contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice.").

Similarly, there is no merit to Plaintiffs' claim that Sequans failed to disclose that the transition from WiMAX to LTE was "negatively impacting the Company's revenues." Compl. ¶ 58. Documents incorporated in the Complaint by reference contradict the allegation that Sequans' revenues had suffered from this transition as of the IPO date. The very earnings releases and earnings conference calls which Plaintiffs cite in the Complaint demonstrate that Sequans enjoyed "rapid growth in the first two quarters of the year" — a period which encompassed the April 15, 2011 offering date and months beyond. Compl. ¶ 80; *see also id.* ¶ 81 (quoting analyst call referring to "blistering pace of growth in the first six months"). Indeed, after the IPO, the Company announced two successive quarters of record revenue driven by sales of WiMAX chips. *See id.*; *see also* Gimbel Decl. Ex. D at 2, 4 (transcript of earnings conference call noting record shipments and earnings in first and second quarters); *id.* Ex. E (2d quarter 2011 earnings release). These facts belie Plaintiffs' claim that, at the time of the IPO, the transition from WiMAX to LTE was "negatively impacting" Sequans' revenues and leading to "softening" demand for its products. Compl. ¶ 74.

Almost four months after the IPO, on July 28, 2011, the Company did issue lower-than-expected guidance *for the second half of the year* based on "more cautious order patterns" for its WiMAX products. Compl. ¶ 80. But Sequans cannot be faulted for failing to inform investors in the Offering Documents of a decline in revenue would occur months in the future — a warning that would have required a crystal ball. "The securities laws do not require clairvoyance in the preparation of offering documents; these documents are not guarantees of an offering's subsequent success, nor do they insure investors against the vicissitudes of technology

and industry . . . ." *Panther Partners, Inc. v. Ikanos Comm., Inc.*, 538 F. Supp. 2d 662, 664 (S.D.N.Y. 2008) (Crotty, J.).

Moreover, the Offering Documents warned of the risks posed by the potential transition from WiMAX to LTE. Specifically, the Company cautioned that "substantially all" of its revenues were derived from WiMAX products; that "the number of new WiMAX customers is likely to be limited as customers prepare for the adoption and commercialization of LTE technology;" and that Sequans' financial results could suffer as a result of the transition:

> <u>We currently derive substantially all of our revenue from the sale of our semiconductor solutions for the WiMAX market and expect to do so through at least 2011. If the WiMAX market declines, our results of operations would be harmed</u> . . . . [T]he WiMAX market may decline significantly in anticipation of LTE deployments.</u> If customers believe LTE deployments will provide the same or superior coverage as WiMAX networks in the near future, customers may prefer to adopt LTE services and products instead of WiMAX, which in turn is likely to cause the WiMAX market to grow at a slower pace than expected or to decline. <u>If the WiMAX market declines prior to the commercial viability and acceptance of our LTE solutions, our business, operating results and financial condition will be harmed.</u>

Prospectus at 10 (emphasis added); *see also id.* Reg. Stmt. at 9. Because the Offering Documents warned "investors of exactly the risk the plaintiffs claim was not disclosed," Plaintiffs' claims are untenable and should be dismissed. *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F. 3d 2, 5 (2d Cir. 1996).

### B. *The Offering Documents Did Not Mislead Investors as to Sequans' Position in the LTE Market.*

Plaintiffs' allegation that the Offering Documents misled investors as to Sequans' position in the LTE market — and its ability to earn revenue from LTE products — is equally deficient. Although Plaintiffs assert that the Offering Documents failed to disclose that the

Company's LTE solutions were not yet commercially viable and would not generate meaningful revenue until 2012 (e.g. Complaint ¶ 61), the disclosures prove otherwise.

Sequans disclosed in the Offering Documents that it expected to generate "substantially all" of its revenue from the WiMAX market — not LTE — "through at least 2011." Prospectus at 10; Reg Stmt. at 9. It also disclosed that, as of the offering date, it had no LTE solution available for smartphones and all but one of its LTE products remained in development. See Prospectus at 66 (table showing only one available LTE product for USB dongles and Customer Premise Equipment and no available LTE products for smartphones); Reg. Stmt. at 64 (same). In addition, it warned that its LTE solutions had not yet achieved "commercial viability and acceptance" and that — if the WiMAX market declined before its products achieved commercial viability and acceptance — its financial results would be harmed. Prospectus, at 10; see also Reg. Stmt., at 9 (same). Given these disclosures and others discussed in the Company Memorandum, there is clearly no merit to Plaintiffs' allegation that the Offering Documents misled investors about the status of the Company's LTE products, their commercial viability, or their ability to generate revenue in the short term.[3]

### C. The Challenged Statements Are Not Actionable.

Plaintiffs' claims fail for the additional reason that the purportedly misleading statements in the Offering Documents are not actionable as a matter of law. The large majority of the challenged statements consist of forward-looking statements that were accompanied by meaningful cautionary language. Under the 'bespeaks caution' doctrine, such statements are

---

[3] The Complaint also alleges, in passing, that the Offering Documents made certain false statements about the capabilities of Sequans' WIMAX chips. Compl. ¶¶ 54-55. As explained in the Company Memorandum, these statements were accurate descriptions of the *maximum* performance of the chips, notwithstanding Plaintiffs' irrelevant allegation that, on certain networks such as the Sprint WiMAX network, performance was slower. See Co. Mem. at 18-19.

"immaterial as a matter of law" and do not give rise to liability under the securities laws. *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d at 413.

Plaintiffs assert, for example, that the Company misled investors by stating in the Offering Documents that it expected to "maintain [its] market position in WiMAX;" to leverage its expertise to "become a leader in LTE;" and to continue "to grow" revenues. Compl. ¶ 52. All of these statements are forward-looking in nature and were accompanied by meaningful cautionary language. Both the Prospectus and the Registration Statement warned that Sequans' "expectations regarding ... sales" and statements about "trends" in the "markets in which we compete and in which our products are sold, including statements regarding the WiMAX and LTE markets[,]" were forward-looking statements that were "based on assumptions and subject to risk and uncertainties." Prospectus at 30; Reg. Stmt. at 29. The Offering Documents also cautioned investors that it is impossible to provide assurances that the Company's "plans, intentions or expectations will be achieved." Prospectus at 30; Reg. Stmt. at 29. Investors were also warned of the risk that future financial results would suffer if customers transitioned to WiMAX before the Company's LTE products were commercially viable (Prospectus at 10; Reg. Stmt. at 9); if the Company's LTE "solutions are not successfully developed or adopted by our customers" (Prospectus at 11; Reg. Stmt. at 10); if customers canceled, changed, or delayed orders, which they could do with little or no notice and without penalty (Prospectus at 14; Reg. Stmt. at 13); or if there was a market shift to other technologies (Prospectus at 12; Reg. Stmt. at 11). In light of this and other extensive cautionary language in the Offering Documents, the many forward-looking statements challenged in the Complaint are clearly protected by the 'bespeaks caution' doctrine. *See In re Britannia Bulk Holdings Inc.*, 665 F. Supp. 2d at 413; *see also* Co. Mem. at 17-18.

8

The balance of statements challenged by Plaintiff are no more actionable. As discussed in detail in the Company Memorandum, the statements are either accurate or consist of "puffery" and general statements of corporate optimism that are not actionable as a matter of law. *See, e.g., Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("expressions of puffery and corporate optimism do not give rise to securities violations"); *see also* Co. Mem. at 16-19. As such, they do not give rise to a viable claim under Section 11 or Section 12(a)(2).

## II. THE COMPLAINT ON ITS FACE ESTABLISHES THE DEFENSE OF NEGATIVE CAUSATION.

Under both Section 11 and Section 12(a)(2), a defendant may not be held liable if there is "negative causation" — that is, if the allegedly misleading statements in the offering documents did not cause the losses complained of by the plaintiff. *In re Britannia Bulk Holdings Inc.*, 665 F. Supp. 2d at 418. A court may dismiss a claim based on this defense at the pleading stage where "negative causation is apparent on the face of the Complaint . . . ." *Id.*

Here, Plaintiffs claim to have suffered losses when Sequans' stock price fell on July 28, 2011, following disclosures by the Company of lower-than-expected earnings guidance for the second half of the year. *See* Compl. ¶¶ 77-82. The disclosures in question revealed that, while the Company had experienced "rapid growth in the first two quarters of the year," it had recently experienced "a drop in demand for the US WiMAX market" that would limit its growth in the second half. *Id.* ¶ 82.[4] Because the negative disclosures concerned a drop in demand that occurred months after the IPO, it is clear that the resulting drop in Sequans' stock price had no

---

[4] Plaintiffs also assert that the second-quarter results announced by Sequans were "disappointing" (Complaint ¶ 130), but this allegation is contradicted by the earnings disclosures cited in the Complaint, which reveal that the Company experienced "blistering" growth in the first two quarters of the year. *See* Compl. ¶ 81; Gimbel Decl. Ex. E at 2 (announcing "another quarter of strong growth with record revenue and adjusted profits" in the second quarter).

9

connection with any misrepresentation or omission in the Offering Documents, which were prepared prior to the IPO and described Sequans' business activities up to the time of the IPO.

In *Britannia Bulk Holdings*, the Court considered allegations that the plaintiff suffered losses as the result of disclosures concerning events that occurred a month or more "after the IPO was already completed." *In re Britannia Bulk Holdings*, 665 F.Supp.2d at 419. Because the disclosures did "not speak at all to the Company's business activities prior to or at the time of the IPO," they did not reflect "any falsity of the Offering Documents." *Id* (internal citations and quotation marks omitted). As a result, the Court concluded that the defense of negative causation was apparent on the face of the Complaint. The same is true here. Because the Complaint concedes that Sequans' stock price dropped as a result of events that occurred after the IPO — and that necessarily were not addressed in the Offering Documents — Plaintiffs' losses cannot plausibly be attributed to any statement or omission in the Offering Documents. Plaintiffs' claims under Section 11 and Section 12 should therefore be dismissed. *See id.*

III.  PLAINTIFFS LACK STANDING TO ASSERT A CLAIM UNDER SECTION 12.

Section 12(a)(2) provides a private right of action against sellers who make material misstatements "by means of a prospectus." 15 U.S.C. § 77l(a)(2). As the Supreme Court held in *Gustafson v. Alloyd Co. Inc.*, 513 U.S. 561 (1995), the statutory reference to a "prospectus" is "a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder . . . ." *Id* at 584 (inner quotations omitted). Accordingly, the private right of action in the statute extends only to purchasers who acquired stock in an initial public offering — not those who acquire shares in the aftermarket. *See In re Cosi Sec. Litig.*, 379 F. Supp. 2d 580, 588-89 (S.D.N.Y. 2005) (dismissing Section 12(a)(2) claim where "plaintiffs have not alleged that they purchased their shares in the IPO...").

10

Here, Plaintiffs lack standing to bring a claim under Section 12(a)(2) because the Complaint does not plead that they purchased shares in the IPO. The Complaint instead alleges that Plaintiffs purchased shares "pursuant to and/or traceable to" the IPO (Complaint ¶ 99) — an allegation that courts in this district repeatedly have rejected as insufficient because it leaves open the possibility that the plaintiff purchased in the secondary market. *See In re Cosi Sec. Litig.* 379 F.Supp.2d at 580; *see also, e.g., In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2004 WL 1435356, at * 5 (S.D.N.Y. June 28, 2004). Plaintiffs not only fail to allege that they purchased shares in the IPO, but have admitted in certifications filed with the Court that their purchases occurred well after the April 15, 2011 IPO date — beginning on May 24, 2011 and continuing through July 27, 2011. *See* Gimbel Decl. Ex. F.

Unable to assert that they purchased directly in the IPO, Plaintiffs argued in their pre-motion conference letter that a plaintiff has standing under Section 12(a)(2) so long as the plaintiff purchased securities at a time when there was an obligation to provide a prospectus, even if the transaction occurred in the aftermarket. Plaintiffs' reliance on this broad view of standing is misplaced, because the decision from which it derives —*Feiner v. SS & C Tech., Inc.*, 47 F. Supp. 2d 250 (D.Conn. 1999)[5] — repeatedly has been rejected. As courts have recognized, the broad view of standing articulated in *Feiner* is "contrary to the great weight of authority and, indeed, represents the minority opinion even within the Second Circuit." *See Local 295/Local 851 IBT Emp'r. Grp. Pension Trust and Welfare Fund v. Fifth Third Bancorp*, 731 F.Supp.2d 689, 714 (S.D. Ohio 2010); *In re Worldcom, Inc. Sec. Litig.*, 2004 WL 1435356, at * 5 ("The *Feiner* analysis is not persuasive."). Adopting such a broad view of standing would ignore the

---

[5] Plaintiffs cited *In re Giant Interactive Group, Inc. Securities Litigation*, 643 F. Supp. 2d 562, 574 (S.D.N.Y. 2009) in their pre-motion conference letter, but the decision relies on *Feiner.*

11

Supreme Court's instruction that Section 12(a)(2) applies only to public offerings and that "the Securities Exchange Act" — not Section 12(a)(2) of the Securities Act — "generally regulates post-distribution trading." *Fifth Third Bancorp*, 731 F. Supp. 2d at 714.

Finally, even under *Feiner*, the allegations of the Complaint are insufficient to demonstrate standing. The court in *Feiner* made clear that a plaintiff who purchases in the aftermarket has standing to assert claims against an underwriter only to the extent that the underwriter acquired shares in the aftermarket and resold them to the plaintiff or acted as a dealer for third parties in an aftermarket sale to the plaintiff. *Feiner*, 47 F. Supp. 2d at 254 ("[A] defendant's mere status as an underwriter is not sufficient to make it a seller to all purchasers for purposes of § 12(a)(2)"); *In re Worldcom, Inc. Sec. Litig.*, 2004 WL 1435356, at * 5 (under *Feiner*, "plaintiffs who purchased shares in the aftermarket from someone other than the defendant" do not have standing). Nowhere in the Complaint do Plaintiffs allege that they acquired their shares from the Underwriter Defendants in any such transaction.

## CONCLUSION

For the foregoing reasons, and those set forth in the Company Memorandum, all claims against the Underwriter Defendants should be dismissed with prejudice.

Dated: New York, New York
May 14, 2012

COVINGTON & BURLING LLP

/s/ Mark P. Gimbel

Mark P. Gimbel
David W. Haller
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: (212) 841-1000

*Attorneys for Defendants UBS Limited and Jefferies & Company, Inc.*