UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DONALD DEAN JOHNSON,

                             Plaintiff,

v.

SEQUANS COMMUNICATIONS S.A., et al.,

                             Defendants.

Civil Action No. 11-cv-06341 (PAC)

**CLASS ACTION**

**ORAL ARGUMENT REQUESTED**

---

### MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS OF DEFENDANTS SEQUANS COMMUNICATIONS S.A., GEORGES KARAM, DEBORAH CHOATE, MICHAEL ELIAS, JAMES PATTERSON, DAVID ONG, HUBERT DE PESQUIDOUX, DOMINIQUE PITTELOUD, ALOK SHARMA, ZVI SLONIMSKY, AND T. CRAIG MILLER

Dated:  May 14, 2012

ORRICK HERRINGTON & SUTCLIFFE

Michael D. Torpey, admitted *pro hac vice*
James N. Kramer, admitted *pro hac vice*
James E. Thompson, admitted *pro hac vice*
The Orrick Building
405 Howard Street
San Francisco, California  94105-2669
+1-415-773-5700

Attorneys for Defendants Sequans
Communications S.A., Georges Karam,
Deborah Choate, Michael Elias, James
Patterson, David Ong, Hubert de Pesquidoux,
Dominique Pitteloud, Alok Sharma, Zvi
Slonimsky, and T. Craig Miller

## TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION ............................................................................................. 1

II.  STATEMENT OF FACTS ............................................................................... 3

    A.   The History of 3G/4G Technology ........................................................ 3

    B.   Sequans' Market Position ...................................................................... 4

    C.   Sequans' IPO and Public Disclosures.................................................... 4

    D.   Sequans' Record Sales Following Its IPO ............................................. 6

    E.   Sprint's Adoption of the iPhone ............................................................ 7

    F.   The Instant Complaint............................................................................ 7

III. LEGAL STANDARD...................................................................................... 8

IV.  PLAINTIFFS DO NOT PLEAD SUFFICIENT FACTS TO ESTABLISH
    A SECTION 11 CLAIM .................................................................................. 9

    A.   Statements Challenged By Plaintiffs ..................................................... 9

    B.   The CAC Does Not Sufficiently Allege That Any Statement Was
        False When Made ................................................................................ 10

        1.   Plaintiffs Have Not Plead Facts Showing the WiMAX
              Market Was in a Steep Decline Due to a Shift to LTE ............... 11

        2.   Plaintiffs Have Not Pled Facts Establishing That Sequans'
              Sales Were Slowing .................................................................... 13

        3.   Sequans Disclosed That It Would Not Generate Meaningful
              Revenue From LTE in the Near Future ....................................... 14

        4.   Sequans Warned Investors of the Precise Risks that
              Ultimately Came to Pass ............................................................. 15

    C.   None of the Challenged Statements Are Actionable ............................. 16

        1.   Vague and Generalized Statements Are Not Actionable............. 17

        2.   The Forward-Looking Statements Are Not Actionable............... 17

        3.   Accurate Risk Disclosures Are Not Actionable.......................... 18

        4.   The Remaining Challenged Statements Are Accurate................. 18

V.   PLAINTIFFS DO NOT PLEAD SUFFICIENT FACTS TO ESTABLISH
    A SECTION 12(A)(2) CLAIM......................................................................... 19

    A.   Plaintiffs Do Not Have Standing Under Section 12(a)(2) ...................... 19

    B.   Plaintiffs Have Not Alleged Defendants Were Statutory "Sellers"......... 19

    C.   The CAC Does Not Sufficiently Allege Any Statement Was False
        When Made Or Is Even Actionable........................................................ 20

**TABLE OF CONTENTS**

**Page(s)**

VI.    PLAINTIFFS DO NOT PLEAD SUFFICIENT FACTS TO ESTABLISH
        A SECTION 10(B) CLAIM .................................................................... 20

        A.    Statements Challenged By Plaintiffs ...................................... 21

        B.    The CAC Does Not Sufficiently Allege Any Statement Was False
               When Made ............................................................................ 21

        C.    None of the Challenged Statements Are Actionable .............. 21

        D.    Plaintiffs Have Not Pled The Requisite Strong Inference of
               Scienter ................................................................................. 22

               1.    Plaintiffs Have Not Established A Motive to Commit
                      Securities Fraud ........................................................... 22

               2.    Defendants' Trading Activity Negates Any Potential
                      Inference of Scienter .................................................... 23

               3.    The Core Operations Doctrine Does Not Provide Scienter ......... 23

VII.   PLAINTIFFS FAIL TO PLEAD A SECTION 15 OR 20(A) VIOLATION ...... 25

VIII.  CONCLUSION ...................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Achtman v. Kirby, McInerney & Squire,*
  LLP, 464 F.3d 328 (2d Cir. 2006) ......................................................................8

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)............................................................................................8

*Avon Pension Fund v. GlaxoSmithKline PLC,*
  2009 WL 2591173 (2d Cir. Aug. 24, 2009).......................................................23

*Barnum v. Millbrook Care Ltd. P'ship,*
  850 F. Supp. 1227 (S.D.N.Y. 1994)..............................................................11, 13

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007)............................................................................................8

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.,*
  2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ......................................................12

*Boguslavsky v. Kaplan,*
  159 F.3d 715 (2d Cir. 1998)..............................................................................25

*Breacher v. Citigroup Inc.,*
  797 F. Supp.2d 354 (S.D.N.Y. 2011).................................................................24

*Capri v. Murphy,*
  856 F.2d 473 (2d Cir. 1988)..............................................................................20

*DeBlasio v. Merrill Lynch & Co., Inc.,*
  2009 WL 2242605 (S.D.N.Y. July 27, 2009) ....................................................14

*DeMaria v. Andersen,*
  318 F.3d 170 (2d Cir. 2003)................................................................................8

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,*
  553 F.3d 187 (2d Cir. 2009)...............................................................9, 17, 23, 25

*Frederick v. Mechel OAO,*
  2012 WL 1193724 (2d Cir. 2012).......................................................................24

*Garber v. Legg Mason, Inc.,*
  537 F. Supp. 2d 597 (S.D.N.Y. 2008).................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)...................................................................................24

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995)................................................................................................................9, 19

*Hutchinson v. Deutsche Bank Sec. Inc.*,
    647 F.3d 479 (2d Cir. 2011)..................................................................................................13

*In re Barclays Bank PLC Sec. Litig.*,
    2011 WL 31548 (S.D.N.Y. Jan. 5, 2011) ............................................................................19

*In re Duane Reade Inc. Sec. Litig.*,
    2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) ....................................................................21

*In re Gen. Elec. Co. Sec. Litig.*,
    2012 WL 90191 (S.D.N.Y. Jan. 12, 2012) ..........................................................................24

*In re Initial Pub. Offering Sec. Litig.*,
    358 F. Supp. 2d 189 (S.D.N.Y. 2010)....................................................................................9

*In re Leapfrog Enters., Inc. Sec. Litig.*,
    527 F. Supp. 2d 1033 (N.D. Cal. 1997) ............................................................................9, 18

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)..................................................................................................19

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
    2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ....................................................................18

*In re Prestige Brands Holding, Inc.*,
    2006 WL 2147719 (S.D.N.Y. July 10, 2006) ......................................................................23

*In re Salomon Analyst Winstar Litig.*,
    2006 WL 510526 (S.D.N.Y. Feb. 28, 2006)........................................................................15

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)....................................................................................................23

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp.2d 326 (S.D.N.Y. 2011)..............................................................................24, 25

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*,
    2009 464934, at *8 (S.D.N.Y. Feb. 25, 2009) ....................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*,
  32 F.3d 697 (2d Cir. 1994)........................................................................8

*Lasker v. N.Y. State Elec. & Gas Corp.*,
  85 F.3d 55 (2d Cir. 1996)........................................................................17

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
  238 F.3d 363 (5th Cir. 2001) ...................................................................20

*Mangiafico v. Blumenthal*,
  471 F.3d 391 (2d Cir. 2006)......................................................................3

*Matusovsky v. Merrill Lynch*,
  186 F. Supp. 2d 397 (S.D.N.Y. 2002)......................................................11

*Miller v. Holtzbrinck Publishers, LLC*,
  2009 WL 528620 (S.D.N.Y. Mar. 3, 2009) ...............................................9

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)...............................................................15, 22

*Olkey v. Hyperion 1999 Term Trust*,
  98 F.3d 2 (2d Cir. 1996).............................................................8, 14, 16

*P. Stolz Family P'ship L.P. v. Daum*,
  166 F. Supp. 2d 871 (S.D.N.Y. 2001)......................................................25

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
  538 F. Supp. 2d 662 (S.D.N.Y. 2008)................................................ passim

*Podany v. Robertson Stephens, Inc.*,
  318 F. Supp. 2d 146 (S.D.N.Y. 2004)......................................................21

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)...............................................................13, 23

*Salinger v. Projectavision, Inc.*,
  934 F. Supp. 1402 (S.D.N.Y. 1996).........................................................22

*San Diego Cnty. Emps. Ret. Ass'n v. Maounis*,
  749 F. Supp. 2d 104 (S.D.N.Y. 2010).......................................................18

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008).......................................................................3

# TABLE OF AUTHORITIES

**Page(s)**

*Steinberg v. PRT Grp., Inc.*,
   88 F. Supp. 2d 294 (S.D.N.Y. 2000)..................................................................8

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2008).............................................................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...............................................................................9, 20, 22

*Tyler v. Liz Claiborne*,
   814 F. Supp. 2d 323 (S.D.N.Y. 2011)..............................................................24

**STATUTES**

15 U.S.C.

   § 77k(a) ................................................................................................................8
   § 78u-4(b)(1)(B)..................................................................................................20
   § 78u-4(b)(2)........................................................................................................24

1933 Act...................................................................................................................8

1934 Act...................................................................................................................8

PSLRA .......................................................................................................9, 20, 24

SEC Act of 1933

   §11 .........................................................................................................................7
   §12(a)(2) ...................................................................................................... passim

SEC Act of 1934

   §10(b) .......................................................................................................... passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9(b) ...........................................................................................9, 20

Fed. R. Civ. P. 12(b)(6).........................................................................................8

## I.    INTRODUCTION

The gravamen of Plaintiffs' Consolidated Amended Complaint ("CAC") is that Defendants knew at the time of Sequans Communications S.A.'s ("Sequans") initial public offering ("IPO"), but failed to disclose, that sales of Sequans' 4G WiMAX chips were declining because of a market transition to 4G LTE technology.  Unfortunately for Plaintiffs, their core theory of fraud is belied by the facts alleged in the CAC and in judicially noticeable documents.

Contrary to Plaintiffs' claim of declining sales, following the IPO, Sequans announced successive quarters of record revenues.  On April 28, 2011, weeks after the IPO, Sequans announced record results for its first quarter of 2011, with sales of $25.4 million.  The next quarter (the second quarter of 2011) was even better, with sales of $30.6 million.

It was not until months after the IPO that this momentum began to change when Sprint, Sequans' largest indirect customer, began displaying "more cautious order patterns" of HTC phones containing Sequans' chips.  Understanding that this would likely impact its future results, Sequans immediately disclosed this to its investors.  Shortly thereafter, Sprint finalized a four year deal with Apple to purchase at least $15.5 billion worth of 3G iPhones.  While Sprint's reversion to 3G technology was unexpected, Sequans repeatedly warned investors of this type of risk in its offering documents, including that it was vulnerable to customers reducing or canceling chip orders with little or no notice, and that it had limited visibility into future demand in the wireless market.

Notwithstanding Sequans' two consecutive quarters of record results post-IPO and prompt disclosure of "more cautious order patterns," Plaintiffs attempt to create a hindsight claim that the offering documents, issued months earlier, were somehow false or misleading. But Plaintiffs' theory of fraud is both implausible and contrary to the allegations in the CAC. Plaintiffs argue that Defendants failed to disclose that: (1) the WiMAX market was in steep

decline due to a shift to LTE; (2) Sequans' sales were slowing as a result of this shift; and (3) Sequans was unable to generate meaningful revenue from LTE at the time of the IPO. Yet Plaintiffs' own allegations show that the WiMAX market was not in steep decline at the time of the IPO, Sequans' sales increased for two quarters after its IPO, and Sequans specifically warned investors that it did not expect to earn revenue from LTE in the near future.

Not only are none of the challenged statements false or misleading, but none are actionable in the first instance. All of them are vague generalized statements, forward looking statements, accurate statements of historical fact, statement of opinion, or accurate risk disclosures that are not actionable as a matter of law.

Plaintiffs' Section 12(a)(2) claim also fails because Plaintiffs have not – and cannot – allege facts establishing that they purchased shares in the IPO. Nor do Plaintiffs adequately allege that Defendants were statutory sellers. Both are fatal to a Section 12(a)(2) claim.

Plaintiffs' Section 10(b) claim must also be dismissed because Plaintiffs have not pled facts that give rise to the requisite strong inference of scienter. Plaintiffs have not alleged facts showing that anyone at Sequans knew anything that would contradict any of the challenged statements. In fact, Defendants' lack of trading activity negates any potential inference of scienter. Plaintiffs admit that Defendants held more than eleven million ADRs when the share price declined in July 2011, therefore suffering implied losses greater than the entire putative class. This is flatly inconsistent with Plaintiffs' theory that Defendants artificially inflated Sequans' share price in order to personally benefit. Without facts to support a strong inference of scienter, Plaintiffs quickly turn to the core operations doctrine. Not only is this doctrine inapplicable, but it does not provide an independent basis for scienter.

Finally, because Plaintiffs fail to plead a predicate Section 11, 12(a)(2) or 10(b) violation,

Plaintiffs' control person claims under Sections 15 and 20(a) must also be dismissed.[1]

## II.   STATEMENT OF FACTS

### A.   The History of 3G/4G Technology

3G ("third generation") technology for mobile phones was introduced in the late 1990s and by 2006, its networks were 90 times faster than previous technologies for data transmission. Declaration of James E. Thompson ("Decl.") Ex. A, 60.[2]  3G technology, however, was constrained by data transfer rates optimized for voice, therefore prompting the development of 4G technology to meet the increasing demand for wireless broadband services.  *Id.*

4G technology is faster and more reliable than 3G.  CAC ¶73.  The main 4G protocols are WiMAX and LTE.  CAC ¶24.  Sprint first introduced WiMAX in 2010, and by the time of Sequans' April 2011 IPO, WiMAX constituted the vast majority of the 4G market with more than 100 active networks worldwide compared to less than 10 LTE .  CAC ¶26; Decl. Ex. D, 13. WiMAX had experienced exponential growth since introduction, and this growth was expected to continue for several years.  WiMAX chip sales were expected to increase from 13.6 million in 2010 to 60.5 million in 2014.  Decl. Ex. A, 62.

While a portion of the 4G market was expected to ultimately transition to LTE technology, this transition was not predicted to "gather real steam" until 2013 or 2014.  Decl. Ex. E, 1; *see also* Decl. Ex. D, 12; Ex. F, 2.  LTE has two variants: TDD and FDD, the choice of which is based on the spectrum allocated to the operator.  Decl. Ex. A, 62.  TDD transmits and receives signals on the same frequency using a time-sharing scheme, while FDD uses different frequencies to transmit and receive signals simultaneously.  *Id.* at 61.  Despite the U.S.'s early

---

[1] Sequans and the Individual Defendants join in and incorporate by reference the arguments set forth in the memorandum of law in support of Defendants' UBS Limited and Jefferies & Company, Inc. (collectively "Underwriter Defendants") motion to dismiss.

[2] On a motion to dismiss, the Court may take judicial notice of documents referenced in the complaint, documents filed with the Securities Exchange Commission ("SEC"), and matters of public record.  *See e.g.*, *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 424-25 (2d. Cir. 2008); *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d. Cir. 2006) (judicial notice of documents "integral" to complaint proper).

deployment of FDD technology, TDD was predicted to gain a significant foothold, particularly in large developing countries like China and India.  *Id*. at 62; Decl. Ex. D, 29-30.

**B.** **Sequans' Market Position**

Sequans makes 4G wireless chips, which are embedded in smartphones, tablets, and other data devices.  Decl. Ex. A, 1, 38.  Sequans sells its chips to manufacturers, like HTC, who incorporate the chips, along with other components, into end products.  *Id*.  Those products are then sold to carriers, like Sprint, who combine them with their service.  *Id*.  Sequans' chips are incorporated during the products' design stage, thus its sales cycle is lengthy and often lasts more than twelve months, particularly in the case of smartphones.  *Id*. at 14.  During this extended sales cycle, Sequans' customers may cancel, change, or delay their orders with little or no notice and without penalty.  *Id*.

Sequans capitalized on WiMAX's growth through the inclusion of its chips in extremely successful devices such as the HTC EVO 4G smartphone.  *Id*. at 1, 59.  At the time of the IPO, Sequans expected this growth to continue as its chips were included in several widely anticipated WiMAX devices scheduled to be released throughout 2011 and early 2012.  CAC ¶26; Decl. Ex. A, 1, 59.

Despite WiMAX's success, Sequans was also investing heavily in developing LTE solutions at the time of the IPO.  Decl. Ex A, 11.  Sequans had developed LTE-TDD chips that were deployed in trials conducted in China in 2010, and was in the process of developing several dual mode WiMAX-LTE chips, FDD-TDD chips, and TDD-only chips scheduled to be released in late 2011 or early 2012.  *Id*. at 1, 59, 66.  These LTE products were not expected to generate substantial revenue until 2012 at earliest.  Sequans therefore warned investors that "substantially all" of its revenue "through at least 2011" would come from WiMAX products.  *Id*. at 10.

**C.** **Sequans' IPO and Public Disclosures**

On March 22, 2011, Sequans filed its Form F-1 Registration Statement ("Registration Statement") for its IPO of 7,700,000 American Depository Shares ("ADS")[3] at $10 per share. The IPO Prospectus ("Prospectus") became effective on April 15, 2011.[4]  The offering was conducted via firm commitment underwriting by the Underwriter Defendants, wherein the banks purchased the securities directly from Sequans and resold the shares to the public.  *Id.* at 110.

The Offering Documents provided extensive disclosures regarding Sequans' business, including detailed cautionary language regarding the risks that it faced.  More than <u>twenty-two pages</u> described (1) the various events that could alter demand for Sequans' products, including technological developments and issues concerning growth of WiMAX and LTE; (2) Sequans' dependence upon a limited number of customers, particularly HTC; (3) that Sequans' customers could cancel, change, or delay purchase commitments with little or no notice and without penalty; (4) that Sequans focused solely on 4G and that a market shift to other technologies could greatly affect the Company; and (5) that as a result of these and other risks, Sequans had limited visibility into future demand.  *Id.* at 9-29.

Specifically, the Offering Documents contained the following Risk Factors:

- "Our revenue and operating results have fluctuated significantly from period to period and will do so in the future…Factors that may cause our operating results to fluctuate include: reductions in orders or cancellations by our customers, particularly HTC and Huawei; changes in size, growth, or growth prospects of the WiMAX and LTE markets; [and] changes in the competitive dynamics of our market, including …our ability to compete in the LTE market."  *Id.* at 9.

- "A significant amount of our total revenue is attributable to a small number of customers and we anticipate that this will continue to be the case for the foreseeable future.  The customers may decide not to purchase our semiconductor solutions at all, to purchase fewer semiconductors than they did in the past, or to alter the terms on which they purchase products."  *Id.* at 10.

---

[3] An ADS is a U.S. dollar-denominated equity share of a foreign-based company available for purchase on an American stock exchange.

[4] The Registration Statement and Prospectus are collectively referred to as the "Offering Documents."

- "We do not have firm, long-term purchase commitments from our customers. Substantially all of our sales are made on a purchase order basis, which permits our customers to cancel, change, or delay product purchase commitments with little or no notice to us and without penalty… Our ability to accurately forecast demand can be harmed by a number of factors, including inaccurate forecasting by our customers, changes in market conditions, changes in our product order mix and demand for our customers' products.  Even after an order is received, our customers may cancel these orders or request a decrease in production quantities. Any such cancellation or decrease subjects us to a number of risks, most notably that our projected sales will not materialize on schedule or at all, leading to unanticipated revenue shortfalls…"  *Id*. at 14.

- "A fundamental shift in technologies in any of our target markets could harm our competitive position within those markets.  Our failure to anticipate these shifts, to develop new technologies or to react to changes in existing technologies could materially delay our development of new products, which could result in product obsolescence, decreased revenue, and a loss of design wins."  *Id*. at 12.

**D.      Sequans' Record Sales Following Its IPO**

On April 28, 2011, two weeks after the IPO, Sequans announced record results for the first quarter of 2011.  Due to the continued demand for 4G devices, Sequans' revenue grew to $25.4 million, an increase of 11% from the prior quarter and 149% from the prior year.  Decl. Ex. G, 4.  On July 28, 2011, Sequans released its second quarter results.  Revenue increased 21% from the first quarter, and 84% from the prior year.  Decl. Ex. H, 4.  Moreover, the number of units shipped between the first and second quarters increased significantly, from 2.1 million to 2.9 million.  Decl. Ex. I, 4.  This significant growth reflected Sequans' expanding role in the WiMAX market during the first half of 2011.[5]  Decl. Ex. H, 4.

The July 28, 2011 earnings release also disclosed that Sequans was seeing "more cautious order patterns" for several WiMAX phones in the United States.  *Id*.  Consequently, Sequans' guidance for the second half of 2011 was below market expectations, with forecasted revenue of

---

[5] Despite increased revenue, Sequans' net profit declined between the first and second quarters of 2011 because of a pre-negotiated price reduction triggered by a "significant volume increase associated with the launch of new 4G smartphones and tablets."  Decl. Ex. H, 4.

less than $50 million.[6]  *Id*. at 5.  That same day, the price of Sequans' ADS declined from $15.43 to $8.55.  CAC ¶82.

### E.     Sprint's Adoption of the iPhone

HTC, the producer of the popular 4G EVO line of smartphones, was Sequans' primary customer, accounting for 78% of Sequans' revenue in the first quarter of 2011.  Decl. Ex. I, 4; *see also* Decl. Ex. A, 10.  Sprint, a leading WiMAX provider, was HTC's primary customer for 4G phones.  CAC ¶26.  Accordingly, Sequans' success was closely tied to both HTC and Sprint. *Id*.  Throughout 2010 and early 2011, HTC's WiMAX phones proved extremely popular with Sprint customers, and thus, HTC was ordering Sequans' chips at a rapid pace.  Decl. Ex. G, 4; Ex. H, 4.

In mid 2011, well after Sequans' IPO, Sprint began displaying "more cautious order patterns" of HTC phones containing Sequans' chips.  Decl. Ex. H, 4; Ex. I, 3.  Shortly thereafter, in September 2011, Sprint finalized a deal with Apple to carry the 3G iPhone, agreeing to purchase at least $15.5 billion worth of these phones over four years.  Decl. Ex. J, 44-45, F-30. Sprint's reversion from 4G to 3G technology was unexpected given that it had, until then, been the leader and driver of the 4G market.  Decl. Ex. L, 32, 49.

### F.     The Instant Complaint

Plaintiffs filed the CAC on January 31, 2012, on behalf of all persons who purchased Sequans ADS "pursuant and/or traceable to the Company's IPO on or about April 15, 2011, as well as purchasers of the Company's ADS between April 15, 2011 and July 27, 2011."  CAC ¶14.  Plaintiffs assert claims against Sequans, the Individual Defendants, and the Underwriter Defendants pursuant to Sections 11 and 12(a)(2) of the Securities Act of 1933 ("1933 Act"). Plaintiffs also allege violations of Section 10(b) of the Securities Exchange Act of 1934 ("1934

---

[6] Sequans had not previously issued guidance.

Act") against Sequans and Individual Defendants Karam and Choate.[7]

## III.   LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), Plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face" and that "rises above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  When evaluating a complaint, a court assumes the veracity only of well-pleaded factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  Pleadings that "are no more than conclusions[] are not entitled to the assumption of truth." *Id.* at 679; s*ee also Achtman v. Kirby, McInerney & Squire*, LLP, 464 F.3d 328, 337 (2d Cir. 2006) ("Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss.").

Each of Plaintiffs' claims, including the Section 11 claim, requires an underlying false statement or omission of material fact necessary to make the statement not misleading.  *See Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000).  The statement must be false or misleading <u>when made</u>.  15 USC § 77k(a); *see also Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008).  The central inquiry in determining whether a statement is materially misleading is "whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the investment."  *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003).  Where a company discloses the complained of risk, the Second Circuit has repeatedly held that a reasonable investor would not have been misled and that the statements are not actionable.  *See, e.g.*, *Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2, 9 (2d Cir. 1996); *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d. Cir. 1994).

---

[7] Plaintiffs also allege violations of Section 15 of the 1933 Act against the Individual Defendants and violations of Section 20(a) of 1934 Act against Defendants Karam and Choate.

Moreover, certain types of statements are not actionable as a matter of law.  A securities claim cannot be premised on generalized statements of optimism, statements of opinion that are held by the speaker, accurate statements of historical fact, forward-looking statements coupled with meaningful cautionary language, or accurate risk disclosures.  *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d. Cir. 2009); *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 210-12 (S.D.N.Y. 2010); *In re Leapfrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048-49 (N.D. Cal. 1997).

In addition to a material misstatement or omission, Section 12(a)(2) also requires the "seller" to have passed title or successfully solicited the purchase of the security.  Moreover, to have standing, plaintiffs must have purchased the securities in the initial public offering.  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 578 (1995).

Section 10(b) requires a plaintiff to allege particularized facts showing not only the existence of a material misrepresentation or omission, but that the statement was made with the intent to mislead investors.  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).  Section 10(b) claims are subject to the heightened pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA.  The CAC must therefore plead with particularity the who, what when, where, and how of the alleged fraud, and plead an inference of scienter that is "cogent and compelling, thus strong in light of other explanations."  *Miller v. Holtzbrinck Publishers, LLC*, 2009 WL 528620, at *3 (S.D.N.Y. Mar. 3, 2009); *Tellabs*, *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

## IV.   PLAINTIFFS DO NOT PLEAD SUFFICIENT FACTS TO ESTABLISH A SECTION 11 CLAIM

### A.   Statements Challenged By Plaintiffs

The CAC alleges that Sequans made several misleading statements in its Registration Statement.  The challenged statements fall into three general categories.  First, Plaintiffs attack

statements about the WiMAX market and Sequans' position in it.  *See* CAC ¶52 ("We believe
we have a strong position in the WiMAX market and are an early leader in the LTE market");
*see also* ¶¶55, 57, 72-73.

Second, Plaintiffs challenge statements regarding Sequans' strategy, expectations, and
anticipated future earnings.  *See* CAC ¶52 ("[O]ur strategy include[s] …maintaining and
extending our market position in WiMAX…[and] leveraging WiMAX expertise to become a
leader in LTE…"); ¶57 ("We expect our product revenue to continue to grow in absolute terms,
although at a significantly lesser rate…"); *see also* ¶¶72-73.

Third, Plaintiffs complain about statements concerning Sequans' ability to generate
revenue from LTE.  *See* CAC  ¶59 (Sequans expects "[d]eployments of TD LTE networks… to
be driven by wireless carriers…in China [and] India…");  ¶60 ("[W]e have also leveraged our
leadership in WiMAX to successfully develop LTE semiconductor solutions that are being
deployed globally…"); *see also* ¶¶52, 57, 63, 72-73.

**B.    The CAC Does Not Sufficiently Allege That Any Statement Was False When
Made**

To plead a Section 11 violation, Plaintiffs must plead facts establishing that a statement
was false or misleading <u>at the time it was made</u>, here April 15, 2011.  Plaintiffs argue that the
challenged statements are misleading because they omit that: (1) WiMAX was in steep decline
due to a shift to LTE; (2) Sequans' sales were slowing as a result of this shift; and (3) Sequans
was unable to generate meaningful revenue from LTE.  However, the allegations of the CAC and
judicially noticeable documents refute that WiMAX was in a steep decline, show that Sequans'
sales were actually increasing, and that the Company expressly disclosed that it did not anticipate
generating meaningful revenue from LTE in the near future.

1. **Plaintiffs Have Not Plead Facts Showing the WiMAX Market Was in a Steep Decline Due to a Shift to LTE**

Plaintiffs claim several challenged statements are misleading because WiMAX was in steep decline at the time of the IPO due to a shift to LTE technology. CAC ¶¶52-53, 57-58, 72-75. Plaintiffs' own cited materials, however, fatally refute this claim. These materials show that WiMAX dominated the market at the time of Sequans' IPO (noting more than 100 active WiMAX networks worldwide versus less than 10 for LTE), that any potential transition to LTE would be "gradual" and not "even begin to gather real steam until 2013," and advised that operators were "better off continuing to expand their WiMAX footprint and gain market share" rather than transitioning to LTE. Decl. Ex. D, 12; Ex. E, 1; Ex. F, 2. These documents, which are expressly incorporated by Plaintiffs into the CAC, refute any suggestion that the WiMAX market was in a steep decline in April 2011. Indeed, WiMAX chip sales were expected to increase dramatically between 2010 and 2014 at a 45% compound annual growth rate.[8] Decl. Ex. C, 62. Where, as here, Plaintiffs' allegations are contradicted by documents incorporated into the complaint, "those allegations are insufficient to defeat a motion to dismiss." *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002); *see also Barnum v. Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227, 1232-33 (S.D.N.Y. 1994) (where a document relied upon in complaint contradicts plaintiff's allegations, the court need not accept plaintiff's allegations as true).

Plaintiffs rely on assertions that Clearwire was not expanding its WiMAX network to support its claim of a purported decline of WiMAX. But this is another red herring. Clearwire already had an extensive WiMAX network in place at the time of the IPO. Decl. Ex. M, 7 (Clearwire "offered [its] services in 88 markets in the United States covering an estimated 114.2

---

[8] That the WiMAX market was in a steep decline at the time of the IPO is also belied by Sequan's significant increases in sales of WiMAX chips in the first and second quarters of 2011.

million people").  Thus, even if Clearwire's WiMAX network was not expanding

geographically, WiMAX phones containing Sequans' chips could continue to be sold in

extensive areas with existing WiMAX coverage.  *Id*.  Indeed, of the 114 million people with

coverage, only 4.4 million had subscribed to Clearwire's services, leaving massive room for

growth within its existing network.  *Id*. at 6.  Moreover, in December 2011, Clearwire confirmed

the continuing viability of its WiMAX network, announcing a $926 million deal with Sprint to

provide WiMAX service through at least 2015.  Decl. Ex. N, 4-5.

 Not only do Plaintiffs fail to plead the existence of a steep decline in the WiMAX market

(because there was not one), but they fail to allege that Sequans was aware of any such purported

decline.[9]  "The critical inquiry for the Court [] is whether— and to what extent—[the Company]

was aware of the issues and their potential impacts at the time of the offering statements."

*Panther Partners*, 538 F.Supp. 2d at 669; *see also Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d

597, 614 (S.D.N.Y. 2008).  The CAC does not plead facts suggesting that Sequans was aware, at

the time of the April 2011 IPO, that its WiMAX orders would decline abruptly in the second half

of the year.  In fact, the articles cited by Plaintiffs predict a "gradual" transition from WiMAX to

LTE that is entirely consistent with Sequans' stated expectations in the Offering Documents.

*Compare* Decl. Ex. B, 9-10, 39, *with* Decl. Ex. E, 1; Ex. F, 2.

 Finally, Sequans warned investors that the WiMAX market could decline and that its

results could be harmed as a result.  Sequans disclosed that "the WiMAX market may decline

significantly in anticipation of LTE deployments," that it earned "substantially all of [its]

revenue from sales of…semiconductor solutions to the WiMAX segment of the 4G market," and

---

[9] Because Plaintiffs have not shown that Sequans knew of information inconsistent with its disclosures, Plaintiffs have not established that Sequans was required to disclose more pursuant to Form 20-F, Item 5(D), and Regulation S-K, Item 503(c).  *See Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc*., 2010 WL 148617, *9 (S.D.N.Y. Jan. 14, 2010) (knowledge of trend is an essential element triggering disclosure).

that "[i]f the WiMAX market declines, [Sequans'] results of operations will be harmed."[10]  Decl.

Ex. B, 3, 9.  These disclosures were "of sufficient precision and clarity to alert prudent investors

to the nature of the offerings and the risks entailed," thus Plaintiffs' attempt to plead an omission

based upon the purported decline in WiMAX fails.  *Panther Partners*, 538 F. Supp. 2d at 664;

*see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("alleged misrepresentations... are

immaterial as a matter of law if it cannot be said that any reasonable investor could consider

them important in light of adequate cautionary language set out in the same offering.").

### 2. Plaintiffs Have Not Pled Facts Establishing That Sequans' Sales Were Slowing

Plaintiffs also assert that several challenged statements are misleading because Sequans'

sales were allegedly slowing at the time of the IPO due to a shift from WiMAX to LTE.  CAC

¶¶52-53, 57-58, 72, 74.  But Sequans sales were not slowing.  After the IPO, Sequans announced

record sales in the first quarter of 2011, and surpassed that mark in the second quarter.  Decl. Ex.

G, 4; Ex. H, 4.  These record results were driven by sales of <u>WiMAX</u> chips.  *Id*.  Where, as here,

Plaintiffs' allegations are inconsistent with facts alleged or incorporated by reference into the

CAC, the Court should disregard them.  *See Barnum*, 850 F. Supp. at 1232-33.

Not surprisingly, Plaintiffs also fail to allege that Sequans believed its sales were slowing

at the time of its IPO.[11]  Even putting aside the Company's record results post-IPO, at the time of

the IPO, Sequans' chips had already been included in several new WiMAX devices scheduled

for release in 2011 (significantly more than released in 2010), further undermining any

---

[10] Sequans also disclosed: (1) "If customers believe LTE deployments will provide the same or superior coverage as WiMAX networks in the near future, customers may prefer to adopt LTE services and products instead of WiMAX, which in turn is likely to cause the WiMAX market to grow at a slower pace than expected or to decline" and (2) "we expect that the number of new WiMAX customers is likely to be limited as customers prepare for the adoption and commercialization of LTE technology."  Decl. Ex. B, 9.

[11] Because Plaintiffs fail to allege facts showing Sequans was aware of a downward trend in sales at the time of the IPO, Sequans was not required to disclose additional information pursuant to Items 5(D) or 503(c).  *See Hutchinson v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 486 (2d Cir. 2011); *Panther Partners*, 538 F. Supp. 2d at 673.

suggestion that Sequans believed its sales were slowing at that time.  Decl. Ex. B, 1, 57; *see DeBlasio v. Merrill Lynch & Co., Inc.*, 2009 WL 2242605, at *26 (S.D.N.Y. July 27, 2009) ("[T]he Court [] is not obliged to reconcile plaintiffs' own pleadings that are contradicted by other matter asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint.") (citation omitted).

      In any event, the Registration Statement included detailed and extensive cautionary language regarding the risk of slowing sales resulting from a transition to LTE.  *See, e.g.*, Decl. Ex. B, 9 ("If the WiMAX market declines prior to the commercial viability and acceptance of our LTE solutions, our business, operating results, and financial condition will be harmed.").  There is no omission where an accurate statement is accompanied by disclosures specifically identifying the complained of risks.  *See Olkey*, 98 F.3d at 9 ("This court has consistently affirmed [] dismissal of securities claims where risks are disclosed in the prospectus.").

### 3.      Sequans Disclosed That It Would Not Generate Meaningful Revenue From LTE in the Near Future

      Plaintiffs claim several challenged statements are misleading because Sequans failed to disclose that it would not generate meaningful revenue from LTE in the near future.  CAC ¶¶52-54, 57-64, 72-76.  But Sequans plainly disclosed this in its Registration Statement: "We currently derive substantially all of our revenue from…the WiMAX market and expect do so through at least 2011."  Decl. Ex. B, 9.  Sequans repeatedly informed investors of its LTE strategy and timing.  For example, Sequans disclosed that it was devoting "substantial time and resources" to developing LTE products, and gave anticipated release dates for several new TDD, FDD, and dual-mode chips, which would allow it to compete in U.S. markets, where FDD technology had been adopted, and in emerging countries such as China and India where TDD technology was likely to be implemented.  *Id*. at 10, 39, 57, 60.

Sequans also warned investors of the risks in any potential transition to LTE stating, "if we fail to predict market requirements or market demands for LTE, or if our solutions are not successfully developed [ ] by our customers, our business will suffer." *Id*. at 10.  It also cautioned that "wireless carriers may choose to deploy technologies not supported by our solutions," and that Sequans' "failure to anticipate [market] shifts, to develop new technologies, or to react to changes in existing technologies…could result…in decreased revenue." *Id*. at 10, 11.  Sequans' precise and extensive risk disclosures bar Plaintiffs' claim.  *See In re Salomon Analyst Winstar Litig.*, 2006 WL 510526, at *11 (S.D.N.Y. Feb. 28, 2006) (statements could not have misled reasonable investor when "considered together and in context" due to sufficient risk disclosures related directly to the risks that brought plaintiffs' losses).[12]  Accordingly, Plaintiffs' alleged omission regarding Sequans' future revenue from LTE fails.

### 4.    Sequans Warned Investors of the Precise Risks that Ultimately Came to Pass

Plaintiffs' theory amounts to nothing more than because Sequans was experiencing "more cautious order patterns" in July 2011, its statements made months before in the Offering Documents <u>must have been</u> misleading.  But the securities laws do not require clairvoyance and uniformly reject this type of hindsight pleading.  *Panther Partners*, 538 F. Supp. 2d at 664 ("The securities laws do not require clairvoyance in the preparation of offering documents; these documents are not guarantees of an offering's subsequent success, nor do they insure investors against the vicissitudes of technology and industry, nor the volatility of the stock market itself."); *see also Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

Shortly after Sprint began displaying "more cautious order patterns" of HTC phones

---

[12] Plaintiffs claim that Sequans failed to disclose that LTE-TDD networks were not yet deployed, which they argue is required under Item 503(c).  The Offering Documents, however, disclosed that TDD networks were only "expected," clearly indicating that they had not yet been deployed.  Decl. Ex. B, 60.  Accordingly, Sequans disclosed all that was required.

containing Sequans' chips, Sprint announced that it had been in clandestine negotiations with Apple to carry the 3G iPhone.  Decl. Ex. J, 44-45, F-30.  Sprint, the first 4G carrier in the U.S., had fueled Sequans' growth throughout 2010 and early 2011 via sales of HTC WiMAX devices containing Sequans' chips.  CAC ¶¶ 26-27; Decl. Ex. B, 9.  Thus, Sprint's reversion to 3G technology came as a surprise to both the market and Sequans.  Decl. Ex. L, 32, 49.  Moreover, this reversion was not a small step – as a result of the deal with Apple, Sprint was obligated to buy at least $15.5 billion worth of iPhones.  Decl. Ex. J, 44-45, F-30.

Although Sprint's adoption of the iPhone was unexpected, Sequans' disclosures were more than sufficient to warn investors of this type of event and its resulting impact.  Specifically, Sequans cautioned investors that it relied heavily on a small number of customers, particularly HTC (who accounted for 78% of its revenue in the first quarter of 2011), and indirectly Sprint who was the largest buyer of HTC WiMAX phones.  Decl. Ex. B, 9; Ex. I, 4.  Moreover, Sequans warned that its agreements with these customers were terminable at will, making Sequans vulnerable to customers canceling chip orders with little or no notice, even after an order had already been received.  Decl. Ex. B, 13.  As a result of these disclosed risks, Sequans informed investors that it had limited visibility into future demand, particularly given the rapidly changing wireless market and risk that products not containing Sequans' technology would increase in popularity and erode its market share.  *See, e.g.*, *id*. at 8, 11.  Where an accurate statement, such as those challenged by Plaintiffs, is "coupled with the precise disclosure of a risk later realized," the statement "cannot adequately form the basis for a securities claim."  *Panther Partners*, 538 F.Supp. 2d at 672; *see also Olkey*, 98 F.3d at 9.  Accordingly, Plaintiffs' Section 11 claim must fail.

### C.     None of the Challenged Statements Are Actionable

Plaintiffs' Section 11 claim also fails because none of the purportedly misleading

statements are actionable.  Two of the challenged statements are non-actionable vague and generalized statements of optimism (CAC ¶¶52, 63), three are forward-looking statements protected by the bespeaks caution doctrine (CAC ¶¶52, 57, 59), two are non-actionable risk disclosures (CAC ¶¶72-73), and two are accurate statements simply mischaracterized or misunderstood by Plaintiffs (CAC ¶¶55, 60).

### 1.    Vague and Generalized Statements Are Not Actionable

The two vague, generalized statements challenged in the Offering Documents are "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable."  *ECA*, 553 F.3d at 206; *see also Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d. Cir. 1996).  These statements – "[w]e believe we have a strong position in the WiMAX market," and "we believe we are better positioned to drive our roadmap to meet those needs" – are the type of "generalized statements of optimism that are not capable of objective verification" and therefore cannot support a Section 11 claim.  CAC ¶¶52, 63; *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, 2009 464934, at *8 (S.D.N.Y. Feb. 25, 2009).

### 2.    The Forward-Looking Statements Are Not Actionable

Three of the challenged statements are, as a matter of law, non-actionable forward-looking statements.  *See* CAC ¶52 ("We intend to maintain our market position in WiMAX by growing our revenues…"); ¶57 ("We expect our product revenue to continue to grow…"); ¶59 ("Deployments of TDD LTE networks are expected to be driven by wireless carriers…").  These statements concern Sequans' future expectations and strategy, and are plainly forward-looking.  Moreover, each of these statements is accompanied by extensive, meaningful cautionary language.  For example, the statement that Sequans intended to maintain its position in the WiMAX market was coupled with the specific warning that "customers may prefer to adopt LTE services and products instead of WiMAX, which in turn is likely to cause the WiMAX market to

grow at a slower pace than expected or to decline." Decl. Ex. B, 9. In light of this and other

cautionary language, these statements are protected by the "bespeaks caution" doctrine and are

not actionable. *San Diego Cnty. Emps. Ret. Ass'n v. Maounis*, 749 F. Supp. 2d 104, 123

(S.D.N.Y. 2010).

### 3.     Accurate Risk Disclosures Are Not Actionable

Plaintiffs contend two risk disclosures were misleading because they addressed only the

possibility of a decline in the WiMAX market, not that the WiMAX market was in fact declining

at the time of the IPO as Plaintiffs allege. CAC ¶¶72-76. Claims based upon risk factors,

however, are "not actionable to the extent plaintiffs contend defendants should have stated that

the adverse factors 'are' affecting financial results rather than 'may' affect financial results," as

alleged here. *Leapfrog*, 527 F. Supp. 2d at 1048; *see also In re Noah Educ. Holdings, Ltd. Sec.*

*Litig.*, 2010 WL 1372709, at *7-8 (S.D.N.Y. Mar. 31, 2010). Even assuming *arguendo* that this

type of risk disclosure were actionable, as discussed in Section IV.B *supra*, Plaintiffs' own

documents confirm that the alleged risks had not materialized. Accordingly, Sequans was not

required to disclose more.

### 4.     The Remaining Challenged Statements Are Accurate

Plaintiffs mischaracterize or misunderstand the two other challenged statements.

Plaintiffs allege that a statement regarding Sequans' chip speed is misleading because tests

showed that its chips did not reach such speeds on Sprint's network. CAC ¶¶55-56. But

Sequans' statement merely described the *maximum* capabilities of its WiMAX chips and was not

tethered to their performance on Sprint's or any other network. Decl. Ex. B, 61. That Sprint's

network could not support the chip's full potential does not make the statement misleading.

Plaintiffs also challenge that Sequans' had "successfully develop[ed] LTE semiconductor

solutions that are being deployed globally." CAC ¶¶60-62. But Sequans' LTE chips had been

deployed in 2010 in connection with China Mobile's LTE-TDD tests.  Decl. Ex. B, 1, 57.

Plaintiffs simply misunderstand the statement, believing it to represent that Sequans chips were

running on already operational TDD networks.  No such representation was made.  When read in

context, Sequans was clear that its LTE chips were still in testing and did not indicate that any of

those chips were currently in publicly released end products.  *Id*.

## V.    PLAINTIFFS DO NOT PLEAD SUFFICIENT FACTS TO ESTABLISH A SECTION 12(A)(2) CLAIM

### A.    Plaintiffs Do Not Have Standing Under Section 12(a)(2)

To have standing under Section 12(a)(2), a plaintiff must purchase his security pursuant

to an initial public offering.  *Gustafson*, 513 U.S. at 578.  Plaintiffs do not, and cannot, plead that

they purchased pursuant to Sequans' IPO.  Their allegations that their purchases were "pursuant

and/or traceable to the Company's IPO" are insufficient to survive a motion to dismiss.  *See*

CAC ¶¶7-11 (emphasis added); *In re Barclays Bank PLC Sec. Litig.*, 2011 WL 31548, at *5

(S.D.N.Y. Jan. 5, 2011).  Moreover, as shown in the Motions for Lead Plaintiff, Plaintiffs did not

purchase shares on April 15, 2011, the date of the IPO, and therefore can never have standing.

Rosenfield Decl. Supp. Mot. Lead Pl., Ex. B [Doc. No. 15]; Brower Decl. Supp. Mot. Lead Pl.,

Ex. B [Doc. No. 21].  Accordingly, as explained in greater detail in the Underwriter Defendants'

motion to dismiss, Plaintiffs' Section 12(a)(2) claim must be dismissed for lack of standing.

### B.    Plaintiffs Have Not Alleged Defendants Were Statutory "Sellers"

A party is liable under Section 12(a)(2) only if it "passed title, or other interest in the

security, to the buyer for value" or "successfully solicit[ed] the purchase [of a security],

motivated at least in part by a desire to serve his own financial interests."  *See In re Morgan*

*Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d. Cir. 2010) (alterations in original) (citation

omitted).  Because the IPO was conducted via a firm commitment offering,[13] neither Sequans nor

the Individual Defendants passed title to any shareholder.  Moreover, Plaintiffs fail to allege that

Defendants "solicited" the purchase of any security.  *See e.g.*, *Capri v. Murphy*, 856 F.2d 473,

478-79 (2d Cir. 1988) (plaintiffs must plead facts demonstrating that a defendant actually

solicited their investment); *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363 (5th

Cir. 2001) (preparing the prospectus and conducting road show are insufficient to allege

"solicitation" for purpose of § 12(a)(2)).  Accordingly, Plaintiffs' Section 12(a)(2) claim must

fail for this additional reason.

> **C.      The CAC Does Not Sufficiently Allege Any Statement Was False When Made
> Or Is Even Actionable**

The statements challenged pursuant to Section 12(a)(2) are the same as those challenged

under Section 11.[14]  CAC ¶97.  Thus, as discussed in Section IV.B-C *supra*, Plaintiffs fail to

plead that any challenged statement was false or misleading at the time it was made or

actionable, therefore requiring dismissal of their Section 12(a)(2) claim as well.

## VI.     PLAINTIFFS DO NOT PLEAD SUFFICIENT FACTS TO ESTABLISH A SECTION 10(B) CLAIM

Plaintiffs allege Section 10(b) claims against Sequans and Individual Defendants Karam

and Choate.  These claims must satisfy the heightened pleading standards of Fed. R. Civ. P. 9(b)

and the PSLRA, which require Plaintiffs to plead both falsity and scienter with particularity.  *See*

15 U.S.C. § 78u-4(b)(1)(B).  Moreover, "the inference of scienter must be more than merely

'reasonable' or 'permissible.'"  *Tellabs*, 551 U.S. at 324.  Rather, it must be "cogent and *at least*

*as compelling* as any opposing inference one could draw from the facts alleged," weighing all

"plausible, nonculpable explanations for the defendant's conduct" against "inferences favoring

---

[13] In a firm commitment offering, the underwriting bank purchases the securities directly from the company, thereby assuming the risk that the market will not accept the securities at the price set.

[14] Plaintiffs do not specify which statements are challenged for purposes of 12(a)(2), but every challenged statement appears in both the Prospectus and the Registration Statement.  Therefore, the analysis is the same.

the plaintiff." *Id.* (emphasis added).  Plaintiffs fail to meet these stringent requirements.

### A.   Statements Challenged By Plaintiffs

In addition to the statements discussed in Section IV.B-C *supra*, Plaintiffs allege that three post-IPO statements violate Section 10(b).  CAC ¶¶108-14.

### B.   The CAC Does Not Sufficiently Allege Any Statement Was False When Made

For the same reasons discussed in Section IV.B-C *supra,* Plaintiffs fail to plead contemporaneous facts showing that any challenged post-IPO statement was false when made, and accordingly this claim must be dismissed.

### C.   None of the Challenged Statements Are Actionable

Two of the Section 10(b) specific statements are non-actionable accurate statements of historical fact, while the third is a non-actionable statement of opinion.

Plaintiffs argue that Defendants' statements – "[o]ur first quarter results reflect continued strong demand for 4G devices" (CAC ¶113), and "[o]n WiMAX, our market share is around 40%" (*id.* ¶108) – are misleading because they suggest Sequans' continued success in WiMAX. *Id.* ¶¶109, 114.  But these statements report only Sequans' past results, the disclosure of which does not imply that those results will continue.  *See In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003) (no liability for "accurate reports of past successes, even if present circumstances are less rosy").

Moreover, Mr. Karam's statement that "the relationship between Sprint and Clearwire stabilizing… gives us more stability in the WiMAX business with Sprint" is a non-actionable statement of opinion.  CAC ¶110.[15]  Statements of opinion are not actionable unless the speaker did not actually hold the opinion at the time it was stated.  *See Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004) ("[P]roving [the statement's] falsity…is the

---

[15] Plaintiffs also misunderstand this statement, suggesting that it implies stabilization of the WiMAX market generally, when in fact it is merely discussing the stabilization of Sequans' relationship with Sprint.  CAC ¶110.

same as proving scienter, since the statement…cannot be false at all unless the speaker is knowingly misstating his truly held opinion.").  Here, Plaintiffs plead <u>no facts</u> regarding Mr. Karam's contrary knowledge or beliefs.

### D.      Plaintiffs Have Not Pled The Requisite Strong Inference of Scienter

Plaintiffs also fail to plead particularized facts showing a strong inference of scienter that is "cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 310.  Plaintiffs' alleged <u>facts</u> (as opposed to argument and speculation) actually negate any inference of scienter causing them to quickly retreat to the narrow "core operations" exception to pleading particularized facts, which is inapplicable here and cannot save their claims.  CAC ¶¶115-17, 120.

### 1.      Plaintiffs Have Not Established A Motive to Commit Securities Fraud

Plaintiffs allege that Defendants committed securities fraud to raise capital for operations. CAC ¶120.  This type of general motive allegation, however, is routinely rejected because it is common to all corporate insiders.  *See Novak*, 216 F.3d at 307 ("[M]otives possessed by virtually all corporate insiders, including [a] desire to…sustain the appearance of corporate profitability" cannot support a finding of scienter); *Salinger v. Projectavision, Inc*., 934 F. Supp. 1402, 1414 (S.D.N.Y. 1996) ("[A]lleging [an] abstract desire to… ease the difficulties of raising of additional capital" is insufficient to establish scienter).

Defendants also purportedly perpetrated the fraudulent scheme to exercise options and warrants that would vest only in the event of an IPO.  CAC ¶120.  But these options and warrants did not begin vesting until one year <u>after</u> the IPO, and then only 25%, with the remaining 75% vesting over the following three years.  Decl. Ex. A, 5.  Thus, when the stock price declined in July 2011, <u>none</u> of Defendants' options had vested or been exercised.  The exercise price for the options and warrants was $8.62 per ADS – above the $8.55 price following the July 2011 stock

drop – therefore, by the time the options and warrants could be exercised, they were already underwater.  *Id*.; CAC ¶82.  Because Plaintiffs fail to plead any motive to commit securities fraud, their Section 10(b) claim should be dismissed.  *See ECA*, 553 F.3d at 197 (a strong inference of scienter is not pled unless plaintiffs allege that defendant "benefitted in some concrete and personal way from the purported fraud").

> **2.**  **Defendants' Trading Activity Negates Any Potential Inference of Scienter**

Insider stock sales do not support an inference of scienter unless they are "unusual" or "suspicious."  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001).  Here, Ms. Choate sold none of her shares during the class period and Mr. Karam sold only 3.6% of his total holdings.  Decl. Ex. A, 82; Ex. O; CAC ¶124.  Such trading activity is not unusual or suspicious. Moreover, their retention of almost all of their holdings during the class period negates any potential inference of scienter as they suffered significant implied losses when the stock price dropped in July 2011.  *Avon Pension Fund v. GlaxoSmithKline PLC*, 2009 WL 2591173, at *2 (2d. Cir. Aug. 24, 2009) (absence of stock sales negates any potential inference of scienter); *In re Prestige Brands Holding, Inc.*, 2006 WL 2147719, at *7 (S.D.N.Y. July 10, 2006) ("Early Investors…routinely sell stock in IPOs, and such sales raise no inference of fraud" especially where defendants retain significant amount of shares post-IPO).  In fact, the CAC concedes that Defendants collectively retained more than eleven million shares post-IPO and therefore suffered substantially greater implied losses than the entire putative class.  CAC ¶124; *Rombach*, 355 F.3d at 177 ("no personal interest sufficient to establish motive" where defendants "share[d] the pain when the company failed").  This is clearly inconsistent with the alleged scheme to artificially inflate Sequans' stock price to sell at those inflated prices.  Accordingly, Plaintiffs fail to plead a cogent and compelling inference of scienter.

### 3.    The Core Operations Doctrine Does Not Provide Scienter

Tacitly admitting the lack of <u>facts</u> supporting the requisite strong inference of scienter, Plaintiffs attempt to invoke the narrow "core operations" doctrine, which would allow a court to infer management's knowledge of facts concerning the company's "core operations" in certain rare circumstances where (1) there are *detailed* and *specific* allegations about management's exposure to factual information within the company, or (2) where the falsity of the information disclosed is so patently obvious that it would be "absurd to suggest that top management was unaware of [it]."  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 596 (S.D.N.Y. 2011); *In re Gen. Elec. Co. Sec. Litig.*, 2012 WL 90191, at *26 (S.D.N.Y. Jan. 12, 2012).  This doctrine, however, is inconsistent with the PSLRA and therefore should not be applied.  The PSLRA requires Plaintiffs to plead scienter <u>with particularity</u> as to <u>each individual defendant</u>.  15 U.S.C. § 78u-4(b)(2).  The core operations doctrine obviates this requirement, thus, not surprisingly, several courts in this Circuit and elsewhere have rejected its application.[16]  *See, e.g.*, *In re Wachovia Equity Sec. Litig.*, 753 F. Supp.2d 326, 353 (S.D.N.Y. 2011); *Breacher v. Citigroup Inc.*, 797 F. Supp.2d 354, 371 (S.D.N.Y. 2011).

Moreover, even if the doctrine were applicable, which it is not, here there are <u>no facts</u> regarding Defendants' *actual* exposure to the disputed information, let alone facts that are detailed and specific.  And as discussed above, none of the challenged statements are false in the first instance, therefore their falsity cannot be characterized as patently obvious.  Simply put, this is not one of the rare circumstances where the core operations doctrine applies.

Regardless, the doctrine does not provide an independent basis for pleading scienter, and can only bolster existing allegations.  *Tyler v. Liz Claiborne*, 814 F. Supp. 2d 323, 343 (S.D.N.Y.

---

[16] The Second Circuit has not adopted or applied the core operations doctrine post-enactment of the PSLRA and recently questioned "whether, and in what form, the [] doctrine survives as a viable theory of scienter" in *Frederick v. Mechel OAO*, 2012 WL 1193724, at *2 (2nd Cir. 2012).

2011); *Wachovia*, 753 F. Supp. 2d at 352 (district courts apply the core operations doctrine, if at all, as "supplementary but not independently sufficient means to plead scienter").  Because here there are no existing allegations to bolster, the core operations doctrine cannot save Plaintiffs' Section 10(b) claim.

## VII.   PLAINTIFFS FAIL TO PLEAD A SECTION 15 OR 20(A) VIOLATION

Because Plaintiffs have failed to allege a primary violation, their control person claims pursuant to Sections 15 and 20(a) must also be dismissed.  *See ECA*, 553 F.3d at 207 (affirming dismissal of plaintiffs' §§ 15 and 20(a) claims "for want of a primary violation").[17]

## VIII.   CONCLUSION

For the foregoing reasons, the CAC should be dismissed in its entirety.

Dated: San Francisco, California
      May 14, 2012

Respectfully submitted,

Orrick, Herrington & Sutcliffe LLP


By:_____ */s/ James N. Kramer*_____
            James N. Kramer

The Orrick Building
405 Howard Street
San Francisco, California  94105-2669
+1-415-773-5700

Attorneys for Defendants Sequans Communications S.A., Georges Karam, Deborah Choate, Michael Elias, James Patterson, David Ong, Hubert de Pesquidoux, Dominique Pitteloud, Alok Sharma, Zvi Slonimsky, and T. Craig Miller

---

[17]Plaintiffs' failure to plead facts showing Defendants' exercise of control or culpable participation similarly defeats their control person claims.  *See Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d. Cir. 1998); *P. Stolz Family P'ship L.P. v. Daum*, 166 F. Supp. 2d 871, 873 (S.D.N.Y. 2001).