**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

DONALD DEAN JOHNSON,           :

                Plaintiff,   :     Civil Action No. 11-cv-06341-PAC

       vs.             :

SEQUANS COMMUNICATIONS S.A., et al.,  :

           Defendants   :

------------------------------------------------------------x

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTIONS TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

PRELIMINARY STATEMENT .................................................................... 1

STATEMENT OF FACTS .................................................................... 3

I.   Wireless Standards Background .................................................... 3

II.  WiMAX Stagnates and Declines Relative to LTE ................................. 4

III. The Materially False and Misleading Registration Statement ..................... 6

IV.  Defendants' Post-IPO Misrepresentations ......................................... 7

V.   The Truth Begins to Emerge ...................................................... 8

ARGUMENT ................................................................................. 8

I.   The Applicable Legal Standard on a Motion to Dismiss ............................ 8

II.  The Complaint Alleges Valid Section 11 Claims ................................... 9

     A. Defendants' Statements Were Materially False and Misleading When Made ... 10

        1. Defendants Knew WiMAX Was Stagnant and Declining ................... 10

        2. Defendants' Disclosures and Warnings Were Completely Inadequate ..... 13

     B. Defendants Had an Independent Duty to Disclose the Potential Impact of
        These Known Adverse Trends Upon Sequans ............................... 14

     C. Defendants' Statements Are All Actionable .............................. 17

        1. Defendants' Misleading Statements of Optimism Are Actionable ......... 17

        2. Defendant's Statements Are Not Protected by the Bespeaks Caution
           Doctrine .......................................................... 19

        3. Defendants' Inadequate Risk Disclosures Are Actionable ............... 20

        4. Defendants' Accurate Statements Were Still Misleading ................ 21

III. The Complaint Alleges Valid  §12(a)(2) Claims .................................. 22

IV.  Defendants' Negative Causation Defense is Premature ............................ 24

V. The Complaint Alleges Valid §10(b) Claims ........................................... 25

    A. Defendants Statements Are All Actionable........................................ 26

    B. The Alleged Facts Support a Strong Inference of Scienter...................... 26

        1. Defendants' Statements Related to the Company's Core Operations....... 26

        2. Defendants Had Ample Motive to Commit Fraud ........................... 28

VI. The Complaint Alleges Valid Claims for Control Person Liability.................. 30

CONCLUSION.................................................................................. 30

## TABLE OF AUTHORITIES

## <u>CASES</u>

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................ 9

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd*, 493 F.3d 87 (2d Cir. 2007) .......................... 9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................... 9

*Blue Tree Hotels Inv., Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212 (2d Cir. 2004) ......................................................................................................... 11

*Caiola v. Citibank, N.A.*, 295 F.3d 312 (2d Cir. 2002) ............................................... 18

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, No. 11 Civ. 5026, 2012 U.S. Dist. LEXIS 97185 (S.D.N.Y. July 13, 2012) ............................................... 26

*City of Roseville Emps. Ret. Sys. v. Energysolutions, Inc.*, 814 F. Supp. 2d 395 (S.D.N.Y. 2011) .................................................................................................... 16

*Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*, No. 99 Civ. 12046 (WHP), 2001 U.S. Dist. LEXIS 3332 (S.D.N.Y. Mar. 27, 2001) ............................................. 20

*Darquea v. Jarden Corp.*, No. 06 Civ. 0722, 2007 U.S. Dist. LEXIS 40247 (S.D.N.Y. May 31, 2007) ................................................................................................................. 19

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) ......................................................................................................... 26

*Feiner v. SS&C Techs., Inc.*, 47 F. Supp. 2d 250 (D. Conn. 1999) ............................. 23

*Global Network Communs., Inc. v. City of N.Y.*, 458 F.3d 150 (2d Cir. 2006) ........... 11

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985) ..................................................... 18

*Gotham Holdings, LP v. Health Grades, Inc.*, 534 F. Supp. 2d 442 (S.D.N.Y. 2008) ............... 22

*Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603 (S.D.N.Y. 2008) ............. 19, 25

*In re Barclays Bank PLC Sec. Litig.*, 2011 U.S. Dist. LEXIS 2667 (S.D.N.Y. 2011) ............... 23

*In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052 (N.D. Cal. 2010) ........................ 23

*In re Britannia Bulk Holdings Inc. Secs. Litig.*, 665 F. Supp. 2d 404 (S.D.N.Y. 2009) ............. 25

*In re Citigroup Bond Litig.*, 723 F. Supp. 2d 568 (S.D.N.Y. 2010) ............................................ 24

*In re Dynex Capital Inc. Sec. Litig.*, No. 05 Civ. 1897 (HB), 2009 U.S. Dist. LEXIS 96527
(S.D.N.Y. Oct. 19, 2009) ..................................................................... 27

*In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346 (S.D.N.Y. 2008) ................................................ 21

*In re Flag Telecom Holdings, Ltd. Sec. Litig*, 574 F.3d 29 (2d Cir. 2009) .................................. 24

*In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419 (S.D.N.Y. 2009) .......................................... 25

*In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562 (S.D.N.Y. 2009) .............. 23

*In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983 (S.D. Cal. 2005) .......................... 22, 26

*In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033 (N.D. Cal. 2007) ...................... 20

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*, 2010 U.S. Dist. LEXIS 34459 (S.D.N.Y. 2010) ... 21

*In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613 (S.D.N.Y. 2003) .......................... 9

*In re Prudential Sec. Ltd. Pshps. Litig.*, 930 F. Supp. 68 (S.D.N.Y. 1996) ................................ 20

*In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283 (S.D.N.Y. 1999) ...........................18, 26

*In re Regeneron Pharms., Inc. Sec. Litig.*, No. 03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350
(S.D.N.Y. Feb. 1, 2005) ..................................................................... 19, 20

*In re Reserve Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310 (S.D.N.Y. 2010) ................ 27

*In re Scholastic Corp. Sec. Litig*, 252 F.3d 63 (2d Cir. 2001) .................................................... 26

*In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220 (S.D.N.Y. 2006) .............................. 19

*In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392 (S.D.N.Y. 2003) .................................. 24

*In re Xinhua Fin. Media, Ltd. Secs. Litig.*, No. 07 Civ. 3994, 2009 U.S. Dist. LEXIS 14838
(S.D.N.Y. Feb. 25, 2009) ..................................................................... 18

*Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408 (S.D.N.Y. 2008) ........................ 22

*Litwin v. Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011) ........................................... *passim*

*Local 295/Local 851 IBT Emplr. Group Pension Trust & Welfare Fund v. Fifth Third Bancorp*,
731 F. Supp. 2d 689 (S.D. Oh. 2010) ......................................................... 23

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363 (5th Cir. 2001) .......................... 23

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86 (2d Cir. 2010) ................................................................................................. 22

*P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92 (2d Cir. 2004) .................................. 14, 19, 20

*Panther Partners Inc. v. Ikanos Communs., Inc.*, 681 F.3d 114 (2d Cir. 2012) ........ 13, 16, 17, 24

*Panther Partners Inc. v. Ikanos Communs., Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008) 13, 14, 15

*Robbins v. Moore Med. Corp.*, 788 F. Supp. 179 (S.D.N.Y. 1992) ................................. 18, 22, 26

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ............................................................... 20, 21

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) ...................................................... 9

*Thomas v. Little Flower For Rehab. & Nursing*, 793 F. Supp. 2d 544 (E.D.N.Y. 2011) ........... 22

*Util. Metal Research, Inc. v. Generac Power Sys.*, 179 F. App'x 795 (2d Cir. 2006) ............... 23

*Van Der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005) .................... 21

*Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744 (S.D.N.Y. 2011) ....... 9

*Zucker v. Quasha*, 891 F. Supp. 1010 (D.N.J. 1995) .................................................................. 22

## STATUTES

15 U.S.C. § 77k(a) ........................................................................................................ 1, 10, 15

17 C.F.R. §229.503 ................................................................................................................. 16

17 C.F.R. §240.10b-5 ................................................................................................................ 1

# PRELIMINARY STATEMENT

This is a federal securities class action on behalf of all persons other than Defendants[1] who purchased the American Depositary Shares ("ADSs") of Sequans Communications S.A. ("Sequans" or the "Company") pursuant or traceable to the Company's initial public offering on or about April 14, 2011 ("IPO" or "Offering"), as well as purchasers of the Company's ADSs between April 14, 2011 and July 27, 2011 inclusive ("Class Period") alleging violations of §§11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act") and §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

Although Defendants have filed two separate motions to dismiss the Complaint, their memoranda of law ("Sequans Mem." and "Underwriter Mem.") suffer from the same related flaws. _First_, Defendants do not even address their duty under Item 5 of Form 20-F (_see_ 15 U.S.C. § 77k(a)) to disclose whether and to what extent the negative trends and uncertainties identified in the Complaint might be reasonably expected to affect Sequans's investments. For example, Defendants unquestionably knew at the time of the IPO that there were no functioning 4G LTE networks utilizing the standard used by Sequans's only available LTE product. Yet they failed to disclose either the existence of this uncertainty or its impact upon Sequans. Quite the contrary, Sequans misleadingly described itself as an "early leader in the LTE market" and misrepresented the market for its products as it existed at the time of the IPO.

_Second_, Defendants mischaracterize the Complaint as simply pleading in hindsight. But Plaintiffs do _not_ claim that Sequans's statements in the Offering documents were retroactively

---

[1] Defendants Georges Karam (Sequans's CEO and Chairman of the Board), Deborah Choate (CFO), and various individuals who served as directors of the Company (Michael Elias, James Patterson, David Ong, Hubert de Pesquidoux, Alok Sharma, Zvi Slonimsky, and T. Craig Miller) are the "Individual Defendants." UBS Limited ("UBS") and Jefferies & Company, Inc. ("Jefferies"), the lead underwriters for the IPO, are the "Underwriter Defendants." Sequans, the Individual Defendants, and the Underwriter Defendants are collectively the "Defendants."

rendered false and misleading because the Company experienced softening demand in July 2011. Rather, the Complaint alleges that demand by Sequans's largest customer, HTC, was already declining prior to the IPO, in late 2010 and early 2011, such that a larger decline was inevitable. This was reinforced by the troubles of Clearwire Corp. and its subsidiary Clearwire Communications, LLC (together "Clearwire"), on which Sequans depended to build the WiMAX network utilized by the vast majority of its products. Defendants' rosy statements about the Company's present and future outlook were misleading by virtue of their failure to disclose materially adverse facts like these that were known to Defendants at the time of the IPO.

*Third*, rather than drawing all reasonable inferences in Plaintiffs' favor as the law requires, Defendants' arguments rest upon a series of self-serving inferences and improperly introduced facts from outside the Complaint. For example, Defendants insist allegations of declining demand by HTC are contradicted by the undisputed fact that Sequans experienced strong sales to HTC for the first two quarters of 2011. But even if true, this does not undermine the plausible inference that Defendants were aware that HTC was signaling its intention to shift to LTE, making a material decline in revenues imminent. Similarly, Defendants dismiss allegations that Clearwire abandoned construction of its WiMAX network due to financial problems as a "red herring," noting Clearwire's existing network still had plenty of room for growth in sales of Sequans chips. But even if Defendants' presumption were true, this does not undermine the plausible inferences that this "massive room for growth" was not caused by lack of customer interest or, alternatively, market saturation. And regardless, Defendants were required to disclose the *uncertainty* and risk created by Clearwire's troubles.

*Fourth*, Defendants erroneously assume that accurate statements cannot mislead, repeatedly insisting their positive statements about WiMAX generally and Sequans specifically,

as well as their warnings about the possible risks facing the Company, were all accurate and therefore non-actionable. But statements must be accurate *and* complete. By omitting adverse facts such as HTC's declining demand, Clearwire's financial struggles, and the lack of any operational 4G TDD-LTE networks, Defendants' statements misled, even if, assuming arguendo, they were literally true. And, further, by couching risk disclosures in contingent, hypothetical language, Defendants misled investors into believing those risks had not yet materialized.

Thus, as elaborated below, Defendants' motions to dismiss should be denied in their entirety.

## STATEMENT OF FACTS

Sequans describes itself as a designer, developer, and supplier of 4G semiconductor solutions for wireless broadband applications. ¶20.[2] The term 4G stands for fourth generation and refers to the newest generation of wireless standards that provide for higher data rates and more reliable service than third-generation wireless (i.e., 3G). ¶23.

### I.    Wireless Standards Background

The two main 4G wireless protocols are WiMAX and LTE ("4G LTE" or "LTE"). WiMAX is used by Sprint, the third largest wireless network provider in the US, in phones and other wireless devices that run on its network. 4G LTE is used by the two largest telecommunications networks in the United States, AT&T Mobility ("AT&T") and Verizon Wireless ("Verizon"). Tests show 4G LTE is up to nine times faster than WiMAX. ¶24. 4G LTE can be further subdivided into FDD-LTE ("FDD") and TDD-LTE ("TDD"), which are two different methods of transmitting and receiving data simultaneously. ¶25. At the time of the IPO, there were 16 LTE networks operational in the world, each of which used the FDD standard, and no commercial TDD networks had yet been launched. *Id.*

---

[2] Citations to the Complaint are in the form: ¶__.

At the time of the IPO, Sequans-designed 4G chips were used in only two smartphones, both made by HTC and used only on Sprint's 4G WiMAX network. Sprint does not own its 4G network and was dependent on Clearwire to build, launch, and operate a viable WiMAX network – meaning, Sequans's fate was inextricable intertwined with Clearwire's as well. ¶30.

## II.    WiMAX Stagnates and Declines Relative to LTE

Clearwire launched its WiMAX network in 2008, but was plagued by mismanagement and financial difficulties. ¶31. By March 2011, Clearwire's financial strain brought WiMAX expansion in the US to a near halt well short of complete coverage, with ongoing WiMAX projects abruptly terminated. For example, as explained in the Complaint, a former employee of Bechtel Construction, who worked on Clearwire's WiMAX buildout in Denver, Colorado, reports that project was stopped in October 2010 only half completed. So great were Clearwire's struggles that, by the time of the IPO, it stated it might turn to 4G LTE if it could obtain funding. ¶38. Even as Clearwire's deployment of WiMAX was stagnating, Verizon and AT&T were rapidly expanding their respective 4G LTE networks. Verizon launched its 4G LTE market in December 2010, covering 38 markets. In January 2011, Verizon announced plans to expand into 49 markets, followed by another announcement, on March 22, 2011, that another 59 markets would see 4G LTE before the end of 2011. ¶39. This trend of exponential growth in 4G LTE was mirrored worldwide in countries like Russia and Saudi Arabia. ¶40. European WiMAX networks were all but gone, and India announced plans to switch from WiMAX to LTE. ¶41. These shifts reflected the technological superiority of LTE. ¶42.

The global trend away from WiMAX in favor of 4G LTE was clear to Sequans well before the IPO. Sequans's main customer, HTC, was moving away from WiMAX. As stated in a January 2011 article in *The Taiwan Economic News*, "[a]fter launching two 4G phones, namely

4

EVO 4G and Mytouch 4G, in 2010, [HTC] now is increasingly devoted to development of new smartphones operating on the LTE network, and has expanded its cooperation with related telecom operators in the US." ¶35. According to a former employee of Sequans, who worked at the Company's office in Japan, which oversaw five Japanese WiMAX projects and two Korean WiMAX projects, it was apparent that Sequans would not have any opportunities to expand its WiMAX network in Japan or Korea because of the growing demand for the LTE standard. For this reason, Sequans closed its Japanese office in late 2010. ¶43.

At the time of the IPO, moreover, none of Sequans's 4G LTE chips were being used commercially, but the Company was keenly aware of the skyrocketing demand for that technology, as demonstrated by its plans to develop dual-band chips that would work on both WiMAX and 4G LTE networks. ¶46. Despite these efforts, however, Sequans had earned no revenue from LTE solutions by the time of the IPO. As of January 2011, there were 16 operational LTE networks worldwide. ¶47. All of these networks, however, utilized the FDD standard, whereas Sequans's 4G LTE utilized the competing TDD standard. As a result, the Sequans LTE chip was not compatible with any of the LTE commercial networks that were operational at the time of the IPO.

## III.    The Materially False and Misleading Registration Statement

Against this backdrop, on or about March 22, 2011, Sequans filed with the Securities and Exchange Commission ("SEC") a Form F-1 Registration Statement and four amendments thereto ("Registration Statement") for the IPO. On or about April 14, 2011, the Prospectus with respect to the IPO ("Prospectus"), which forms part of the Registration Statement, became effective, and 7.7 million shares of Sequans ADSs were sold to the public at $10 per ADS, thereby raising $77 million. ¶22. Unfortunately for investors, the Registration Statement and Prospectus were both

riddled with materially false and misleading statements regarding the Company's business and prospects.

For example, the Registration Statement positively described the Company's "competitive strengths" in the 4G market as a result of its "strong position in the WiMAX market" and its being an "early leader in the 4G LTE market." ¶52. The Company also stated it was "leveraging [its] strong market position and technical expertise in WiMAX to deploy best-in-class LTE solutions" suggesting such deployments were already underway. ¶53. The Company also misleadingly stated that it had "leveraged [its] leadership in WiMAX to successfully develop LTE semiconductor solutions that are being deployed globally." ¶60. In reality, of course, the Company was not an "early leader" in 4G LTE and was not "deploy[ing]" 4G LTE solutions to any commercially viable customer because the Company's LTE TDD chips were incompatible with any networks in commercial operation at the time. *Id.*

The Company also boasted "product revenue [was] growing rapidly," and that it had experienced "increased sales volume . . . due to various trends in the 4G wireless broadband market," including "deployment and broader adoption" of WiMAX and LTE. ¶57. Defendants failed to disclose that they knew that the market was trending away from WiMAX in favor of LTE, that the Company was poorly positioned to take advantage of that trend due to its reliance on the TDD standard, and that demand from its main customer, HTC, was already softening in ways suggesting a much deeper decline was imminent. ¶58. The Registration Statement further hyped Sequans's development and deployment of LTE in places like China, but failed to mention China had no plans to deploy a network until 2014 at the earliest. ¶¶60-62.

Even Defendants' risk disclosures were misleading. The Registration Statement disclosed that "[i]f the WiMAX market declines, our results of operations would be harmed." It similarly

disclosed that Sequans would be harmed "if wireless carriers delay or are unsuccessful in the commercial deployment of or upgrades to 4G technology." These statements, which were all framed as potential risks, misled investors because the Company was already experiencing softening demand for its products as customers like HTC shifted away from WiMAX to focus exclusively on 4G LTE, and that the WiMAX market was already stagnant and declining due to the financial struggles of key player Clearwire. ¶¶72-74.

## IV.   Defendants' Post-IPO Misrepresentations

Following the IPO, Defendants continued to misstate and omit the truth about the stagnation and decline of WiMAX generally and Sequans's weak business prospects specifically. On April 28, 2011, Sequans issued a press release announcing its financial results for the first quarter of 2011, for the period ending March 31, 2011, and attributed those results to the "continued strong demand for 4G devices." ¶108. They never mentioned that WiMAX generally was declining relative to LTE, that sales to HTC were softening, and that the Company was in no position to profit from LTE until late 2012 at the earliest. ¶109. The false and misleading impression was reinforced during a conference call that same day when Defendant Karam boasted of "more stability in the WiMAX business with Sprint which is good news for the company in our existing business." ¶110. No mention was made about Clearwire's struggles, which presaged imminent threats to Sequans's business. ¶111.

On May 24, 2011, Defendant Karam further exacerbated the false impression when he bragged the Company's WiMAX market share was "around 40% of the world," and discussed the possibility of achieving 15% of the world market for LTE. ¶113. Karam failed to disclose, however, that the Company's WiMAX business was in steep decline, that HTC was focusing

heavily on 4G LTE, and that Sequans did not offer any 4G LTE products for 4G LTE networks that were commercially operational at the time. ¶114.

## V.     The Truth Begins to Emerge

On July 28, 2011, before the stock market opened, Sequans announced financial results for the second quarter of 2011, and reported net profit of $0.1 million, or $0.00 per diluted ADS. ¶77. The press release referred to the Company "seeing more cautious order patterns," and expressed a negative outlook for the third quarter of 2011. ¶¶78-79. But it was during a conference call with analysts the same day that Defendant Karam dropped the real bomb he and his fellow Defendants had known all along: the WiMAX market in the US would decline and there was a significant shift from WiMAX to 4G LTE. ¶80. During that same call, Karam lowered guidance for the third quarter of 2011 25% more than analysts had expected. ¶81.

Following the Company's announcements on July 28, 2011, the price of Sequans ADSs dropped from $15.43 per ADS to $8.55 per ADS, a one day decline of approximately 45%, on extremely heavy volume. Over the next seven days, the Company's ADSs continued to trade lower on heavy volume, closing at $5.70 per ADS on August 8 – a 63% drop from the July 27 closing price. ¶82.

Finally, on December 31, the Company announced that HTC had cut orders by 60%. ¶84. In commenting on the change, Defendant Karam admitted the Company had experienced "reduced WiMAX demand," that "this development in our WiMAX business is disappointing," and that "the small quantities of LTE chips we expect to ship in the first half of 2012 will not be sufficient to offset the greater than expected decline in our WiMAX business." *Id.*

### ARGUMENT

## I.      The Applicable Legal Standard on a Motion to Dismiss

On a motion to dismiss under Rule 12(b)(6), the court must accept the well-pleaded factual

allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns Inc. v. Shaar Fund, Ltd*, 493 F.3d 87, 98 (2d Cir. 2007). "To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 750 (S.D.N.Y. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Moreover, "[a] pleading is not a trial and plaintiffs are not required to marshal their evidence and sustain a verdict at this stage." *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003) (citation omitted). Therefore, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citation omitted).

## II.     The Complaint Alleges Valid §11 Claims

Section 11 provides that any signer, director, or underwriter is liable if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). "'[Section 11] was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering.'" *Litwin v. Blackstone Group*, L.P., 634 F.3d 706, 716 (2d Cir. 2011) (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983)). This stringent standard "is intended to ensure that issuers, under pain of civil liability, not cut corners in preparing registration statements and that they disclose all material information required by the applicable statutes and regulations." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1204 (1st Cir. 1996).

Further, the pleading requirements for a §11 claim are "relatively minimal." *Litwin*, 634 F.3d at 718. As the Second Circuit stated:

> So long as a plaintiff establishes one of the three bases for liability under these provisions – (1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading – then, in a Section 11 case, the general rule [is] that an issuer's liability . . . is absolute.

*Id.* (quoting *In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 73 n.1 (2d Cir. 2007)) (citation omitted).

**A.       Defendants' Statements Were Materially False and Misleading When Made**

**1.       Defendants Knew WiMAX Was Stagnant and Declining**

The Complaint alleges that the "WiMAX industry was stagna[nt] and in steep decline" in ways that were obvious to Defendants – but not necessarily the investing public – at the time of the IPO. ¶¶53, 109. The industry was stagnant in the sense that growth in domestic and international markets alike had stalled, as Sequans was keenly aware because of the troubles of Clearwire. The industry was in steep decline relative to LTE, a reality that was obvious to Sequans internally as a result of softening sales and lost business opportunities with partners like HTC. ¶¶33-44. Indeed, Figure 1 below clearly shows how rapidly LTE overtook WiMAX as the dominant 4G standard between LTE's launching in 2010 through 2012. ¶36.



***Figure 1.* 4G Worldwide Subscriber Forecast (Millions of Subscribers)**

Although Defendants argue that "Plaintiffs' own cited materials" refute any claim the WiMAX industry was stagnant and declining (Sequans Mem. 11; Underwriter Mem. 4), such extrinsic material may only be considered when "the complaint relies *heavily* upon its terms and effect." *Global Network Communs., Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (citation omitted). Moreover, Plaintiffs are entitled to have all reasonable inferences drawn in their favor from documents referenced in the Complaint. *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004). And even where "a court may take judicial notice, 'it may do so on a motion to dismiss only to establish the existence of the opinion, not for the truth of the facts asserted in the opinion.'" *Global Network*, 458 F.3d at 156 (quoting *Lum v. Bank of America*, 361 F.3d 217, 222 n.3 (3d Cir. 2004). In addition to referencing these documents for the truth of the matters asserted therein, Defendants also utterly fail to credit any reasonable inferences in Plaintiffs' favor.

Defendants contend that these extrinsic materials show that WiMAX dominated the market at the time of the IPO, that any potential transition to LTE would be gradual, and that operators were better off expanding their investment in WiMAX than switching to LTE. Sequans Mem.

11

11; Underwriter Mem. 4. But these are issues of fact, which are not ripe at the motion to dismiss stage, and even if true, these "facts" do not necessarily contradict the Complaint's allegations. For example, the claim that WiMAX was still the "dominant" technology is entirely consistent with allegations that the industry had stopped growing and was rapidly losing ground to LTE.[3] WiMAX only "dominated" because it was, for a few years, the only 4G standard, but once LTE networks went operational, LTE quickly overtook WiMAX to become the dominant standard. *See* Figure 1, *supra*.

Defendants further fail to refute the allegations concerning Clearwire's financial troubles instead choosing to label such allegations as a "red herring" (Sequans Mem. 11). Defendants infer there was massive room for growth within Clearwire's existing network because only 4.4 million subscribers out of a possible 114 million subscribed to WiMAX. *Id.* at 11-12. But other plausible inferences include that this "massive room for growth" was caused by lack of customer interest. Moreover, the Complaint alleges that Clearwire's WiMAX network, regardless of its size, fell well short of what that company had originally planned, as indicated by, among other things, the abrupt termination of ongoing projects around the country. *See* ¶38 (describing how the WiMAX build out in Denver was unexpectedly stopped with only half the work completed).

Defendants also argue unpersuasively that Sequans's record sales in the first and second quarters of 2011 belie allegations that the Company's business was declining in ways that threatened to imminently impact revenues. Sequans Mem. 13; Underwriter Mem. 5. But this does not undermine the plausible inference that Defendants were privy to information concerning HTC's declining demand for Sequans's WiMAX chips well before the rest of the market. The Complaint alleges that HTC was Sequans's main customer, and that in late 2010 and early 2011

---

[3] As described in the Complaint, even as WiMAX growth stalled, LTE was expanding by leaps and bounds world-wide. ¶¶39, 40-41, 43; *see also* Figure 1, *supra*.

– well before the IPO – HTC shifted its development primarily to LTE smartphones due to the technological superiority of LTE. ¶¶35, 42. Accordingly, Defendants had a duty to reveal not merely the possibility, but the *reality* of that decline when hyping the strength of Sequans's WiMAX business and that of the industry generally.

Defendants further contend that the Complaint fails to allege that Sequans was aware of the actual decline in the WiMAX market. *See* Sequans Mem. 12 (quoting *Panther Partners Inc. v. Ikanos Communications, Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008) ("*Panther Partners I*")) ("The critical inquiry for the Court . . . is whether – and to what extent – [the Company] was aware of the issues and their potential impacts at the time of the offering statements."). But as the Second Circuit recently clarified in a subsequent decision in that case, defendants need not know with certainty the negative trend in question will impact revenues. *See Panther Partners Inc. v. Ikanos Communs., Inc.*, 681 F.3d 114, 121-22 (2d Cir. 2012) ("*Panther Partners V*"). Rather, it is the *uncertainty* that must be disclosed. *Id.* at 121 ("But neither of these facts, undermines the plausible inference that . . . [defendant] was aware of the 'uncertainty' that it might have to accept returns of a substantial volume, if not all, of the chips it had delivered to its major customers.").[4]

## 2.    Defendants' Disclosures and Warnings Were Completely Inadequate

Defendants insist they disclosed all of the adverse information and risks that Plaintiffs allege were misstated in, or omitted from, the Registration Statement. Sequans Mem. 15; Underwriter Mem. 6. But these purported disclosures did not alleviate the effect of Defendants' material omissions and in many cases exacerbated it. For example, Plaintiffs allege that Defendants failed

---

[4] The Second Circuit further held the plaintiffs were not required to quantify the defect problem as "above average." *Panther Partners V*, 681 F.3d at 122 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318-19 (2011)). This holding forecloses any argument by Defendants in this case that Plaintiffs were required to allege the precise amounts by which Sequans's sales to its main customer HTC had begun to suffer.

to disclose "the Company would not be in position to generate any meaningful revenues from sales of 4G LTE products until late 2012" at the earliest. ¶53(c). Defendants counter that they disclosed Sequans would derive most of its revenues from WiMAX through 2011, and gave anticipated release dates for its LTE products in the US and overseas in China and India. Sequans Mem. 14; Underwriter Mem. 7. But Defendants' objectively false claims of present fact that the Company "*is* an early leader in the LTE market," and *is* "deploy[ing] best-in-class LTE solutions," misled investors about the compatibility of its LTE chip with the LTE networks operating at that time and the timing of sales of that chip. ¶54 (emphasis added). Defendants' reference to the end of 2011 not only failed to dispel that misimpression, it encouraged it.

Defendants' warnings were similarly inadequate to shield them from liability. They point to statements warning of the potential risks of transitioning to LTE, of carriers choosing different technologies, and of the Company's failure to anticipate such changes. Sequans Mem. 15. But these warnings were all qualified by contingent language like "if," "may," and "could." *Id.* The adverse information they omitted, by contrast, was not "unforeseen or contingent" but rather "present fact-knowledge within the grasp of the offeror." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004). "It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language." *Id.* Thus, contrary to Defendants' claim Plaintiffs neither require clairvoyance nor plead in hindsight. *See* Sequans Mem. 15 (citing *Panther Partners I*, 538 F. Supp. 2d at 664); Underwriter Mem. 5-6.

### B.   Defendants Had an Independent Duty to Disclose the Potential Impact of These Known Adverse Trends Upon Sequans

Defendants also violated §11 by omitting material facts from the Registration Statement that were "required [by Item 5(D) of Form 20-F] to be stated therein." 15 U.S.C. § 77k(a). Item 5

requires an issuer to "discuss, for at least the current fiscal year, any known trends, uncertainties . . . that are reasonably likely to have a material effect on the company's net sales or revenues." Form 20-F, Item 5(D).[5] Thus, Sequans had a duty to disclose "'a trend, demand, commitment, event or uncertainty [that] is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'" *Litwin*, 634 F.3d at 716 (citation omitted).

Defendants assert, in a footnote, that they had no such duty because they did not know of the trends at issue. Sequans Br. at 13 n.11. But it is inconceivable that Defendants were unaware that at the time of the IPO, every operational LTE network in the world utilized the FDD standard – not the TDD standard – and that Sequans did not have a single available product that supported the FDD standard. ¶52. Because these known facts cast serious doubt on Sequans's ability to capitalize on the LTE standard, Defendants were obligated to discuss "whether, and to what extent, the particular known trend, event, or uncertainty might have been reasonably expected to materially affect [the Company's] investments." *Litwin*, 634 F.3d at 718-19.

Defendants also incredibly contend that the Prospectus disclosed that there were no operational TDD networks (Sequans Br. at 15. n.12) when any fair reading shows that is not the case.[6] However, even if the Court finds that they disclosed such fact, "[P]laintiffs are not seeking the disclosure of the mere fact" there were no TDD networks in operation. *Litwin*, 634 F.3d at 719. Rather, Sequans "was required to disclose the manner in which" that known trend and

---

[5] The SEC has interpreted Item 5 "as calling for the same disclosure as Item 303 of Regulation S-K." Securities Act Release No. 33-8350 (Dec. 29, 2003), *available at* http://www.sec.gov/rules/interp/33-8350.htm.

[6] Defendants point to the following sentence to show that the Offering Documents indicated that TDD networks had not yet been deployed: "Deployments of TDD LTE networks are expected to be driven by wireless carriers such as China Mobile in China, [etc.]." Sequans Br. at 15. n.12 (citing Thompson Decl. Ex. B, 60). While that sentence refers to what may be expected to occur in the future, it fails to disclose that no commercially viable TDD LTE networks existed at that time. Indeed, the Prospectus uses similar language in discussing FDD networks, which had already been deployed: "In the near term, we believe deployments of FDD LTE networks will be driven largely by legacy 3G wireless carriers who possess FDD spectrum licenses." Thompson Decl. Ex. B, 60.

uncertainty "might reasonably be expected to materially impact [the Company's] future revenues." *Id.*; *Panther Partners V*, 681 F.3d at 120-21 (quoting *Litwin* with approval).

Similarly, despite Sequans's reliance on Clearwire and despite Clearwire's financial difficulties at the time of the IPO, there is no disclosure whatsoever of whether and how "any known trends, [or] uncertainties [concerning Clearwire] . . . are reasonably likely to have a material effect on the company's net sales or revenues." Form 20-F, Item 5(D). Additionally, the Registration Statement did not "prominently disclose risk factors" associated with Clearwire "that are specific to the company or its industry and make an offering speculative or one of high risk." Form 20-F, Item 3(D). Nor did the Registration Statement include a "discussion of the most significant factors that make the offering risky or speculative." 17 C.F.R. §229.503. Specifically, the Registration Statement did not disclose, among other things, that Sprint was dependent on Clearwire to build, launch, and operate a viable WiMAX network, and that at the beginning of 2011, Clearwire was having financial difficulties and lacked funding to continue expanding into new markets.

Finally, it was clear at the time of the IPO that LTE was the 4G network of choice and there was a strong trend towards accelerating growth in LTE at the expense of other competing networks, including WIMAX. Although LTE was not operational in 2010, by 2012, it had overtaken WiMAX in subscribers. This trend, which was known by Defendants to exist at the time of the IPO, was reasonably likely to – and eventually did – have a material effect on the Company's net sales or revenues. *E.g., City of Roseville Emps. Ret. Sys. v. Energysolutions, Inc.*, 814 F. Supp. 2d 395, 428 (S.D.N.Y. 2011) (holding that allegations of failure by defendants to describe lack of market for its services as it existed at time of statements sufficient under §10(b) for Exchange Act claim and for violation of Item 503 for Securities Act claim).

### C.  Defendants' Statements Are All Actionable

Defendants also argue that "none of the purportedly misleading statements are actionable" because the representations are mere statements of general optimism, forward-looking statements protected by the bespeaks caution doctrine, inactionable risk disclosures, or accurate statements that were supposedly misunderstood by Plaintiffs. Sequans Mem. 16-17; Underwriter Mem. 7-9. But Defendants' arguments are belied by the established law and the relevant facts.

### 1.  Defendants' Misleading Statements of Optimism Are Actionable

Accordingly, the Complaint sufficiently alleges that (i) the stagnation and decline of the WiMAX market, (ii) the financial struggles of the operator of the US's sole WiMAX network, Clearwire, (iii) the softening demand by its main customer, HTC,[7] and (iv) the incompatibility of its TDD technology with any existing LTE networks in operation, all constituted "known trend[s] or uncertaint[ies] that [the Company] reasonably expected would have a material unfavorable impact on revenues or income from continuing operations." *Panther Partners V*, 681 F.3d at 121; *see also Litwin*, 634 F.3d at 718-19 (finding that the defendant company was required to disclose the manner in which failure of a key investment, the downward trend in the real estate market, and the loss of an important contract might reasonable affect the defendant company's future revenues).[8] Defendants were obligated not only to disclose these trends and uncertainties, but to discuss their potential impact on Sequans's future operations. Yet Defendants utterly failed to do so.

---

[7] In arguing that Plaintiffs are "pleading by hindsight," Defendants misleadingly suggest the Complaint states that demand did not start to soften until July 2011. Sequans Mem. 15. To be clear, however, that is simply when Defendants *disclosed* HTC's cautious order patterns to the public. Plaintiffs allege that HTC's demand began declining noticeably in late 2010 and early 2011 as HTC shifted primarily to LTE smartphones. ¶¶35, 42.

[8] Additionally, Defendants' discussion about the iPhone is a red herring as the Complaint contains no allegations concerning Sprint's adoption of the iPhone.

Defendants argue that their optimistic statements concerning Sequans's "strong position in the WiMAX market" are "the type of 'puffery' that this and other circuits have consistently held to be inactionable." Sequans Mem. 17; Underwriter Mem. 9. But Plaintiffs do not focus on the specific adjective used but rather the misleading overall impression created by the combination of optimistic hype and the omissions of material facts that contradicted that hype. *See Robbins* 788 F. Supp. at 186 ("The combination of nondisclosure of alleged problems and false statements of optimism" misled investors.).[9] Defendants' statements left investors with the false impression that Sequans's strength in the WiMAX market had given the Company an early lead in the LTE market, when Defendants knew the Company's TDD technology was incompatible with the every LTE network in operation at the time of the IPO. ¶52. Because omitted material facts directly contradicted the hype, this case is distinguishable from those relied upon by Defendants. *See* Sequans Mem. 17 (quoting *In re Xinhua Fin. Media, Ltd. Secs. Litig.*, No. 07 Civ. 3994, 2009 U.S. Dist. LEXIS 14838, at *23 (S.D.N.Y. Feb. 25, 2009)). For example, in *Xinhua*, the statement at issue touted the defendants' "international media operations skills, and none of the omissions call[ed] into question this aspect of the management team's experience." *Xinhua*, 2009 U.S. Dist. LEXIS 14838, at *22. All of the omitted facts here, by contrast, called into direct question the representations made by the Defendants.

---

[9] *See also Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete.") (citing *Robbins*); *Goldman v. Belden*, 754 F.2d 1059, 1063, 1070 (2d Cir. 1985) (defendant misled investors by making positive predictions about the marketing prospects of a computer system while omitting facts that showed "grave uncertainties and problems concerning future sales of" that system); *In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 292-93 (S.D.N.Y. 1999) ("Quintel 'publicly hyped' its 'unique' and 'exciting' partnership with AT&T, as well as its success in decreasing chargebacks; therefore there was a duty to disclose when Quintel received information that rendered that hype misleading.").

### 2.    Defendants' Statements Are Not Protected by the Bespeaks Caution Doctrine

Defendants also invoke the "bespeaks caution" doctrine in an attempt to immunize certain statements they insist were "plainly forward looking." Sequans Mem. 17; Underwriter Mem. 7-8. But these statements are *not* protected by the bespeaks caution doctrine because they also relate to Sequans's "current or historical performance." *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 236 (S.D.N.Y. 2006).[10] For example, Defendants' statement concerning Sequans's intention to maintain market position was accompanied by the claims that "we *have* a strong position in the WiMAX market and *are* an early leader in the LTE market." ¶52 (emphasis added). Similarly, their expectation of continued product-revenue growth was prefaced with the claim that "[o]ur product revenue *is* growing rapidly." ¶57 (emphasis added). And Defendants' expectations concerning deployment of TDD networks was preceded by the statement that several wireless carriers "deployed" FDD technology in 2010. ¶59. Such statements were not "forward looking" because they involved claims of current and historical fact about Sequans. *See In re Regeneron Pharms., Inc. Sec. Litig.*, No. 03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350, at *39 (S.D.N.Y. Feb. 1, 2005).

At best, Defendants can only claim that their statements contained *both* forward-looking claims *and* claims of historical fact, but "[i]t is well recognized that . . . when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." *Darquea v. Jarden Corp.*, No. 06 Civ. 0722, 2007 U.S. Dist. LEXIS 40247, at *20 (S.D.N.Y. May 31, 2007); *see also In re Regeneron,* 2005 U.S. Dist. LEXIS 1350, at **39-40.

---

[10] *See also Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 617 (S.D.N.Y. 2008) (bespeaks caution doctrine "only applies to forward-looking statements, and not to misrepresentations of present or historical fact"); *P. Stolz Family P'ship*, 355 F.3d at 96-97 (limiting the "bespeaks caution" doctrine to "forward-looking, prospective representations") (collecting cases from other Circuits).

Even if Defendants' statements were only forward looking, the bespeaks caution doctrine still would not apply because Plaintiffs allege that these statements were made with knowledge that they were materially false and misleading, and "the safe harbor provision does not protect a statement made with 'actual knowledge' that it was false and misleading." *In re Regeneron*, 2005 U.S. Dist. LEXIS 1350, at *40; *see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

Furthermore, it is well established that "warnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*, No. 99 Civ. 12046 (WHP), 2001 U.S. Dist. LEXIS 3332, at *23 (S.D.N.Y. Mar. 27, 2001); *In re Regeneron*, 2005 U.S. Dist. LEXIS 1350, at *55. For this reason, Defendants' conditional warnings were tantamount "to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential*, 930 F. Supp. at 72. Such a transparent attempt to evade liability by "gaming" the doctrine of bespeaks caution should be denied. *See Rombach*, 355 F.3d at 173 ("The bespeaks caution doctrine does not serve if it is abused or gamed.").

### 3.    Defendants' Inadequate Risk Disclosures Are Actionable

Besides being inadequate to insulate Defendants from liability, many of Defendants' risk disclosures were materially false and misleading themselves because they failed to reveal the risks had already begun to materialize. ¶¶72-76. Defendants counter with a decision from the Northern District of California holding that risk disclosures are "not actionable to the extent plaintiffs contend defendants should have stated that the adverse factors 'are' affecting financial results rather than 'may' affect financial results," like in this case. Sequans Mem. 18 (quoting *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048 (N.D. Cal. 2007)). But the Second Circuit has suggested that such disclosures are actionable. *See P. Stolz Family P'ship*,

355 F.3d at 97 ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language."); *Rombach*, 355 F.3d at 170 ("[C]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."). Consequently, courts in this District have held that "to warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Van Der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) (quotation omitted).

Defendants also cite *In re Noah Educ. Holdings, Ltd. Securities Litigation*, No. 08 Civ. 9203, 2010 U.S. Dist. LEXIS 34459, at *23 n.7 (S.D.N.Y. Mar. 31, 2010), where the court found contingent risk disclosures were not misleading. In that case, the court distinguished *In re Van Der Moolen* in favor of *In re FBR Inc. Securities Litigation,* 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008), finding "its analysis better fits the facts of this case." 2010 U.S. Dist. LEXIS 34459, at *23 n.7. In *FBR*, however, the court ruled simply that general, boilerplate regulatory warnings "could not have been misleading to a reasonable investor as the description 'said nothing company-specific, and no reasonable investor would infer anything about the state of [the company's regulatory] compliance.'" 544 F. Supp. 2d at 362.

### 4.    Defendants' Accurate Statements Were Still Misleading

The Complaint alleges Defendants' statements concerning WiMAX chip speeds and the present status of their LTE deployment were materially false and misleading because the chips were much slower under real-world circumstances and Sequans was nowhere close to deploying LTE at the time. ¶¶55-56, 60-62. Defendants counter that these statements were accurate because they correctly reported the chips' maximum speeds, and the Company had indeed deployed its technology as part of testing in China. Sequans Mem. 18; Underwriter Mem. 7 n.3. At best,

however, Defendants' explanations render these statements ambiguous, and on "a Rule 12(b)(6) motion to dismiss, the Court is required to make all inferences and construe any ambiguities in favor of the Plaintiff." *Thomas v. Little Flower For Rehabilitation & Nursing*, 793 F. Supp. 2d 544, 549 (E.D.N.Y. 2011).

Moreover, even assuming Defendants' statements were accurate, "literally accurate statements can, 'through their context and manner of presentation, [become] devices which mislead investors.'" *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) (citation omitted). Here, Defendants' failure to disclose that its WiMAX chips actually ran much slower on Sprint's network, and that China had no plans to deploy LTE until 2014, left investors with the false impression that the Company's WiMAX chips and LTE deployment were both better than they actually were. *See Robbins* 788 F. Supp. at 186; *see also In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1019 (S.D. Cal. 2005) ("Plaintiffs' criticism is not that what was said was inaccurate, but that it was incomplete, thus portraying the results of the clinical trial in an unduly optimistic light.").

## III.   The Complaint Alleges Valid §12(a)(2) Claims

Because the Registration Statement incorporates the Prospectus, Plaintiffs have adequately alleged material misstatements and omissions for a claim under §12(a)(2) of the Securities Act as well. While §11 applies to omissions required to be stated in the Registration Statement (which includes portions of the Prospectus), §12(a)(2) applies to misrepresentations or omissions made by means of prospectus or oral communication. *Gotham Holdings, LP v. Health Grades, Inc.*, 534 F. Supp. 2d 442, 444 (S.D.N.Y. 2008). "Claims under Sections 11 and 12 are usually evaluated in tandem." *Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008). Plaintiffs pleading §§11 and 12 claims must state facts showing the allegedly omitted facts both existed and were known or knowable, at the time of the offering. *Zucker v.*

22

*Quasha*, 891 F. Supp. 1010, 1014-17 (D.N.J. 1995). As with §11, the pleading requirements for a §12(a)(2) claim are "relatively minimal." *Litwin*, 634 F.3d at 718.

Defendants object that Plaintiffs lack standing to pursue §12(a)(2) claims because Plaintiffs did not purchase their shares in the actual IPO. Sequans Mem. 19 (citing *In re Barclays Bank PLC Sec. Litig.*, 2011 U.S. Dist. LEXIS 2667, at *21 (S.D.N.Y. Jan. 5, 2011)) ; Underwriter Mem. 10-12. Section 12(a)(2) liability, however, attaches any time there is an obligation to provide a prospectus, even if the transaction occurred in the aftermarket. *See In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 574 (S.D.N.Y. 2009).[11] Defendants' standing objection, moreover, rests upon factual claims that have not been established, making it premature at this stage of the litigation. *See id.* While Plaintiffs are certainly required to allege facts supporting their claims, they need not plead evidence. *See Util. Metal Research, Inc. v. Generac Power Sys.*, 179 Fed. Appx. 795, 797 (2d Cir. 2006).[12]

In view of the foregoing, Plaintiffs believe they have adequately alleged violations of §12(a)(2). If the Court disagrees, however, Plaintiffs respectfully request leave to amend the Complaint. *See Barclays*, 2011 U.S. Dist. LEXIS 2667, at *22 n.16 (permitting leave to amend to add allegations the plaintiff was a direct purchaser); *Lone Star Ladies Inv. Club,* 238 F.3d at 371 (reversing denial of leave to amend to add allegations the issuers actively promoted the sale of

---

[11] Defendants argue that *Giant Interactive* relies upon a decision – *Feiner v. SS&C Techs., Inc.*, 47 F. Supp.2d 250 (D. Conn. 1999) – that "is contrary to the great weight of authority and, indeed, represents the minority opinion even within the Second Circuit." Underwriter Mem. 11 (quoting *Local 295/Local 851 IBT Emplr. Group Pension Trust & Welfare Fund v. Fifth Third Bancorp*, 731 F. Supp. 2d 689 (S.D. Oh. 2010). But it is unclear why Defendants credit the characterization of a court from the S.D. Ohio over Plaintiffs' citation from the S.D.N.Y.

[12] Defendants further object the Complaint cannot allege they were statutory sellers, as required by §12(a)(2), be-cause the IPO was conducted via a firm commitment offering – meaning, Defendants never passed title to any shareholder. Sequans Mem. 19-20. But Defendants' own cited authority makes it clear that privity is not an absolute requirement for §12 liability. *See Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 370 (5th Cir. 2001) (recognizing some cases "in which the issuer is sufficiently active in promoting the securities as to essentially be-come the vendor's agent"); *see also In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1073 (N.D. Cal. 2010) (rejecting the argument that firm commitment offerings prohibit defendants from qualifying as statutory sellers as "not wholly convincing").

shares). In assessing this request, the Court should "'consider all possible amendments' – not just 'proposed amendments' – in [assessing] futility." *Panther Partners V*, 681 F.3d at 118 (citation omitted).

## IV.   Defendants' Negative Causation Defense Is Premature

A plaintiff alleging violations of §10(b) must allege and prove loss causation. "By contrast, under the Securities Act, it is the defendant who bears the burden of demonstrating that something other than the misstatement at issue caused plaintiff's loss." *In re Flag Telecom Holdings, Ltd. Sec. Litig*, 574 F.3d 29, 35-36 (2d Cir. 2009). "Although 'not insurmountable,' [D]efendants' burden in establishing this defense is heavy since 'the risk of uncertainty' is allocated to [D]efendants." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d at 408 (quoting *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987)). "Given the burden on Defendants to establish an affirmative defense such as negative causation, . . . dismissal on this ground is more properly considered on a motion for summary judgment." *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 444 (S.D.N.Y. 2009); *see also In re Citigroup Bond Litig.*, 723 F. Supp. 2d 568, 588 (S.D.N.Y. 2010) (quoting *Fuwei Films* with approval). For a defendant to prevail on the face of a complaint, the "Plaintiff must plead [himself] out of court by unintentionally alleging facts (taken as true) that establish an affirmative defense." *Fuwei Films*, 634 F. Supp. 2d at 444 (quoting *Levine v. Atricure Inc.,* 594 F. Supp. 2d 471, 474 (S.D.N.Y. 2009)).

Defendants nevertheless argue this is the unusual case where their claim of negative causation can be resolved on a motion to dismiss, without resort to summary judgment procedure. Underwriter Mem. 9-10. The crux of Defendants' argument is that because their disclosure on July 28, 2011 "concerned a drop in demand that occurred months after the IPO," they cannot be causally related to misstatements and omissions in the Registration Statement,

which was "prepared prior to the IPO and described Sequans' activities up to the time of the IPO." *Id.* at 10. But Defendants' argument fails. To reiterate, the Complaint alleges their omissions related to softening demand by Sequans's main customer HTC, which accounted for 78% of the Company's business. The Complaint further alleges this demand started softening in late 2010 and early 2011. As a result, Defendants were aware a severe decline in demand was imminent at the time of the IPO, but delayed revealing the truth until this decline actually impacted revenues in July 2011. These allegations distinguish this case from the decision cited by Defendants, *In re Britannia Bulk Holdings Inc. Securities Litigation*, 665 F. Supp. 2d 404, 419 (S.D.N.Y. 2009), where there was no such causal nexus between the subject matter of the omissions and disclosure.

## V.      The Complaint Alleges Valid §10(b) Claims

The Complaint sufficiently pleaded §10(b) claims. To state a claim for relief under §10(b) and Rule 10b-5, a plaintiff must plead: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Heller v. Goldin Restructuring Fund, L.P.,* 590 F. Supp. 2d 603, 613 (S.D.N.Y. 2008) (quotation omitted). Plaintiffs have satisfied these elements.

### A.      Defendants' Statements Are All Actionable

Following the IPO, Defendants continued making similar false and misleading statements, touting the "continued strong demand for 4G devices," Sequans's 40% share of the WiMAX market, and the stability of the Company's relationship with Sprint. ¶¶106-14. Defendants argue these statements are not actionable because they accurately reported the Company's past results. Sequans Mem. 21. Again, however, "Plaintiffs' criticism is not that what was said was inaccurate, but that it was incomplete," misleading investors into believing the Company's

business prospects were much stronger than they actually were. *Immune Response*, 375 F. Supp. 2d at 1019; *see also Robbins* 788 F. Supp. at 186 ("The combination of nondisclosure of alleged problems and false statements of optimism could . . . work a fraud cognizable under § 10(b)").[13]

**B.     The Alleged Facts Support a Strong Inference of Scienter**

To state a §10(b) claim a plaintiff must allege facts providing a strong inference that the defendants acted with a strong inference of scienter. *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). In this Circuit, the requisite strong inference may be established by alleging facts that either (i) constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (ii) demonstrate that defendants had motive and opportunity to commit fraud. *ECA*, 553 F.3d at 198; *In re Scholastic Corp. Sec. Litig*, 252 F.3d 63, 74 (2d Cir. 2001).

**1.     Defendants' Statements Related to the Company's Core Operations**

The Complaint alleges that Defendants' misstatements and omissions related to Sequans's core operations, supporting a strong inference of scienter. "This doctrine states that if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company." *City of Pontiac General Emps.' Ret. Sys. v. Lockheed Martin Corp.*, No. 11 Civ. 5026, 2012 U.S. Dist. LEXIS 97185, at *32 (S.D.N.Y. July 13, 2012) (citation and quotation marks omitted).

---

[13] Defendants also claim that Defendant Karam's optimistic statements concerning the Company's relationship with Sprint was a non-actionable statement of opinion. Sequans Mem. 21. However, the very notion of "stability" implies continuity between past, present, and future. Thus, "there was a duty to disclose when [Sequans] received information that rendered that hype misleading." *Quintel*, 72 F. Supp. 2d at 292-93 (S.D.N.Y. 1999).

The Complaint has pleaded facts that give rise to an inference that Defendants knew of contradictory facts by virtue of their positions. For example, the Complaint alleges that Defendants knew or recklessly disregarded that the Company was dependent upon Sprint and Clearwire and that Clearwire's WiMAX network had stopped expanding into new markets. ¶117. Additionally, the Complaint alleges that Defendants knew or recklessly disregarded that at the time of the IPO there were no LTE networks in the world that utilized the FDD standard and, further, that because Sequans's sole 4G product utilized TDD, the Company was dependent upon other companies to launch commercially operational TDD networks and then buy Sequans's products. ¶119.

Although Defendants argue the "core operations" inference is inconsistent with the PSLRA and insufficient by itself to establish scienter (Sequans Mem. 24), this argument is belied by a long line of contrary authority.[14] And "although the Second Circuit has not expressly ruled on whether the core operations doctrine survives the PSLRA, it has very recently endorsed the idea behind the core operations doctrine as enhancing, if not independently supporting, an inference of scienter, albeit in dicta in a non-precedential opinion." *Lockheed*, 2012 U.S. Dist. LEXIS 97185, at *33 (citation omitted).

Even though Defendants contend the Complaint fails to allege sufficient facts supporting application of the inference in this case (Sequans Mem. 24), the Complaint specifically alleges that the subject matter of the statements involved the Company's *only* business (4G technology), relationships with its *main* customer (HTC), and the builder of its *only* WiMAX network (Clearwire). ¶¶30, 35, 118-19. Against this backdrop, it is implausible to suggest Defendants were unaware of the problems alleged. *See In re Toyota Motor Corp. Sec. Litig.*, No. 10-922, 2011 U.S.

---

[14] *See In re Reserve Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 322-23 (S.D.N.Y. 2010); *In re Dynex Capital Inc. Sec. Litig.*, No. 05 Civ. 1897 (HB), 2009 U.S. Dist. LEXIS 96527, at *15 (S.D.N.Y. Oct. 19, 2009), *In re Pall Corp.*, No. 07-CV-3359, 2009 U.S. Dist. LEXIS 88240 at *21 (E.D.N.Y. Sept. 21, 2009); *In re Winstar Communs.*, No. 01 CV 3014, 2006 U.S. Dist. LEXIS 7618 at *23 (S.D.N.Y. Feb. 24, 2006); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 489 (S.D.N.Y. 2004).

Dist. LEXIS 75732, at *11 (C.D. Cal. July 7, 2011) ("The defects at issue were simply too sig-nificant for it to be plausible that top Toyota management was not aware of the possible ramifi-cations of the problem by the time the statements at issue were made.").

## 2.    Defendants Had Ample Motive to Commit Fraud

"To make out a claim [under a 'motive and opportunity' theory], plaintiffs 'must assert a concrete and personal benefit to the individual defendants resulting from the fraud.'" *Energysolutions*, 814 F. Supp. 2d at 420 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)). Although Plaintiffs need not allege motive to successfully state a claim, *see Tellabs*, 551 U.S. at 325 ("[A]bsence of a motive allegation is not fatal."), the Complaint adequately alleges two motives for why Defendants committed the alleged fraud. *First*, Defendants were motivated to conduct the IPO at inflated prices so as to raise enough capital to fund operations and the research and development of 4G LTE products. In other words, Defendants knew that if they told the truth, the IPO would have raised significantly less money and the Company would have been unable to fund indispensible research, which could have imperiled the Company. ¶120. Although Defendants dismiss this allegation as "common to all corporate insiders" (Sequans Mem. 22), the desire for a successful IPO is "a sufficient motive to raise an inference of fraudulent intent on the part of [the Company]." *In re American Bank Note Holographics Secs. Litig.*, 93 F. Supp. 2d 424, 445 (S.D.N.Y. 2000); *see also EnergySolutions*, 814 F. Supp. 2d at 420 (holding allegations of sales of company shares through public offerings sufficient concrete benefit for scienter). Moreover, Plaintiffs allege Defendants were specially motivated by the knowledge that their WiMAX technology was declining rapidly, distinguishing this case from Defendants' cited authorities concerning the abstract desire to raise funds or appear profitable. *See* Sequans Mem. 22.

*Second*, Defendants were motivated by their desire to benefit personally by selling shares and earning options that could be sold at a later date. "[T]he Court of Appeals for the Second Circuit has held that motive is adequately pleaded where plaintiffs allege that a defendant sold its own shares while at the same time misrepresenting corporate performance in order to inflate stock prices." *Energysolutions, Inc.*, 814 F. Supp. 2d at 420 (citing *Kalnit*, 264 F.3d at 141-42). The Complaint alleges that Defendants, other Company insiders, and affiliated entities benefited personally by selling 451,358 shares in the IPO for $4,513,580, and that the IPO enabled Defendants and other Company insiders to obtain $6,525,000 worth of options and warrants (including 500,000 to Karam, 112,500 to Choate, and 40,000 to Miller) that would vest only if the Company completed the IPO. ¶¶120-24. Although Defendants question the plausibility of this motive given that the options did not begin vesting until after Sequans's share price declined in July 2011 (Sequans Mem. 22), they fail to appreciate that the "concrete and personal benefit to the individual defendants" was not guaranteed profit but, rather, the chance to profit. The technology accounting for substantially all of the Company' revenue, WiMAX, was becoming obsolete – thus, had the Defendants not committed this alleged fraud, Sequans would have been unable to raise enough capital to conduct essential research and development to enable it to profit from LTE. Because the very future of the Company was in jeopardy, Defendants faced two options: commit fraud so that the Company could raise money thereby giving the Defendants a chance at profiting from vested options down the road or tell the truth and possibly not raise enough capital to shift the Company's product line to a new technology.[15]

---

[15] Defendants further note that none of Defendants' trading activity was unusual or suspicious, and argue this fact undercuts an inference of scienter. Sequans Mem. 23. But the absence of insider trading allegations does not negate an inference of scienter as a matter of law. *See Pirraglia v. Novell, Inc.,* 339 F.3d 1182, 1191 n.12 (10th Cir. 2003); *No. 84 Employer-Teamster Joint Council Pension Trust Fund*, 320 F.3d 920, 944 (9th Cir. 2003).

## VI.     The Complaint Alleges Valid Claims for Control Person Liability

As the preceding suggests, Plaintiffs have successfully alleged primary violations of §§11, 12(a)(2), and 10(b). The Complaint also alleges control by virtue of the Individual Defendants' roles as officers and directors. ¶104. Accordingly, Plaintiffs have alleged valid claims for control person liability pursuant to §§15 and 20(a).

## CONCLUSION

For the foregoing reasons, accepting as true the factual allegations contained in the Complaint and drawing all inferences in a light most favorable to the non-moving party, Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss in their entirety.

DATED: July 30, 2012

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
CHRISTOPER M. BARRETT
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com
cbarrett@rgrdlaw.com

BROWER PIVEN A PROFESSIONAL CORPORATION
DAVID A.P. BROWER
BRIAN C. KERR

_____

488 Madison Avenue, Eighth Floor
New York, NY 10022
Telephone:  212/501-9000
212/501-0300 (fax)
brower@browerpiven.com
kerr@browerpiven.com

*Co-Lead Counsel for Plaintiffs*

30

DYER & BERENS LLP
JEFFREY A. BERENS
303 East 17th Avenue, Suite 300
Denver, CO  80203
Telephone:  303/861-1764
303/395-0393 (fax)
jeff@dyerberens.com

*Additional Counsel for Plaintiffs*

31

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2012, I served true and correct copies of the foregoing Plaintiffs' Memorandum Of Law In Opposition To Defendants' Motions To Dismiss The Consolidated Amended Complaint on Defendants' counsel by causing copies to be sent by the ECF system.

Brian C. Kerr