UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| U.S.D.C. S.D.N.Y. |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: <u>January 17, 2013</u> |

DONALD DEAN JOHNSON,

                    Plaintiff,

           v.

SEQUANS COMMUNICATIONS S.A., et al.,

                    Defendants.

No. 11 Civ. 6341 (PAC)

<u>**OPINION AND ORDER**</u>

HONORABLE PAUL A. CROTTY, United States District Judge:

       In this putative securities fraud case, plaintiff investors ("Plaintiffs") assert claims against Sequans Communications S.A. ("Sequans"), several officers and directors, and two underwriter banks primarily relating to Sequans's April 2011 initial public offering ("IPO").  In sum, Plaintiffs accuse Sequans of making misleading disclosures regarding market conditions for the wireless semiconductor industry.  At the time of its IPO, Sequans designed and supplied semiconductor chips for cellular telephones and other wireless devices.  Sequans's chips were sold to device manufacturers, primarily HTC.  The HTC devices that used Sequans's chips operated on only one wireless network in the United States, specifically the Sprint network.  Sprint is a wireless carrier, but unlike the dominant carriers in the United States, Sprint did not have its own network, but rather relied on a company called Clearwire to build out and operate its network.  Plaintiffs basically contend that Sequans did not make adequate disclosures regarding HTC's future demand for Sequans's products and Clearwire's financial state in the IPO offering materials.

       For the reasons stated below, the Court determines that Plaintiffs have failed to allege actionable misstatements or omissions under either the Securities Act or the Exchange Act, lack standing to assert claims pursuant to Section 12(a)(2) of the Securities Act, and have failed to adequately allege scienter under Section 10(b) of the Exchange Act.  Accordingly, the Court GRANTS Defendants' motions to dismiss.

## BACKGROUND

**A.    Facts**

The allegations in Plaintiffs' Consolidated Amended Complaint ("CAC"), which are
assumed to be true for the purposes of the motions to dismiss, see Litwin v. Blackstone Grp.,
L.P., 634 F.3d 706, 708 (2d Cir. 2011), reflect the following.

Sequans is a French designer, developer, and supplier of 4G semiconductor solutions for
wireless broadband applications.  (CAC ¶ 20.)  The term "4G" refers to fourth generation
wireless standards that provide higher data rates and more reliable service than third-generation
("3G") wireless.  (Id. ¶ 23.)  During the relevant time period, Sequans sold its semiconductor
chips to wireless device manufacturers, including HTC, which accounted for the majority of its
operating revenue.  (Id. ¶ 26.)

The two primary wireless 4G protocols are Worldwide Interoperability for Microwave
("WiMAX") and Long Term Evolution ("LTE" or "4G LTE").  (Id. ¶ 24.)  Sprint, well behind
the dominate carriers in customers and coverage, supports devices that run on WiMAX, while
AT&T and Verizon Wireless, the two largest telecommunications networks in the United States,
support devices that run on the 4G LTE network.  (Id.)  Within the 4G LTE category, there are
two "duplex schemes" that allow devices to transmit and receive data simultaneously: frequency
division duplex ("FDD"), which uses one channel to transmit and another channel to receive
data, and time division duplex ("TDD"), which uses one frequency but different times for
transmission and reception.  (Id. ¶ 25.)  At the time of the Sequans IPO, there were sixteen
operational 4G networks, which all used the FDD scheme; none used the TDD scheme.  (Id.)

In addition, at the time of the Sequans IPO, only two phones used chips designed by
Sequans, and both phones operated on Sprint's WiMAX network.  (Id. ¶ 26.)  Sprint does not

own its 4G network, however; it is operated by another company known as Clearwire.  (Id. ¶ 30.)
Although Clearwire had launched its WiMAX network in 2008, two years before its competitors
launched their 4G networks, by March 2011 Clearwire was in financial straits and ceased
expanding its network coverage.  (Id. ¶¶ 31, 33.)

At the time Clearwire was stopping work on its WiMAX network buildout, Verizon and
AT&T were building their LTE networks, with Verizon launching its network in December 2010
and announcing planned expansions in January 2011 and on March 22, 2011.  (Id. ¶ 39.)  During
this time period, overseas telecommunications providers in Russia (February 2011) and Saudi
Arabia (March 2011) announced they would deploy LTE networks.  (Id. ¶ 40.)

By the time of the Sequans IPO, one Taiwanese online publication had stated that
WiMAX technology was inferior to LTE technology (id. ¶ 42), and Sequans's main device
manufacturer client (HTC) had indicated that it was developing devices to work on the LTE
network (id. ¶ 43).  In addition, while Sequans was also developing LTE-compatible chips of its
own, these chips were not being sold commercially, but were still in development at this time.
(Id. ¶¶ 45–47.)

On March 22, 2011, Sequans filed with the Securities and Exchange Commission
("SEC") a Form F-1 Registration Statement for its IPO of American Depository Shares ("ADS").
(Id. ¶ 22.)  On April 14, 2011, the prospectus relating to the IPO became effective and the IPO
for 7,700,000 ADS for $10/share proceeded.[1]  (Id.)

---

[1]  Citations to "Reg." will refer to the registration statement (Gimbel Decl. Ex. B, ECF Nos. 42-3, 42-4);
citations to "Pro." will refer to the prospectus (Gimbel Decl. Ex. A, ECF Nos. 42-1, 42-2).
Collectively, the registration statement and prospectus will be referred to as the "offering documents."

**B.      The Offering Documents' Disclosures**

The offering documents highlighted the uncertainties in Sequans's business and noted

several "[f]actors that may cause our operating results to fluctuate includ[ing]: reductions in

orders or cancellations by our customers, particularly HTC . . .; changes in the size, growth or

growth prospects of the WiMAX and LTE markets; changes in the competitive dynamics of our

market, including . . . our ability to compete in the LTE market."  (Reg. at 8; Pro. at 9.)

As to sales and revenues, Sequans stated that "sales of our semiconductor solutions

fluctuate from period to period due to cyclicality in the semiconductor industry and the short

product life cycles and wide fluctuations in product supply and demand characteristic in the

industry.  We expect these cyclical conductions to continue."  (Reg. at 8; Pro. at 9.)  Sequans

further disclosed that its business was highly concentrated in WiMAX products and dependant

on one customer, HTC, which "accounted for 66% of our total revenue in 2010":

> A significant amount of our total revenue is attributable to a small number of
> customers and we anticipate that this will continue to be the case for the
> foreseeable future.  These customers may decide not to purchase our
> semiconductor solutions at all [or] to purchase fewer semiconductor solutions
> than they did in the past. . . . We expect these customers, who currently purchase
> WiMAX solutions exclusively, will continue to represent a significant percentage
> of our revenue in future periods because we expect that the number of new
> WiMAX customers is likely to be limited as customers prepare for the adoption
> and commercialization of LTE technology. . . . The loss of any significant
> customer [or] a significant reduction in sales we make to them . . . would harm
> our financial condition and results of operations.  (Reg. at 9; Pro. at 10; see also
> Reg. at 37; Pro. at 38 ("We derive a significant portion of our revenue from a
> small number of end customers and we anticipate that we will continue to do so
> for the foreseeable future.").)

Further, given its concentration in WiMAX products, and how changes due to

competitive technologies in the WiMAX market might negatively affect its financial position,

Sequans stated:

We currently derive substantially all of our revenue from the sale of our semiconductor solutions for the WiMAX market and expect to do so through at least 2011.  If the WiMAX market declines, our results of operations would be harmed. . . . [T]he WiMAX market may decline significantly in anticipation of LTE deployments.  If customers believe LTE deployments will provide the same or superior coverage as WiMAX networks in the near future, customers may prefer to adopt LTE services and products instead of WiMAX, which in turn is likely to cause the WiMAX market to grow at a slower pace than expected or to decline.  If the WiMAX market declines prior to the commercial viability and acceptance of our LTE solutions, our business, operations results and financial conduction will be harmed.  (Reg. at 9; Pro. at 10.)

Sequans discussed its revenue growth, stating that "[o]ur product revenue is growing rapidly, driven primarily by increased sales volume of our products due to various trends in the 4G wireless broadband market.  These trends include deployment and broader adoption of the commonly accepted 4G protocols, WiMAX and LTE[.]"  (Reg. at 38; Pro. at 39.)  Nonetheless, Sequans warned of risks relating to its revenue growth, including Sequans's participation in the LTE market, potential problems with the commercial availability of 4G networks, and the nature of Sequans's customer relationships:

If we are unsuccessful in developing and selling new products on a timely and cost-effective basis or in penetrating new markets, including the LTE market, our business and operating results would suffer.  (Reg. at 3; Pro. at 3.)

If existing deployments [of 4G networks] are not commercially successful or do not continue to grow their subscriber base, or if new commercial deployments of 4G networks are delayed or unsuccessful, our business and financial results would be harmed.  (Reg. at 10; Pro. at 11.)

We do not have firm, long-term purchase commitments from our customers. Substantially all of our sales are made on a purchase order basis which permits our customers to cancel, change or delay product purchase commitments with little or no notice to us and without penalty.  (Reg. at 13; Pro. at 14; see also Reg. at 37; Pro. at 38.)

Sequans also contrasted its LTE-specific business with its position in the WiMAX market:

Given that WiMAX and LTE share a common technology platform, we have also leveraged our leadership in WiMAX to successfully develop LTE semiconductor solutions that are being deployed globally as existing 2G and 3G networks are upgraded to 4G.  Our LTE solutions are currently in trials with wireless carriers in the United States and China, where China Mobile has successfully demonstrated its LTE capabilities using our solution at the World Expo in Shanghai and at the Asian Games in Guangshou.  (Reg. at 57; Pro. at 59.)

We believe we have a strong position in the WiMAX market and are an early leader in the LTE market. . . . The key performance characteristics of our solutions include high throughput with peak downlink data transfer rates of 38 Mbps in our WiMAX solutions and support for peak downlink data transfer rates of 150 Mbps in our LTE solutions. (Reg. at 61; Pro. at 63.)

Sequans made additional statements that it categorized as "forward-looking": "statements about: forecast and trends [in] the markets in which we compete and in which our products are sold, including statements regarding the WiMAX and LTE markets [and] . . . our intent to expand our product platform to address the LTE market. . . . These statements reflect our current views with respect to future events and are based on assumptions and subject to risk and uncertainties."  (Reg. 29; Pro. at 30.)  Under the heading "Our Strategy," Sequans stated that:

Our goal is to be the leading provider of next-generation wireless semiconductors . . . . Key elements of our strategy include: Maintaining and extending our market position in WiMAX.  We intend to maintain our market position in WiMAX by growing our revenues through continue penetration into 4G WiMAX devices that are deployed by large wireless carriers. . . . Leveraging WiMAX expertise to become a leader in LTE.  We are leveraging our strong market position and technical expertise in WiMAX to deploy best-in-class LTE solutions, as WiMAX and LTE share many common technologies.  (Reg. at 62; Pro. at 64 (emphasis omitted).)

**C.    Plaintiffs' Allegations**

The offering materials allegedly contained materially misleading misstatements and omissions because Sequans knew that WiMAX was stagnating and declining relative to LTE such that it would imminently affect Sequans's financial results.  Plaintiffs claim that Sequans was aware of this fact particularly in light of softening demand from HTC and the financial

difficulties being experienced at the time of the IPO by Clearwire, which constructed the network on which the HTC phones that used Sequans's chips ran.  Plaintiffs further allege that Sequans was not in a position to generate any meaningful revenue from its LTE products until late 2012 at the earliest.  Plaintiffs assert that this information was known at the time of the IPO, was material, and that its nondisclosure was misleading as it contradicted several of Sequans's statements regarding its position in the industry and future growth.

In particular, Plaintiffs point to Sequans's statements that its "competitive strength" in the 4G market was due to its "strong position in the WiMAX market" and being an "early leader in the 4G LTE market" as misleading statements of material fact because the WiMAX industry was in steep decline due to increased demand for LTE, and this increased LTE competition was reducing demand for Sequans's WiMAX products from HTC; Sequans was not an early leader in the LTE market because its products were not compatible with the commercially available 4G networks at the time (i.e., FDD 4G LTE); and Sequans would not be in a position to generate meaningful revenue from its LTE offerings until late 2012  (Id. ¶¶ 52–54.)  Similarly, Plaintiffs claim that Sequans's statements that "product revenue is growing rapidly, driven primarily by increased sales volume of products due to various trends in the 4G wireless broadband market," including "deployment and broader adoption" of WiMAX and LTE, was misleading because Sequans failed to disclose that the market was trending away from WiMAX and towards LTE, and Sequans was poorly positioned to take advantage of this trend because it was focused on an LTE standard that was not operational at the time.  (Id. ¶¶ 57–58.)

In this same vein, Plaintiffs challenge Sequans's statement that "WiMAX and LTE share a common technology platform, [and] we have also leveraged our leadership in WiMAX to successfully develop LTE semiconductor solutions that are being deployed globally as existing

2G and 3G networks are upgraded to 4G." Plaintiffs contend this was a misstatement of material fact because Sequans's LTE offerings were incompatible with the commercially available LTE networks at the time and were not likely to generate meaningful revenue until late 2012. In fact, Sequans was not "deploying" LTE products to any commercially viable customer because Sequans's LTE products were designed for the TDD scheme, not the FDD scheme already in use by existing networks. (Id. ¶¶ 60–61.) Plaintiffs further challenge Sequans's statement that "deployments of TDD LTE networks are expected to be driven by wireless carriers such as China Mobile in China" and that "our LTE solutions are currently in trials with wireless carriers in . . . China, where China Mobile has successfully demonstrated its LTE capabilities using our solution." Plaintiffs claim these statements were misleading because China had no plans to deploy a network until 2014. (Id. ¶¶ 59–62.)

Plaintiffs also claim that the offering documents contained a specific misstatement of material fact that Sequans's products included "peak downlink data transfer rates of 30 Mbps in our WiMAX solutions and support for peak downlink data transfer rates of 150 Mbps in our LTE solutions" because the phones that used Sequans's WiMAX products at the time averaged speeds of 1 Mbps in real-world trials and none of Sequans's LTE products were being used on an operational network at the time. (Id. ¶¶ 55–56.)

Plaintiffs allege that Sequans omitted information concerning reduced demand for WiMAX in light of the growing demand for LTE (specifically from HTC), and Clearwire's financial difficulties and halted expansion of its WiMAX network. These alleged omissions of known trends or uncertainties and risk factors were reasonably likely to have a material effect on Sequans's financial results. (Id. ¶¶ 65–70.)

Even when Sequans did disclose risk, Plaintiffs allege its disclosures were misleading and not meaningful because they were vague, generic, and boilerplate that failed to warn of the true risks of Sequans.  (Id. ¶ 71.)  Specifically, Plaintiffs claim that the risk disclosure that "[i]f the WiMAX market declines, our results of operations would be harmed" and "if wireless carriers delay or are unsuccessful in the commercial deployment of or upgrades to 4G technology" Sequans's "business may be harmed" were misleading statements of what might happen in the future because, at the time of the IPO, Sequans had already experienced softening demand for its products, the market was moving from WiMAX to LTE, and Sequans was not in a position to generate significant revenue from LTE. (Id. ¶¶ 72–74.)  Plaintiffs also allege this risk disclosure was misleading because Sequans failed to disclose that Clearwire had ceased expanding its WiMAX network, and that the LTE networks that existed at the time were not compatible with Sequans's LTE products (Id. ¶¶ 75, 76.)

Plaintiffs allege that Sequans's true financial position only emerged on July 28, 2011 when Sequans announced financial results for the second quarter of 2011 and announced a net profit of only $100,000.  (Id. ¶ 77.)  The accompanying press release stated that Sequans was experiencing "more cautious order patterns," and projected a negative outlook for the third quarter.  (Id. ¶¶ 78–79.)  During a conference call that day, Defendant Karam stated that there was a significant shift from WiMAX to LTE and that the WiMAX market in the U.S. would decline.  (Id. ¶ 80.)  Karam also lowered guidance for the third quarter beyond what analysts anticipated.  (Id. ¶ 81.)

Following Sequans's announcements, the price of its ADS declined from $15.43 to $5.70 on August 8, 2011.  (Id. ¶ 82.)  On December 13, 2011, Sequans announced that HTC had reduced its orders by 60%, and Karam stated this was an "unexpected development, which the

customer informed us is due to the worldwide economic situation and reduced WiMAX demand."  (Id. ¶ 84.)  Karam also disclosed that "the small quantities of LTE chips we expect to ship in the first half of 2012 will not be sufficient to offset the greater than expected decline in our WiMAX business."  (Id.)

### D.       Plaintiffs' Additional Exchange Act Allegations

Plaintiffs also assert additional allegations against Defendants Sequans, Karam, and Choate.  An April 28, 2011 press release attributing Sequans's first quarter 2011 financial results to "continued strong demand for 4G devices" is alleged to have been misleading because Sequans did not disclose WiMAX was declining relative to LTE, HTC sales were softening, and Sequans was not in a position to profit from LTE until late 2012.  (Id. ¶¶ 108, 109.)  Plaintiffs assert that Karam's statement on a conference call the same day that "more stability in the WiMAX business with Sprint . . . is good news for the company in our existing business" was misleading because the WiMAX market was not "stable" and Karam failed to mention Clearwire's troubled condition that presaged imminent threats to Sequans's business.  (Id. ¶¶ 110, 111.)  Finally, Plaintiffs claim a May 24, 2011 statement by Karam that Sequans's share of the WiMAX market was "around 40% of the world" and Sequans could achieve 15% of the LTE market was misleading because Karam failed to disclose that Sequans's WiMAX business was declining, HTC was moving to LTE, and Sequans did not offer any LTE products for commercially viable networks at the time.  (Id. ¶¶ 113, 114.)

On essentially the same allegations, Plaintiffs assert there is a strong inference of scienter. Sequans, Karam, and Choate were allegedly aware of Sequans's true financial condition; the weakening demand for Sequans's WiMAX products; that Sequans's revenues had already been and would continue to be negatively impacted; that Sequans was dependent on Clearwire (which

had ceased expanding its WiMAX network); that Sequans's LTE products were not compatible with commercially operational LTE networks at the time; and that Sequans's WiMAX revenue would slow and the company would not generate any revenue from its LTE products in 2011. (Id. ¶ 117.)

These allegations of fraud, according to Plaintiffs, go to Sequans's "core business" such that knowledge of the fraud may be imputed to Sequans, Karam, and Choate.  (Id. ¶ 118.) Plaintiffs purport to discover a motive: Sequans, Karam, and Choate misrepresented Sequans's financial position because they were aware that the WiMAX business was in decline and that Sequans would need to raise money to fund a transition to LTE.  (Id. ¶ 120.)  Plaintiffs state that Defendants personally benefitted by pushing the IPO before the WiMAX decline reached a point where an IPO would not be successful, and by selling shares in the IPO.  (Id.)  Furthermore, Plaintiffs assert that Defendants obtained warrants for Sequans stock that would only vest in the event of an IPO.  (Id. ¶ 122.)

## DISCUSSION

### I.   LEGAL STANDARDS

#### A.   Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) requires Plaintiffs to "provide the grounds upon which [their] claim[s] rest[] through factual allegations sufficient 'to raise a right to relief about the speculative level.'"  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  This requires Plaintiffs to allege sufficient "'facts to state a claim to relief that is plausible on its face.'"  Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570)).  "A claim has facial plausibility when the plaintiff[s] plead[] factual content that allows the court to

draw the reasonable inference that the defendant[s are] liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Court accepts as true all well-pleaded factual allegations and draws all inferences in Plaintiffs' favor. See Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006).

In evaluating motions to dismiss, the Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff[s] and upon which [they] relied in bringing the suit." ATSI, 493 F.3d at 98.

### B.    Securities Act Claims

Claims under Sections 11 and 12(a)(2) of the Securities Act are "siblings with roughly parallel elements." In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 359 (2d Cir. 2010). "To state a claim under [S]ection 11, the plaintiff[s] must allege that: (1) [they] purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant[s] participated in the offering in a manner sufficient to give rise to liability under [S]ection 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" Id. at 358–59 (quoting 15 U.S.C. § 77k(a)). "Section 12(a)(2) provides similar redress where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions." Id. at 359 (citing 15 U.S.C. § 77l(a)(2)). "Collectively, the language of [S]ections 11 and 12(a)(2) creates three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure

obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading."  Id. at 360 (citations omitted).

"The veracity of a registration statement which may give rise to liability under [Section 11] is determined by assessing the facts as they existed when the statement became effective." Ladmen Partners, Inc. v. Globalstar, Inc., No. 07 Civ. 0976 (LAP), 2008 WL 4449280, at *10 (S.D.N.Y. Sept. 30, 2008); see In re Flag Telecom Holdings, Ltd. Sec. Litig., 618 F. Supp. 2d 311, 320 (S.D.N.Y. 2009) ("The disclosure provided in a prospectus is adjudged by the facts as they existed when the applicable registration statement became effective.").  "The relevant inquiry under the Securities Act is . . . whether the Company knew or had reason to know, at the time the offering documents were filed, that the statement was untrue."  Zirkin v. Quanta Capital Holdings Ltd., No. 07 Civ. 851 (RPP), 2009 WL 185940, at *10 (S.D.N.Y. Jan. 23, 2009).

"For a misstatement or omission to be actionable under Section 11 or 12(a)(2), a defendant must have a duty to disclose the information, and the omitted or misstated information must be material to the investor."  In re Bear Stearns Mortg. Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 760 (S.D.N.Y. 2012).  Misstatements or omissions are material if, "taken together and in context, [they] would have misled a reasonable investor about the nature of the securities."  Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996) (quotations omitted); see In re Flag Telecom, 618 F. Supp. 2d at 321.  In evaluating alleged misrepresentations or omissions, the Court must read and consider the offering documents in their entirety.  See In re Morgan Stanley, 592 F.3d at 365–66; Olkey, 98 F.3d at 5.

Liability under Section 11 may reach signatories of the registration statement at issue, directors of the issuer, and underwriters.  Ladmen Partners, 2008 WL 4449280, at *10.  Section 12(a)(2) liability "attaches to direct sellers as well as those who 'successfully solicited the

purchase'" of a security.  Id. (quoting Pinter v. Dahl, 486 U.S. 622, 647 (1988)); see In re Morgan Stanley, 592 F.3d at 359.  "Section 15 imposes liability on persons that 'control[] any person liable' under Sections 11 and 12 of the Securities Act."  In re China Valve Tech. Sec. Litig., No. 11 Civ. 0795 (LAK), 2012 WL 4039852, at *8 (S.D.N.Y. Sept. 12, 2012) (quoting 15 U.S.C. § 77o)).

### C.    Exchange Act Claims

"To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, [plaintiffs] must allege that 'the defendant[s], in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the [plaintiffs'] reliance on the [defendants'] action caused injury to the plaintiff[s]."  Id. at *4 (quoting ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) ("ECA & Local 134")); see 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b).

The test for whether a statement is materially misleading under Sections 11 and 12(a)(2) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 is the same: whether the representations, viewed as a whole, would have misled a reasonable investor.  Rombach v. Chang, 355 F.3d 164, 178 n.11 (2d Cir. 2004); see Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 717 n.10 (2d Cir. 2011).

"The requisite state of mind in a [S]ection 10(b) and Rule 10b-5 action is an intent 'to deceive, manipulate, or defraud.'"  ECA & Local 134, 553 F.3d at 198 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007)).  In the Second Circuit, recklessness is also a sufficient mental state.  Id.

An executive may be held accountable under Section 10(b) or Rule 10b-5 where the executive had ultimate authority over the company's statement, signed the company's statement,

ratified and approved the company's statement, or where the statement is attributed to the executive.  In re Fannie Mae 2008 Sec. Litig., Nos. 08 Civ. 7831, 09 MDL 2013, 09 Civ. 6102, 10 Civ. 2781, 10 Civ. 9184 (PAC), 2012 WL 3758537, at *6 (S.D.N.Y. Aug. 30, 2012).

"Section 20(a) imposes liability on control persons for underlying Exchange Act violations."  In re China Valve, 2012 WL 4039852, at *4; see 15 U.S.C. § 78t.

### D.      The Bespeaks-Caution Doctrine

"The bespeaks-caution doctrine is a corollary of the well-established principle that a statement or omission must be considered in context."  Iowa Pub. Emps.' Retirement Sys. v. MF Global, Ltd., 620 F.3d 137, 141 (2d Cir. 2010) (quotations omitted).  Under the doctrine, "[a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading.  In such circumstances, it cannot be supposed by a reasonable investor that the future is settled, or unattended by contingency."  Id.  (citations omitted).

"[C]autionary language [that] did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss" is insufficient for the bespeaks-caution doctrine to obtain.  Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 359 (2d Cir. 2002).  "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."  Rombach, 355 F.3d at 173.

The bespeaks-caution doctrine applies to claims under Sections 11 and 12(a)(2) of the Securities Act and Section 10(b) of the Exchange Act.  See MF Global, 620 F.3d at 141 n.8.

### E.      The Safe Harbor Provision of the PSLRA

Similarly, the Private Securities Litigation Reform Act ("PSLRA") contains a "counterpart safe-harbor provision [that] provides (in pertinent part) that an issuer or underwriter

shall not be liable with respect to any forward-looking statement . . . if and to the extent that (A) the forward-looking statement is (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial[.]"

Rombach, 355 F.3d at 173 (quoting 15 U.S.C. §§ 77z-2(a) & (c)(1), 78u-5(a) & (c)(1)).

The PSLRA safe-harbor does not apply, however, to statements made in connection with an initial public offering.  See 15 U.S.C. § 77z-2(b)(2)(D), 78u-5(b)(2)(D); In re Barclays Bank PLC Sec. Litig., No. 09 Civ. 1989 (PAC), 2011 WL 31548, at *8 n.23 (S.D.N.Y. Jan. 5, 2011).

**F.      Pleading Standards**

A claim of securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5 must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA.  See ATSI, 493 F.3d at 99.  Under Rule 9(b), Plaintiffs must "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff[s] contend[] were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  ATSI, 493 F.3d at 99; see 15 U.S.C. § 78u-4(b)(1).

The PSLRA requires that a complaint alleging securities fraud, with respect to each act or omission alleged, "state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); ATSI, 493 F.3d at 99.  This requires facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  ATSI, 493 F.3d at 99.  An inference of scienter will be considered strong if "a reasonable person would deem [it] cogent and at least as compelling as any opposing inference

one could draw from the facts alleged." Tellabs, 551 U.S. at 324.  In evaluating facts alleged to support a strong inference of scienter, "a court must consider plausible, nonculpable explanations for the defendant[s'] conduct, as well as inferences favoring the plaintiff."  Id. at 323–24.

"[T]he heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud."  Rombach, 355 F.3d at 171; see Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 408 (S.D.N.Y. 2007).

## II.     THE APPLICABLE PLEADING STANDARD

While there is a substantial case to be made that the allegations here, fairly read, sound in fraud and therefore must be pled with particularity, see Rombach, 355 F.3d at 171; Ladmen Partners, 2008 WL 4449280, at *11,  Defendants do not argue that Plaintiffs' Section 11 and 12(a)(2) claims are subject to the heightened pleading standard of Rule 9(b).  As such, the Court reviews the allegations relating to the Section 11 and 12(a)(2) claims under the notice-pleading standard, which requires Plaintiffs to assert enough facts to state a claim to relief that is plausible on its face.  See In re Morgan Stanley, 592 F.3d at 358; New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC, 720 F. Supp. 2d 254, 262 n.6 (S.D.N.Y. 2010).

## III.    PLAINTIFFS HAVE NOT PLEADED ACTIONABLE MISSTATEMENTS OR OMISSIONS

### A.     Allegations The WiMAX Market Was in Steep Decline

Plaintiffs allege that the offering documents' statements relating to the WiMAX market and Sequans's position in it were misleading because Sequans knew and failed to disclose that WiMAX was in steep decline at the time of the IPO due to a market shift to LTE.  Plaintiffs rely on several publications to support these allegations, but Defendants submit that these materials refute Plaintiffs claims because they show that WiMAX dominated the 4G market in April 2011 and that at the time of the IPO the transition to LTE was not anticipated to be swift.

Contrary to Plaintiffs' assertions, the Court may consider the articles cited in the CAC because they are expressly incorporated by reference and were mentioned and relied upon by Plaintiffs.  (CAC ¶ 34 (citing and quoting Thompson Decl. Ex. D, "LTE: Global Outlook & Forecasts, 2010–2014," ECF No. 45-4; Thompson Decl. Ex. E, "LTE Services in the US Will Generate More Than $11 Billion in 2015, Says ABI Research Forecast," ECF No. 45-5), ¶ 44 (citing and quoting Thompson Decl. Ex. F, "A smooth transition from WiMAX to LTE with dual-mode devices," ECF No. 45-5).)  See ATSI, 493 F.3d at 98; In re JP Morgan Auction Rate Sec. Marketing Litig., 867 F. Supp. 2d 407, 413 n.1 (S.D.N.Y. 2012).

Plaintiffs cannot rely on a partial quotation from an article where the entire piece paints a very different picture than the one Plaintiffs urge.  Plaintiffs point to an article to support the allegation that "[b]y the beginning of 2011, 4G LTE was on the rise and WiMAX had fallen out of favor and was viewed as an outdated technology," but the full article reveals that "LTE's deployment as the mainstay 4G technology will take place gradually, and won't even begin to gather real steam until 2013."  (Thompson Decl. Ex. E at 1.)  The white paper Plaintiffs cite in support of their assertion that "Sequans knew that it was highly likely that most WiMAX operators would switch to 4G LTE" states that "[m]ost operators are moving to LTE at a more relaxed pace" and "most operators that are more focused on fixed services have not announced their LTE plans yet; they are likely to delay the move to LTE until the technology has matured and the ecosystem is established.  In the meantime, they are better off continuing to expand their WiMAX footprint and gain market share."  (Thompson Decl. Ex. F at 2.)  The Court need not accept allegations that the WiMAX market was in "steep decline" based on articles that, upon a full reading, point in the opposite direction.  See In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574, 585 (S.D.N.Y. 2007); see also Williams v. Citibank, N.A., 565 F. Supp. 2d 523,

527 (S.D.N.Y. 2008) ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies." (citations omitted)).

The CAC also fails to allege that Defendants were aware of any steep decline in WiMAX.  Sequans had to disclose "any known trends [or] uncertainties . . . that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition" Form 20-F, Item 5(d).  Interpreting similar language of Item 303 of Regulation S-K, the Second Circuit held this requires disclosures of trends "already known and existing at the time of the IPO." Litwin, 634 F.3d at 716 (citing 17 C.F.R. § 229.303(a)); see Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 8350, Exchange Act Release No. 48960, 81 S.E.C. Docket 2905, 2003 WL 22996757, at *1 n.1 (Dec. 19, 2003) (explaining Item 5(d) of Form 20-F requires "the same disclosure as Item 303 of Regulation S-K").

Contrary to Plaintiffs' argument, this cases differs in at least two respects from Panther Partners, 681 F.3d 114 (2d Cir. 2012).  First, the operative complaint in Panther Partners raised a plausible inference that the defendant was aware of the "uncertainty" at issue because the company "was receiving an increasing number of calls from [its] customers and its Board of Directors was discussing the" product failures that the plaintiffs alleged should have been disclosed.  Id. at 121.  Here, there is only the conclusory allegations that Defendants knew of the alleged trend in the decline in WiMAX; there is no allegation that Sequans ever received information alerting it to this fact.  Second, in Panther Partners the offering materials only included "generic cautionary language," id. at 122, but here, the disclosures specifically warned

of the uncertainty that "the WiMAX market may decline significantly in anticipation of LTE

deployments" and that "the number of new WiMAX customers is likely to be limited as

customers prepare for the adoption and commercialization of LTE technology."

Plaintiffs claim there is a plausible inference that Defendants knew about HTC's

declining demand for Sequans's WiMAX chips before the IPO.  This argument relating to

HTC's supposed softening demand is not adequately pleaded in the CAC.  See In re IAC, 695 F.

Supp. 2d at 124 ("It is long-standing precedent in this circuit that parties cannot amend their

pleadings through issues raised solely in their briefs." (citation omitted)).  The CAC alleges that

HTC was increasing its focus on and development of 4G LTE products, but does not state that

HTC was canceling any WiMAX orders at this time or was cutting back from its previous levels

of WiMAX chip orders or otherwise indicated to Sequans that it would reduce its demand for

WiMAX products in the future.  (See CAC ¶ 35.)  Combined with the unchallenged fact that

Sequans actually experienced record sales in the two quarters following the IPO, Plaintiffs'

allegations do not give rise to a plausible inference that the WiMAX industry was in steep

decline at the time of the IPO or that Sequans was aware of this trend.

Plaintiffs' assertions regarding Clearwire are too highly attenuated to support a plausible

inference.  The allegations regarding financial difficulties of a company not alleged to be

affiliated with Sequans, nor a customer or end user of its products, are insufficient on their own

to support a plausible claim there was a steep decline in the WiMAX industry generally or that

Sequans was aware of such decline at the time of the IPO.[2]  Cf. In re Alliance Pharmaceutical

Corp. Sec. Litig., 279 F. Supp. 2d 171, 193–94 (S.D.N.Y. 2003) (summary judgment).

---

[2]  In sum and substance, Plaintiffs seek to impose a disclosure obligation on semiconductor designers for the liabilities and deficiencies of network providers and operators with whom they do not have a direct business relationship.  Thus, the nail manufacturer would be responsible for disclosures about the horse shoe, the horse, and the rider.  See Benjamin Franklin, Poor Richard's Almanac, Preface (1758).

The Court adjudges the accuracy of offering materials "by assessing the facts as they existed" at the time the materials became effective.  Ladmen Partners, 2008 WL 4449280, at *10; see In re Flag Telecom, 618 F. Supp. 2d at 320.  Plaintiffs allege insufficient facts in the CAC to state a claim to relief that is plausible on its face for the alleged misstatements and omissions regarding the "steep decline" in the WiMAX industry because Plaintiffs have not plausibly alleged that—at the time the offering materials became effective—the WiMAX industry was in steep decline or, even if such a trend did exist, that Defendants were aware of it.  Accordingly, the offering documents were not misleading as a consequence of the omissions that Plaintiffs allege.  See In re Morgan Stanley, 592 F.3d at 366.

Even if the Court were to accept Plaintiffs' allegations regarding the "steep decline" of the WiMAX market as true, the relevant disclosures render these statements not misleading.  The offering materials expressly disclosed, for example, that "the WiMAX market may decline significantly in anticipation of LTE deployments" and how such a development would harm Sequans.  (Reg. at 9; Pro. at 10.)  This disclosure directly addresses the risk Plaintiffs claim was not disclosed.  See Olkey, 98 F.3d at 5; see also Ladmen Partners, 2008 WL 4449280, at **13–15.  As to the allegations relating to the decline of the WiMAX market, the Court finds that Plaintiffs have not adequately pleaded that the offering materials contained an untrue statement of material fact or omitted a material fact required to make the statements therein not misleading.  See Blackmoss Inv. Inc. v. ACA Capital Holdings, Inc., No. 07 Civ. 10528 (RWS), 2010 WL 148617, at *8 (S.D.N.Y. Jan. 14, 2010); In re Xinhua Fin. Media, Ltd. Sec. Litig., No. 07 Civ. 3994 (LTS), 2009 WL 464934, at *6 (S.D.N.Y. Feb. 25, 2009).

**B.      Allegations Sequans's Sales Were Slowing as a Result of the Shift to LTE**

Plaintiffs' assertions that Sequans's sales were slowing at the time of the IPO in April 2011 are contradicted by Sequans's record sales revenue in the first and second quarters of 2011, which Plaintiffs do not contest.  (See Sequans Commc'ns S.A., Form 6-K at 4 (Apr. 28, 2011), Thompson Decl. Ex. G, ECF No. 45-5; Sequans Commc'ns S.A., Form 6-K at 4 (Jul. 28, 2011), Thompson Decl. Ex. H, ECF No. 45-5.[3])   Like the statements relating to the purported shift from WiMAX to LTE, the Court is not required to accept allegations that are contradicted by materials properly before the Court, and Plaintiffs' otherwise conclusory allegations are insufficient to survive a motion to dismiss.  See Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002).  Plaintiffs again claim entitlement to a plausible inference that Defendants were privy to information concerning declining demand for Sequans's WiMAX products, particularly from HTC, which allegedly was shifting its attention to LTE.  Wishing does not make it so; Plaintiffs have not pleaded that Defendants were aware—at the time the offering materials became effective—that HTC was planning to cut back on its orders of Sequans's WiMAX products.  See Ladmen Partners, 2008 WL 4449280, at *10; In re Flag Telecom, 618 F. Supp. 2d at 320.  The record sales during this period of time support a contrary conclusion.

Even if Plaintiffs' allegations that Sequans's sales were vulnerable to a dramatic customer shift from WiMAX to LTE that would affect Sequans's operations were accepted, the offering materials disclosed this very risk.  (See Reg. at 9; Pro. at 10 ("If the WiMAX market declines, our results of operations would be harmed. . . . If customers believe LTE deployments will provide the same or superior coverage as WiMAX networks in the near future, customers may prefer to adopt LTE services and products instead of WiMAX, which in turn is likely to

---

[3]  In addition to being uncontested, these facts are relevant because the Court "may consider . . . legally required public disclosure documents filed with the SEC."  ATSI, 493 F.3d at 98.

cause the WiMAX market to grow at a slower pace than expected or to decline.").)  With regard

to the allegations relating to Sequans's slowing sales, the Court finds that Plaintiffs have not

adequately pleaded that the offering materials contained an untrue statement of material fact or

omitted a material fact required to make the statements therein not misleading.  See Blackmoss,

2010 WL 148617, at *8; In re Xinhua, 2009 WL 464934, at *6.

### C.      Allegations Sequans Was Unable to Generate Meaningful Revenue from LTE

Plaintiffs contend that Sequans failed to disclose that it would not generate meaningful

revenue from LTE in the near future.  But this fails in the face of disclosure statements about the

transition from WiMAX to LTE, which warned "investors of exactly the risk the plaintiffs claim

was not disclosed."  Olkey, 98 F.3d at 5.  Again, the offering documents noted that Sequans

> derive[d] substantially all of our revenue from the sale of our semiconductor
> solutions for the WiMAX market *and expect to do so through at least 2011*. . . . If
> the WiMAX market declines *prior to the commercial viability and acceptance of
> our LTE solutions*, our business, operating results and financial condition will be
> harmed.  (Reg. at 9; Pro. at 10 (emphasis added).)

Plaintiffs' contention that Defendants misled investors by stating that Sequans "is an

early leader in the LTE market" fails in light of the disclosures that Sequans's LTE solutions had

not yet achieved commercial viability and acceptance.  (See also Reg. at 3; Pro. at 3 ("If we are

unsuccessful in . . . penetrating new markets, including the LTE market, our business and

operating results would suffer.").)  Since the offering materials disclose the information

regarding LTE revenue that Plaintiffs allege was withheld, Plaintiffs have not adequately pleaded

that the offering materials contained an untrue statement of material fact or omitted a material

fact required to make the statements therein not misleading with regard to LTE revenue.  See

Blackmoss, 2010 WL 148617, at *8; In re Xinhua, 2009 WL 464934, at *6.[4]

---

[4]  When asked at oral argument what Sequans's disclosures regarding these topics should have stated,
    Plaintiff's counsel could not suggest more accurate language.  (See ECF No. 52 at 28–29.)

**D.      Non-Actionable Statements**

In addition to the above three categories of statements and alleged omissions, Plaintiffs

challenge  several statements in the offering materials that are not actionable as a matter of law

because they are general statements of puffery or corporate optimism, or forward-looking

statements protected by the bespeaks-caution doctrine.

1.      *Puffery and Optimism*

Expressions of puffery and corporate optimism are non-actionable statements that do not

give rise to securities violations.  See Rombach, 355 F.3d at 174.

The statements that Sequans "believe[s] we have a strong position in the WiMAX

market," and "believe[s] we are better positioned to drive our roadmap to meet those needs" are

non-actionable.  See In re Xinhua, 2009 WL 464934, at *8 ("To the extent that Plaintiffs'

allegation focuses on the adjectives used to describe the management team, such as 'strong,'

'experienced,' and 'capable,' these soft adjectives are nothing more than puffery, which is not

actionable under the securities laws." (citing Rombach, 355 F.3d at 174)); In re Sierra Wireless,

Inc. Sec. Litig., 482 F. Supp. 2d 365, 377 (S.D.N.Y. 2007).  Similarly, Sequans's statement that

"we . . . are an early leader in the LTE market" is also a non-actionable statement of puffery.  See

Rombach v. Chang, No. 00 Civ. 958 (SJ), 2002 WL 1396986, at *5 (E.D.N.Y. June 7, 2002)

aff'd 355 F.3d 164 (2d Cir. 2004).

2.      *Forward-Looking Statements*

Sequans's statements regarding future expectations and strategy, including drivers of

future revenue growth, are non-actionable.  Plaintiffs argue such statements are not protected

under the bespeaks-caution doctrine because they related to Sequans's then-current or historical

performance.  (CAC ¶¶ 52, 57.)  "It is settled that the bespeaks-caution doctrine applies only to

statements that are forward-looking." MF Global, 620 F.3d at 142.  The Second Circuit has

instructed that if a statement contains elements that look forward and others that do not, the non-

forward-looking elements should be severed and considered separately.  See id. at 144.

Here, Sequans's statement that "our product revenue is growing rapidly" (id. ¶57) is a

statement of present fact that is not protected by the bespeaks-caution doctrine.  See id. at 142.

This statement is not misleading, however, because "disclosure of accurate historical data does

not become misleading even if less favorable results might be predictable by the company in the

future." In re Duane Reade Inc. Sec. Litig., No. 02 Civ. 6478 (NRB), 2003 WL 22801416, at *6

(S.D.N.Y. Nov. 25, 2003) (quotations omitted), aff'd sub nom Nadoff v. Duane Reade, Inc., 107

F. App'x 250 (2d Cir. 2004); see In re Nokia Oyj (Nokia Corp.) Sec. Litig., 423 F. Supp. 2d 364,

395 (S.D.N.Y. 2006).

The forward-looking portions of these challenged statements are non-actionable because

they were identified as forward-looking and are accompanied by sufficient cautionary language.

See MF Global, 620 F.3d at 141.  The bespeaks caution doctrine covers forward-looking

statements regarding intention and expectation.  See id. at 142 (listing examples); see also

Slayton v. Am. Exp. Co, 604 F.3d 758, 769 (2d Cir. 2010) (noting that, in the context of the

PSLRA, phrases such as "we expect" or "we believe" signal forward-looking statements).

Statements that Sequans "intend[s] to maintain our market position in WiMAX by growing our

revenues" and that Sequans is "leveraging our strong market position and technical expertise in

WiMAX to deploy best-in-class LTE solutions" are forward-looking.[5]  (CAC ¶ 52.)

---

[5] The latter statement is also not misleading insofar as it describes Sequans's current market position in
WiMAX and because Sequans otherwise disclosed that its LTE products were not being sold
commercially at the time.  See supra.

The disclosures that accompanied these statements address the exact risks Plaintiffs complain were not disclosed.  Sequans's offering materials state that "expectations regarding . . . sales" and statements about "trends . . . in the markets in which we compete and in which our products are sold, *including statements regarding the WiMAX and LTE markets*," were "based on assumptions and subject to risk and uncertainties."  (Reg. at 29; Pro. at 30 (emphasis added).)  They also warned that it was impossible to assure that Sequans's "plans, intentions, or expectations will be achieved."  (Reg. at 29; Pro. at 30.)  These statements are accompanied by more specific disclosures in the offering materials that stated that future financial results would suffer if customers transitioned to WiMAX before Sequans's LTE products were commercially viable (Reg. at 9; Pro. at 10); if Sequans's LTE "solutions are not successfully developed or adopted by our customers" (Reg. at 10; Pro. at 11); if customers canceled, changed, or delayed orders, which they could do without notice or penalty (Reg. at 13; Pro. at 14); or if there was a shift to other technologies (Reg. at 9; Pro. at 10).

Given this cautionary language, the Court considers whether Defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.  See In re Australia and New Zealand Banking Grp. Ltd. Sec. Litig., No. 08 Civ. 11278 (DLC), 2009 WL 4823923, at *13 (S.D.N.Y. Dec. 14, 2009) (citing Rombach, 355 F.3d at 173); In re Nokia, 423 F. Supp. 2d at 400–02.   The specific disclosures regarding future trends in the 4G market are clearly stated to be contingent on Sequans's WiMAX customers not migrating to LTE before Sequans's LTE products were commercially viable.  The Court thus determines that the challenged statements regarding future expectations and strategy are non-actionable.

### E.    Other Alleged Misstatements

Plaintiffs contend that it was misleading for Sequans to overstate the speed or capacity of its products when it stated "the key performance characteristics of our solutions include . . . peak downlink data transfer rates of 30 Mbps in our WiMAX solutions and support for peak downlink data transfer rates of 150 Mbps in our LTE solutions."  In fact, Sequans's products "averaged" lower speeds and no compatible LTE network was commercially available.  (CAC ¶¶ 55, 56.) Information about average speeds and network availability does not make the statements about peak speeds inaccurate or misleading.

Next, Plaintiffs' argue Sequans misled investors when it stated that it had "successfully develop[ed] LTE semiconductor solutions that are being deployed globally."  In fact, Sequans's LTE products were not being marketed commercially at the time.  (Id. ¶¶ 60, 61.)  But, Sequans did not state that its LTE products were being sold commercially at the time and  Plaintiffs' interpretation of "being deployed globally" is insufficient on its own to sustain a claim.  See In re IAC, 695 F. Supp. 2d at 124–25.[6]

## IV.    PLAINTIFFS LACK STANDING TO PURSUE THEIR
##         SECTION 12(a)(2) CLAIMS

Defendants argue that the private right of action under Section 12(a)(2) is available only to purchasers who acquired their securities in the IPO and not to those who acquired securities in the secondary market.[7]  Defendants argue Plaintiffs lack 12(a)(2) standing because the CAC does not plead that they purchased their ADS in the IPO, but merely alleges their ADS were acquired

---

[6]  Because the Court finds the challenged statements non-actionable, it need not address the issue of negative causation at this time.

[7]  It is well settled that aftermarket purchasers who can trace their securities to an allegedly misleading registration statement have standing to sue under Section 11 of the Securities Act, and the pleading requirement for Section 11 standing is satisfied by general allegations that Plaintiffs purchased pursuant to or traceable to a false registration statement.  See Caiafa , 525 F. Supp. 2d at 407 (citations omitted).

"pursuant to and/or traceable to" the prospectus.  (CAC ¶ 99.)  In addition, Plaintiffs have

otherwise represented to the Court that they purchased their ADS in secondary market

transactions.  (See Gimbel Decl. Ex. F, ECF No. 42-8; see also ECF No. 15-3.)

Plaintiffs argue they have standing under Section 12(a)(2) so long as at the time of their

purchases there was an obligation to provide a prospectus, even in the secondary market.  This is

not the majority position in the Second Circuit, which generally requires plaintiffs to plead that

the securities at issue were purchased in the initial public offering.  See Caiafa, 525 F. Supp. 2d

at 407; In re Cosi, Inc. Sec. Litig., 379 F. Supp. 2d 580, 588–89 (S.D.N.Y. 2005); In re

Worldcom, Inc. Sec. Litig., Nos. 02 Civ. 3288, 03 Civ. 9499 (DLC), 2004 WL 1435356, at *5

(S.D.N.Y. June 28, 2004).

Even if the Court were to adopt Plaintiffs' theory, Plaintiffs have not pleaded sufficient

facts to show that they qualify under it.  As the Second Circuit has noted in response to the same

argument (albeit in a non-precedential opinion), the Court "need not consider here whether a

plaintiff may *ever* have a Section 12(a)(2) claim based on an aftermarket purchase [because the

plaintiffs here] failed to allege that they purchased securities under circumstances requiring the

delivery of a prospectus and thus fail" even under the theory proposed.  Caiafa v. Sea Containers

Ltd., 331 F. App'x 14, 17 (2d Cir. 2009) (summary order).  Accordingly, the Court dismisses

Plaintiffs' Section 12(a)(2) claims for lack of standing.

## V.   PLAINTIFFS HAVE FAILED TO PLEAD SCIENTER

With regard to a strong inference of scienter, Plaintiffs rely on the "core operations"

doctrine, which provides that "[k]nowledge of the falsity of a company's financial statements can

be imputed to key officers who should have known of facts relating to the core operations of

their company that would have led them to the realization that the company's financial

statements were false when issued." In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F.

Supp. 2d 474, 490 (S.D.N.Y. 2004).  Plaintiffs argue that the statements at issue regarded

Sequans's only business, its main customer, and the only builder of its WiMAX network, and as

such a strong inference arises that Sequans, Karam, and Choate are somehow gifted with quasi-

omniscience and knew or should have known of contradictory facts by virtue of their position.

Defendants argue this attempt to impute scienter by alleging misstatements and omissions

about Sequans's "core operations" is insufficient on its own to establish a "strong inference" of

scienter as a matter of law.  The core operations doctrine, first recognized in Cosmas v. Hassett,

886 F.2d 8 (2d Cir. 1989), did not survive the enactment of the PSLRA according to Defendants.

This issue "remains an open question."  Dobina v. Weatherford Int'l Ltd., No. 11 Civ. 1646

(LAK), 2012 WL 5458148, at *11 (S.D.N.Y. Nov. 7, 2012).  The Second Circuit has expressed

some support for the idea that the core operations doctrine survived the enactment of the PSLRA

in some form.  See Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000) ("When all is said and

done, we believe that the enactment of [the PSLRA] did not change the basic pleading standard

for scienter in this circuit . . . ."); City of Pontiac General Emps.' Ret. Sys. v. Lockheed Martin

Corp., No 11 Civ. 5026 (JSR), 2012 WL 2866425, at *11 (S.D.N.Y. July 13, 2012) (noting that

the Second Circuit "has very recently endorsed the idea behind the core operations doctrine as

enhancing, if not independently supporting, an inference of scienter, albeit in dicta in a non-

precedential opinion" (citing New Orleans Emps.' Ret. Sys. v. Celestica, Inc., 455 F. App'x 10,

14 n.3 (2d Cir. 2011) (summary order)).

"[T]he trajectory of 'core operations' law in this and other circuits," however, has been to

narrowly construe this doctrine as a basis for scienter.  In re Wachovia Equity Sec. Litig., 753 F.

Supp. 2d 326, 353 (S.D.N.Y. 2011).  The Court believes it better to consider "'core operations'

allegations to constitute supplementary but not independently sufficient means to plead scienter." Id.; see Bd. of Trustees of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO, 811 F. Supp. 2d 853, 871–73 (S.D.N.Y. 2011); Tyler v. Liz Claiborne, Inc., 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011). Since, for the reasons stated below, the Court finds that there is no other basis for scienter, the Plaintiffs' "core operations" allegations are insufficient to support a "strong inference of scienter."

Plaintiffs also argue that the CAC establishes a strong inference of scienter under a "motive and opportunity" theory. Plaintiffs allege essentially one motivation for the purported fraud—to conduct the IPO at an inflated price in order to raise capital to fund operations and the development of LTE products. The individual Defendants also had a motivation to obtain options and warrants that could be exercised in the future, but as evidenced by Plaintiffs' argument, this theory is derivative of the general motivation to raise capital to fund future operations. (See Pls.' Opp'n at 29 ("Defendants faced two options: commit fraud so that the Company could raise money thereby giving the Defendants a chance at profiting from vested options down the road or tell the truth and possibly not raise enough capital to shift the Company's product line to a new technology.").)

To show motive, "it is not sufficient to allege goals that are possessed by virtually all corporate insiders." South Cherry Street, LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009) (quotations omitted). Such "generally possessed," and therefore insufficient, motives include the motive to maintain the appearance of corporate profitability or of the success of an investment, the desire to maintain a high stock price in order to increase executive compensation, and the desire to prolong the benefits of holding corporate office. See In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d 510, 531 (S.D.N.Y. 2009).

30

Plaintiffs' allegations regarding capital raising are insufficient as a matter of law.  "[T]he alleged motivation of a corporation to raise money to prevent the negative ramifications of a drop in stock price—even if such a drop would allegedly threaten the 'survival' of a company— is far too generalized (and generalizable) to allege the proper 'concrete and personal' benefit required by the Second Circuit."  PXRE, 600 F. Supp. 2d. at 531–33 (collecting cases); see In re Elan Corp. Sec. Litig., 543 F. Supp. 2d 187, 216 (S.D.N.Y. 2008) ("Any corporation would be motivated to make a profit, to avoid bankruptcy, or to finance the successful launch of a promising product. . . . These allegations do not support an inference of scienter.")

Plaintiffs attempt to distinguish this case from a long line of precedent by asserting that "Defendants were specially motivated by the knowledge that their WiMAX technology was declining rapidly."  (Pls.' Opp'n at 28.)  This argument does not distinguish this case in any meaningful way.  The decline in WiMAX technology was an alleged motivation for Sequans to raise capital only because Sequans was involved in WiMAX.  Companies are frequently accused of misrepresenting specially known facts related to their businesses in order to raise funding for continued operations.  See, e.g., Elan, 543 F. Supp. 2d at 215 (a medical company allegedly concealed negative information about the safety of a medical device so that it could complete an offering and raise money to avoid bankruptcy); PXRE, 600 F. Supp. 2d at 530–32 (insurance company accused of misstating its liabilities in order to maintain higher credit ratings to ensure continued viability); Coronel v. Quanta Capital Holdings Ltd., No. 07 Civ. 1405 (RPP), 2009 WL 174656, *16 (S.D.N.Y. Jan. 26, 2009) (same); Zirkin, 2009 WL 185940, at *12 (same).

Plaintiffs' argument that Defendants pushed for an IPO before the transition from WiMAX to LTE became apparent is also undercut by the fact that the named individual Defendants sold only a small amount of their holdings.  Plaintiffs allege that Karam sold 3.6% of

his holdings and that Choate did not sell any of her holdings. Regardless of whether such small amounts on their own negate an inference of scienter, together with the above considerations they certainly downgrade any inference to well below a "strong" or "cogent and compelling" level. See Tellabs, 551 U.S. at 322–23; see also Acito v. IMCERA Grp, Inc., 47 F.3d 47, 54 (2d Cir. 1995) ("[T]he existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter.").

The Court finds that Plaintiffs have not sufficiently pleaded facts giving rise to a strong inference of scienter.

## CONCLUSION

For the foregoing reasons, the motions by the Company Defendants and the Underwriter Defendants to dismiss Plaintiffs' Consolidated Amended Complaint are GRANTED. Plaintiffs have twenty (20) days from the entry of this Order to file a motion for leave to amend and a proposed amended complaint if amendment would not be futile. The Clerk of Court is directed to close the motions at docket numbers 40 and 43.

Dated: New York, New York
       January 17, 2013

SO ORDERED

PAUL A. CROTTY
United States District Judge

32